IN THE UNITED STATES COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLOTTE CARMACK, TERESA MILLER, AND JOVAN ANIAGU<br>Plaintiffs | §<br>§<br>§ | CIVIL ACTION NO. |
| v. | §<br>§<br>§ | 3:16-cv-03500-D |
| PARK CITIES HEALTHCARE, LLC and SHARON D. WESTEN (formerly SHARON D. QUICK)<br>Defendants | §<br>§<br>§<br>§ | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

| MSJ Ex. | Brief Description | App. Pages |
|---|---|---|
| 1. | Deposition of Defendant Sharon Westen<br>- Depo. Ex. 4 – Dec. 27, 2016 Preservation Letter<br>- Depo. Ex. 12 – Park Cities' website | 3 - 70<br>63<br>64 - 67 |
| 2. | Declaration of Plaintiff Charlotte Carmack<br>- Attach. "A" – Back Wages Calculation | 71 - 77<br>78 - 79 |
| 3. | Declaration of Plaintiff Teresa Miller<br>- Attach. "A" – Plaintiffs' 2nd Consol. Disco<br>- Attach. "B" – Back Wages Calculation | 80 - 86<br>87 - 102<br>103 - 104 |
| 4. | Declaration of Plaintiff Jovan Aniagu<br>- Attach. "A" – Back Wages Calculation | 105 - 110<br>111 - 112 |
| 5. | Defendants' Original Answer to Plaintiffs' 1st Amended Complaint, Dkt. 15 | 113 - 122 |
| 6. | Plaintiffs' 2nd Consolidated Discovery<br>- Attach. "A" – Miller's Hours and Pay<br>- Attach. "B" – Carmack's Hours and Pay<br>- Attach. "C" – Aniagu's Hours and Pay | 123 - 130<br>131 - 133<br>134 - 136<br>137 - 139 |

| | | |
|---|---|---|
| 7. | U.S. Department of Labor, Freedom of Information Act File for Park Cities Healthcare, LLC | 140 - 155 |
| 8. | Plaintiffs' 2nd Amended Complaint, Dkt. 34 | 156 - 169 |


Respectfully submitted,


Barry S. Hersh
State Bar No. 24001114

*Board Certified in Labor and Employment Law*
*Texas Board of Legal Specialization*

Hersh Law Firm, A Professional Corporation
3626 N. Hall St., Suite 800
Dallas, TX 75219-5133
Tel. (214) 303-1022
Fax. (214) 550-8170
Email barry@hersh-law.com

ATTORNEY FOR PLAINTIFFS


**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document is being served on all counsel of record via the District Court's ECF system. Certified on this 28th day of February, 2018.

/s/ Barry S. Hersh

# EXHIBIT 1

09:42

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLOTTE CARMACK et al, (
Plaintiffs, (
(
( CIVIL ACTION NO.
PARK CITIES HEALTHCARE, ( 3:16-cv-03500-D
LLC et al, (
Defendants. (

ORAL DEPOSITION
OF

SHARON D. WESTEN

OCTOBER 20, 2017

ORAL DEPOSITION OF SHARON D. WESTEN, a witness produced at the instance of the Plaintiffs, and duly sworn, was taken in the above styled and numbered cause on the 20th day of October, 2017, before Lyenda Johnston, CSR in and for the State of Texas, reported by stenographic method, at the offices of Friedman & Feiger, LLP, located at 5301 Spring Valley Road, Suite 200, Dallas, Texas 75254, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

ORIGINAL

A P P E A R A N C E S:

For the Plaintiffs:

Mr. Barry S. Hersh
Hersh Law Firm PC
3626 N. Hall St., Suite 800
Dallas, Texas 75219

For the Defendants:

Mr. Michael D. Donohue
Friedman & Feiger, LLP
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254

Also present: Ms. Charlotte Carmack

A. W-e-s-t-e-n. 12:15
Q. Okay. What is your home address? 12:15
A. 410 San Jose Street, Irving, Texas 75062. 12:15
Q. What is your work address? 12:15
A. Same. 12:15
Q. Does Park Cities have a physical office that's separate from your home? 12:15 12:15
A. No. 12:15
Q. Did it at any point? 12:15
A. No. 12:15
Q. You are currently married; is that correct? 12:15
A. Yes. 12:15
Q. What is your spouse's name? 12:15
A. John Richard Westen, also known as J.R. 12:15
Q. When did y'all get married? 12:15
A. November 17, 2015. 12:15
Q. My wife gave me a little knife block when we got married with our anniversary on it so that I've got no reason to ever forget our anniversary, but if somebody had asked me, I probably would have stuttered for a second there. 12:15 12:16 12:16 12:16 12:16
Okay. Is Mr. Westen involved in the management or operation of Park Cities? 12:16 12:16
A. No. 12:16
Q. Let me make sure I'm clear on that. He is not 12:16

an employee or contractor for Park Cities?
A. No. He has been used as a consultant because he is a counselor, and I have used him on a couple of cases where he came in and did some grief counseling. 12:16
Q. Is that what type of counselor he is, a grief consultant? 12:16
A. Grief and sobriety, yes. 12:16
Q. Do you have children? 12:16
A. No. 12:16
Q. Let's briefly talk about your educational background. Did you attend college? 12:17
A. Yes, I did. 12:17
Q. Where did you attend college? 12:17
A. Here at Brookhaven which is where I got my nursing degree, and then Texas Woman's University, where I'm still working on my master's. 12:17
Q. What is your undergraduate degree in? 12:17
A. Nursing. 12:17
Q. Is it a BS? 12:17
A. Well, I'm doing an associate to master's bridge, so there's no actual BS. It will be a master's in nursing. 12:17
Q. So do you have your associate's degree from Brookhaven? 12:17
A. Yes. 12:17

Q. Anything else? 12:18
A. No. 12:19
Q. Are you in good standing with the State? 12:19
A. Yes. 12:19
Q. When did you get your RN licensing? 12:19
A. '94. 12:19
Q. Do you have any formal legal training? 12:19
A. No. 12:19
Q. Do you have any formal HR training? 12:19
A. No. 12:19
Q. Have you ever taken any HR classes, either at Brookhaven or Texas Woman's University or online or otherwise? 12:19 12:19 12:19
A. We don't take an HR course, but we do have to have a certain number of online hours in order to get the license for the agency. 12:19 12:19 12:19
Q. For the agency? 12:19
A. As an administrator, you take administrative hours online. 12:19 12:20
Q. Let's back up a minute. Are you talking about in connection with your Texas Woman's University program? 12:20 12:20 12:20
A. No. In connection with Park Cities Healthcare. 12:20 12:20
Q. Okay. So you've taken online courses in 12:20

connection with that? 12:20
A. Online hours. I would not say it's a course. 12:20
Q. How many hours of -- how many of those hours were dedicated to human resources issues, do you know? 12:20 12:20
A. They are administrative courses -- hours that you have to take. I don't know the specific breakdown. 12:20 12:20
Q. Have they ever covered wage and hour issues or overtime issues? 12:20 12:20
A. No. 12:20
Q. Do you own or do you have an ownership interest in any business or entity other than Park Cities? 12:20 12:20 12:20
A. No. 12:20
Q. Have you ever done any online research or independent investigation prior to, I guess, opening of Park Cities on what your obligations would be as they relate to overtime, minimum wage or wage and hour law? 12:21 12:21 12:21 12:21
A. No. 12:21
Q. Have you been a party to a lawsuit before? 12:21
A. Yes. 12:21
Q. Tell me -- I want to understand what your litigation experience is here. Were you a plaintiff or a defendant? 12:21 12:21 12:22
A. Both. 12:22
Q. Let's talk about the times you were a 12:22

App. 0009

that is the actual box number. I'm going to have to look that up. I am -- it's new. I apologize. 12:32 12:32
Q. When did you change the P.O. box? 12:32
A. Two weeks ago. 12:32
Q. Why did you change the P.O. box? 12:32
A. I wanted a new address, and quite frankly, the person who runs the current mailbox facility had such differing political views that I did not want to give him any more money. 12:32 12:32 12:33 12:33
Q. So that's the mailing address for Park Cities. The street address for Park Cities is your home residence address, correct? 12:33 12:33 12:33
A. Yes. 12:33
Q. Who owns Park Cities? 12:33
A. I do. 12:33
Q. You own Park Cities 100 percent? 12:33
A. Yes. 12:33
Q. Nobody else has any ownership? 12:33
A. No. 12:33
Q. Has that always been the case? 12:33
A. Yes. 12:33
Q. Do you have any plans to sell any of your interests in Park Cities? 12:33 12:33
A. No. 12:33
Q. Why don't you, just for purposes of the 12:33

record, provide us a description of the services that Park Cities performs. 12:33 12:33

A. We're a private duty nursing. We provide skilled nursing and caregiving services. 12:33 12:33

Q. Where are those services performed? 12:34

A. In the patients' homes primarily, but sometimes in an assisted living or hospital environment, wherever the patient needs us. 12:34 12:34 12:34

Q. Has this been the case throughout Park Cities' existence? 12:34 12:34

A. Yes. 12:34

Q. When was Park Cities formed? 12:34

A. Let me clarify. When we first started in 2008, I was just providing private duty nursing myself. It wasn't until 2011 that we expanded to include caregiving services, which is an extended licensure. 12:34 12:34 12:34 12:34

Q. And in 2011 is when you started hiring employees to provide those caregiving services; is that correct? 12:34 12:34 12:34

A. Yes. 12:34

Q. Do you remember who Park Cities' first employee was? 12:34 12:35

A. I think it was actually Kilfa Jacobs. 12:35

Q. Do you know who the second employee was? 12:35

A. It was a group of women, Kilfa, Charlotte 12:35

Carmack and Jovan Aniagu, all came in fairly short order, one being referred by the other. 12:35 12:35

Q. Before you -- before Park Cities hired these employees, did you make any investigation to ascertain whether or not the business had to pay them overtime when they worked over 40 hours? 12:35 12:35 12:35 12:35

A. No. 12:35

Q. Let me backtrack a minute here. The patients who Park Cities performs the services for, not specifically, but generally describe to me who your patients are. 12:35 12:36 12:36 12:36

A. Generally they are patients who either don't want Medicare provided home health or hospice or don't qualify because they are either not dying quickly enough, which would constitute hospice, or they're not in a situation where they're getting better, which means home health would provide Medicare services for them. 12:36 12:36 12:36 12:36 12:36 12:36 12:36

Long-term dementia patients, maybe someone who's being discharged from the hospital and needs around-the-clock care, which is not provided for by Medicare, so we would support the physical therapists that are being provided by a Medicare home health agency or support the hospice agency that's in there, because neither of them provides the 12:36 12:36 12:36 12:37 12:37 12:37 12:37

around-the-clock custodial services that we provide. 12:37

Q. So they're -- your patients are elderly individuals and people who are very ill, correct? 12:37 12:37

A. Primarily. 12:37

Q. Okay. And is Park Cities providing them 24/7 care? 12:37 12:37

A. We can. That depends on what the client wants. 12:37 12:37

Q. How do patients pay Park Cities? 12:37

A. They pay by check, credit card, cash. Well, no, they don't pay cash, but they pay me directly, and then I can help file their -- if they have a long-term care policy, I will help them by sending the service notes or whatever that particular insurance company wants us to send. 12:38 12:38 12:38 12:38 12:38 12:38

People are not routinely covered by a long-term care policy, so they're usually paying out of pocket. 12:38 12:38 12:38

Q. And Park Cities does accept credit cards? 12:38

A. Yes. 12:38

Q. What is your title at Park Cities? 12:38

A. RN, owner/administrator. 12:38

Q. I'm sorry, can you repeat that? 12:38

A. RN, owner/administrator. 12:38

Q. Are you also the president? 12:38

A. Yes. 12:38
Q. What are your duties? 12:38
A. Providing skilled nursing when required and overseeing the care of my patients. 12:39
Q. What are your responsibilities as it relates to Park Cities employees? 12:39
A. Interviewing, hiring, managing payroll, providing information to our payroll service. 12:39
Q. Do you make the hire and fire decisions for Park Cities? 12:39
A. Yes, I do. 12:39
Q. Are you authorized to write checks on Park Cities' banking accounts? 12:39
A. Yes, I am. 12:39
Q. Are you responsible for the content that's found on Park Cities' website? 12:39
A. Yes, I am. 12:39
Q. Do you set the rates of pay for Park Cities employees? 12:39
A. Yes, I do. 12:39
Q. Do you also set the policies and guidelines for Park Cities employees? 12:40
A. The policies and guidelines are set by the State of Texas, and we incorporate those into our policy and procedures manual. 12:40

Q. Okay. Does Park Cities have policies and procedures that are separate from what the state requires, showing up on time, tardiness, those sorts of things? 12:40 12:40 12:40 12:40
A. It's part -- I would have to look into our policy and procedure manual to give you an answer on that. 12:40 12:40 12:40
Q. Who created the policies and procedures manual? 12:40 12:40
A. It was something that was actually purchased, and we went through it line by line and determined what fit our particular agency and what did not. 12:40 12:40 12:40
Q. When you say "we," who is the "we"? 12:40
A. The alternate administrator, Charlotte Reynolds who helped me put everything together when the company first started. 12:41 12:41 12:41
Q. Okay. So that was you working with Ms. Reynolds, correct? 12:41 12:41
A. Yes. 12:41
Q. Have you updated it since then? 12:41
A. We have updated some, yes. 12:41
Q. Okay. And when the policies and procedures handbook was updated, who did the updating? Who made those decisions? 12:41 12:41 12:41
A. I did. 12:41

Q. And Park Cities uses employment agreements, correct? 12:41
A. Yes, we do. 12:41
Q. And who made the decision about what goes in that employment agreement? 12:41
A. I do, as well as any attorney I'm using. 12:41
Q. Okay. But the buck stops with you. You're the founder, the president, the RN administrator for Park Cities. You're the final decision maker, correct? 12:41
A. Yes. 12:41
Q. And you're also the person who made the decision whether or not to pay overtime when employees worked over 40 hours, correct? 12:41
A. I did not make a decision not to do it. 12:41
Q. Okay. 12:42
A. I did not know I was required to. 12:42
Q. Let's back up a minute. Based on my understanding, Park Cities did not pay overtime to any employee prior to, was it December 2016; is that correct? 12:42
A. Yes. 12:42
Q. So just for purposes of the record, Park Cities never paid time and a half overtime when an employee worked over 40 hours in a workweek before December 2016? 12:42

A. That's correct.
Q. After 2016 or during December 2016, Park Cities began paying overtime pay to employees when they work over 40 hours in a workweek; is that correct?
A. Yes.
Q. Who made the decision to begin paying overtime in December 2016?
A. I did.
Q. Okay. How are you paid by Park Cities?
A. I'm not.
Q. Okay. Do you take a, I guess, a distribution as an owner as opposed to taking compensation as an employee?
A. Yes.
Q. You mentioned that your husband has been a consultant for Park Cities. Does he receive payments from Park Cities?
A. He has been paid twice, I think, as I recall.
Q. When is the last time that he performed services for Park Cities?
A. I don't recall.
Q. Does he have his own business?
A. Yes, he does.
Q. What is his business called?
A. He works for an organization out of Ashland,

Oregon called Conversations with God.

Q. Okay. Is that a full-time job for him?

A. Yes.

Q. How many employees does Park Cities employ?

A. Currently?

Q. Currently.

A. Six.

Q. And over -- since 2011, when Park Cities began providing those caregiving services that used employees, how many employees do you think you've had since 2011?

A. I don't recall, but I know that document has been given to you.

Q. Let's talk about the employees for Park Cities who provide the caregiving services. What job titles do they have?

A. CNA, MA, medical assistant -- we've had medical assistants.

Q. What does CNA stand for?

A. Certified Nurse Aid.

Q. Any other positions?

A. No.

Q. What are the primary job duties of a CNA at Park Cities?

A. To provide the custodial care for a patient,

12:43 12:43 12:43 12:43 12:43 12:43 12:43 12:43 12:44 12:44 12:44 12:44 12:44 12:44 12:44 12:44 12:44 12:44 12:44 12:44 12:44 12:44 12:44 12:44 12:44

primarily bathing, feeding, linen changes, providing for care and safety while they're under our care. 12:44 12:45

Q. Anything else? 12:45

A. It's really a patient-driven plan of care, so there's nothing specific that we will provide for everyone, and we don't necessarily not provide things if the patient needs them. We do a very focused plan of care for them. 12:45 12:45 12:45 12:45 12:45

Q. Who creates the plan of care? 12:45

A. I do. 12:45

Q. But as it relates to most patients, the CNAs are performing basically the same services? 12:45 12:45

A. To every patient? 12:45

Q. Well, as a general matter they're providing those custodial care services that you just described? 12:45 12:45

A. The basic services, yes. 12:45

Q. And what are the primary duties of the medical assistant? 12:45 12:45

A. In this capacity, the same. 12:45

Q. The same as the CNA? 12:46

A. Yes. 12:46

Q. Does Park Cities use a job description? 12:46

A. Yes. 12:46

Q. Is the job description for the CNA position the same as the job description for the medical 12:46 12:46

assistant?
A. Yes.
Q. Prior to December 2016, how did Park Cities compensate CNAs and MAs, were they hourly paid?
A. Yes.
Q. All of them?
A. Yes.
Q. That includes my clients, correct?
A. Yes.
Q. How did Park Cities track or record their hours worked?
A. They sent in a timesheet every two weeks, which was then given to payroll, and payroll sent out a journal with every payroll.
Q. Who provided a claim sheet to payroll?
A. I did.
Q. Would you sign the paychecks, or would that be the payroll service's assignment?
A. That was payroll service.
Q. Would you review the payroll checks prior to them being issued to the employees?
A. Most of them were direct deposit, so I would not actually look at the checks, but I would look at the journals.
Q. Did you have the ability to make corrections

12:46
12:46
12:46
12:47
12:47
12:47
12:47
12:47
12:47
12:47
12:47
12:47
12:47
12:47
12:47
12:47
12:47
12:48
12:48
12:48
12:48
12:48
12:48
12:48
12:48

to the journal information, if you thought that an employee worked fewer or more hours than those that were reported on the timesheet? 12:48 12:48 12:48

A. Yes. 12:48

Q. Did you, in fact, make changes to those journal forms to either increase or decrease the number of hours worked? 12:48 12:48 12:48

A. If there had been a mistake, as sometimes payroll companies make, I would hear about it first thing in the morning of payday, and I would contact them and make sure that they made the changes. 12:48 12:48 12:48 12:48

Q. Was there anybody else involved in the payroll process on behalf of Park Cities other than you and the payroll company that Park Cities hired? 12:48 12:49 12:49

A. No. 12:49

Q. Who is the payroll service that Park Cities uses? 12:49 12:49

A. We now use ADP. 12:49

Q. When did you begin -- when did Park Cities begin using ADP? 12:49 12:49

A. May of this year. 12:49

Q. May of 2017. Who was it before ADP? 12:49

A. Paychex. 12:49

Q. And when was the starting and stopping date that you used Paychex? 12:49 12:49

A. Inception 2008 to April of 2017. 12:49
Q. Why did you decide to stop using Paychex? 12:49
A. They were just making too many mistakes. 12:50
Q. Did Paychex ever provide you legal advice in 12:50
connection with whether or not Park Cities was required 12:50
to pay overtime to hourly employees? 12:50
A. They did not give legal advice. They supplied 12:50
information. 12:50
Q. What type of information did they supply? 12:50
A. Overtime information that I requested. 12:50
Q. When did you request that information? 12:50
A. In November of 2016. 12:50
Q. Prior to November of 2016, did you ever 12:50
request any information of them relating to Park 12:50
Cities' overtime obligation? 12:51
A. I don't recall. I may have, but I don't 12:51
recall. 12:51
Q. Let me see if I can clarify. Prior to 12:51
November 2016, did you ever reach out to a lawyer or HR 12:51
professional to understand Park Cities' overtime 12:51
obligations? 12:51
A. I spoke to someone in 2014 as a friend and an 12:51
actual client's family member who happens to be a 12:51
lawyer, but he was not hired as legal counsel. 12:51
Q. Tell me about that. 12:51

A. I had heard some rumblings from employees who were coming in applying for positions, telling me that their hours were being decreased elsewhere because of some new overtime law, that I had not heard about. So knowing that my client's sons were both in labor law and health care law, I asked them if they had heard anything about it, if they knew anything about it. I said, "From the research I've done it is a minimum wage situation, and I'm already paying better than time and a half for all the hours my employees work." 12:51 12:52 12:52 12:52 12:52 12:52 12:52 12:52 12:52 12:52

And they said that indeed that sounded appropriate, but that I wasn't to really worry about it, because this was going to be kicked back by the courts anyway, that it would not come into play, and this was end of 2014, like November or December. 12:52 12:52 12:52 12:52 12:52

Q. Who was it that you spoke with? 12:53

A. Steve Clark. 12:53

Q. Mr. Clark. Mr. Clark was your first attorney in this lawsuit? 12:53 12:53

A. Yes. 12:53

Q. Steve Clark? 12:53

A. Yes. 12:53

Q. So take me back to that conversation that you had with him in 2014. Just set the stage. So you weren't -- Park Cities was not a client of Mr. Clark? 12:53 12:53 12:53

Q. So when November of 2016 rolled around, you didn't circle back around with Mr. Clark; is that correct? 12:58 12:58 12:58
A. Eventually, I did. 12:58
Q. Okay. 12:58
A. And met with Mr. Clark, because I felt he had a better understanding of my business because that's where I had gotten the initial response, was from him. 12:58 12:58 12:58
Q. When did you reach out to Mr. Clark? 12:58
A. I would say end of December possibly. I would have to look into that. 12:58 12:58
Q. Of 2016? 12:58
A. Yes, sir. 12:58
Q. Between that late 2014 telephone call with Mr. Clark and the communications that you had with Paychex and the Scheef & Stone law firm in November 2016, did you have any communications -- when I say, "communications," I'm including e-mails, telephone calls, everything, did you have any communications with any attorney or HR professional about overtime obligations? 12:58 12:59 12:59 12:59 12:59 12:59 12:59 12:59
A. Not that I recall. 12:59
Q. During that same time period, did you do any independent investigation online or otherwise, to ascertain what Park Cities' overtime obligations were? 12:59 12:59 12:59

A. No. 12:59
Q. You did at least have an understanding that federal overtime law generally requires that hourly paid employees are required to be paid time and a half over 40 hours in a workweek; is that right? 12:59
MR. DONOHUE: Objection, form. 12:59
Q. (By Mr. Hersh) You can go ahead and answer the question. 12:59
A. No. It was my understanding that that law had not gone through. 12:59
Q. Okay. You're talking about the 2014 law; is that right? 01:00
A. Yes. 01:00
Q. And specifically, what was your understanding of that law that you're referring to, the 2014? 01:00
A. My understanding was that it was a minimum wage law, that wanted to make sure that -- it was for domestic help, to make sure that those who were spending long amounts of time in a client's home were getting at least minimum wage for the hours that they were spending there. 01:00
So initially, I felt that because I'm already paying $12 and $13 an hour to my caregivers, that that is more than time and a half for every hour worked, so I really felt, initially, that I was not 01:00

going to be a part of this logic. I didn't think that it had anything to do with me. 01:00

Q. Let me jump up in, because I'm having trouble following you. I'm trying to understand how you viewed this 2014 law. And you said that it was a minimum wage law. If you're paying minimum wage or above, you don't have to pay overtime. Is that the way you understood the 2014 law? 01:01

A. That was my understanding. 01:01

Q. And was that the information that Mr. Clark provided you? 01:01

A. He concurred when I spoke to him in 2014. 01:01

Q. Just so our record is clear, Mr. Clark concurred in 2014, that if you paid at least minimum wage to your domestic service employees, you wouldn't have to pay overtime for hours worked over 40? 01:01

A. Yes. 01:01

Q. Did you receive any complaints from any employees about Park Cities' failure to pay overtime? 01:02

A. From Teresa Miller, shortly after she was terminated. 01:02

Q. Any other employee complaints? 01:02

A. No. 01:02

Q. I just asked you about employees. But earlier you mentioned there were candidates who you were 01:02

Cities not paying overtime, that would be a genuine dispute between their position and your position. Do you agree?

A. Yes.

Q. Did Kay Suell -- is that Ms. Jacobs by the way?

A. Yes.

Q. Okay. Just for purposes of clarification for our record, Ms. Suell is Ms. Jacobs?

A. Yes.

Q. Has Park Cities ever been the subject of an investigation by either the U.S. Department of Labor or the Texas Workforce Commission for overtime issues?

A. Concurrently with this, the Department of Labor did send an investigator out to interview me.

Q. When did the investigator come and do an on-site?

A. I want to say late spring, early summer. I don't have the exact date of this year.

Q. 2017?

A. Yes.

Q. Let's actually break this apart. So my question was about the Department of Labor and the Texas Workforce Commission. Let's just talk about the Department of Labor.

Q. Did you take notes during that interview? 01:10
A. No. 01:11
Q. Did they interview your husband? 01:11
A. No. 01:11
Q. Have we covered everything about the Department of Labor investigation of Park Cities' overtime practices? 01:11 01:11 01:11
MR. DONOHUE: Objection, form. 01:11
Q. (By Mr. Hersh) You can go ahead and answer the question. 01:11 01:11
A. As far as I know. 01:11
Q. And has the Texas Workforce Commission either performed an audit or investigated Park Cities' overtime practices? 01:11 01:11 01:11
A. No. 01:11
Q. Do you recall what Teresa Miller's rate of pay was when she ended her employment? 01:11 01:12
A. $13 an hour. 01:12
Q. Do you remember what Charlotte Carmack's last rate of pay was? 01:12 01:12
A. $12 an hour. 01:12
Q. And how about Jovan Aniagu? 01:12
A. $12 an hour. 01:12
Q. Are the payroll journals and the payroll records that Park Cities produced in this lawsuit, are 01:12 01:12

those an accurate and correct reflection of the hours worked by those three individuals? 01:12 01:12

A. Yes. 01:12

Q. What day of the week does Park Cities' workweek begin? 01:12 01:13

A. We're 24/7. 01:13

Q. Do you have a day when your workweek begins for purposes of payroll recording? 01:13 01:13

A. Monday, ending the Sunday night two weeks later. 01:13 01:13

Q. I'm sorry, did you say two weeks later? 01:13

A. Yes. It's every two weeks we get paid. 01:13

Q. Okay. You understand that overtime is determined on a seven-day workweek basis? 01:13 01:13

A. No. 01:13

Q. Did Park Cities ever track employees' hours on a seven-day workweek basis? 01:13 01:14

A. No. 01:14

Q. Who is your contact person at Paychex? 01:14

A. I no longer have one. 01:14

Q. Who was the contact person that you dealt with at Paychex? 01:14 01:14

A. I can promise you there were at least a dozen, which was one of the reasons they are no longer our payroll company. I can't begin to tell you who it was. 01:14 01:14 01:14

Q. So as you sit here under oath, you don't recall having a conversation with an employee and telling them that you couldn't afford to pay overtime? 01:31 01:31 01:31
A. No, not specifically. 01:31
Q. Let's go back and talk about the plaintiffs, my clients: Ms. Carmack, Ms. Miller, Ms. Aniagu. In terms of the duties that they performed, did they assist patients with the activities of daily living as part of their job duties? 01:31 01:31 01:31 01:31 01:31
A. Yes. 01:31
Q. Did they also provide companionship services? 01:31
A. They stayed in the home with them. 01:32
Q. They didn't live in the home with them? 01:32
A. No. 01:32
Q. They just worked in the home with them? 01:32
A. Yes. 01:32
Q. Okay. As part of their job duties, were they expected to dress the patient and groom the patient? 01:32 01:32
A. Yes. 01:32
Q. Were they expected to feed and bathe the patient? 01:32 01:32
A. As needed, yes. 01:32
Q. Were they expected to assist the patient with toileting? 01:32 01:32
A. As needed, yes. 01:32

Q. Were they also expected to assist them in transferring them from, for example, a bed to a different room? 01:32
A. Yes. 01:32
Q. And were they also expected as part of their job duties, expected to prepare meals? 01:32
A. Yes, if the patient requested it. 01:32
Q. Okay. Did they drive patients around? 01:32
A. They could if the patient signed a release. 01:32
Q. Okay. It wasn't prohibited? 01:33
A. No. 01:33
Q. And did they also perform housework where the patient lived? 01:33
A. On occasion. Most patients had their own housekeeping staff. 01:33
Q. Okay. 01:33
A. But our caregivers on the plan of care are requested to clean the general area. If they give the patient a bath, then I expect them to clean up the bathroom area. 01:33
Q. What about picking up a broom or a mop and sweeping the kitchen after making a meal or something like that? 01:33
A. Clean up after themselves, yes. 01:33
Q. Okay. Did they also -- their job duties also 01:33

include assisting the patients in taking their medication and arranging medical care for them? 01:33 01:33
A. I arranged medical care for them or the families, and I set up their medication box. 01:33 01:33
Q. That's not something that my clients did? 01:33
A. No. 01:33
Q. Did they physically help them take their medications? 01:33 01:33
A. If they had to pour the medication from the box into their hand or into a cup and offer it to them, they could do that. 01:33 01:33 01:34
Q. Were my clients expected to perform medically related services such as taking temperatures or treating or bandaging wounds or things of that nature? 01:34 01:34 01:34
A. They were expected to do vital signs. Wound care was usually performed, unless it was a Band-Aid on a scratch, wound care was performed by either me or a home health or hospice nurse. 01:34 01:34 01:34 01:34
Q. How long was the work shift for my clients? Was it an eight-hour work shift or 12-hour work shift or something different? 01:34 01:34 01:34
A. 12 hours. 01:34
Q. And generally, this was performed at the patient's -- where the patient lives? 01:34 01:34
A. Yes. 01:34

Q. And how often were you physically present when my clients were performing these services? 01:34 01:34
A. Once a week it was my norm. If the patients called me out more often than that, I would be there. 01:34 01:35
Q. When you say came out once a week, you would go visit the patient while one of my clients was there? 01:35 01:35
A. I routinely visit the patients at the same time every week to set up their medications, yes. 01:35 01:35
Q. And typically, what time would you be out to visit the patients each week? 01:35 01:35
A. That varied. Usually sometimes between 12:00 and 6:00 in the evening. 01:35 01:35
Q. I'm sorry, between 6 and -- 01:35
A. Between 12. 01:35
Q. I had it backwards. Between noon and 6:00 p.m.? 01:35 01:35
A. Yes. 01:35
Q. You said that my clients worked 12-hour shifts. When did the shift begin? 01:35 01:35
A. I often left that up to them. If they had children, I would let them work that out themselves. Oftentimes 7 to 7, but if they amongst themselves wanted to change it to 6 to 6, if it allowed them to pick up their children from school or drop them off. 01:35 01:35 01:35 01:35 01:36
Q. Were they responsible for coordinating the -- 01:36

let me back up a minute. 01:36
If somebody is working 6 to 6, somebody else has to work the other side of the shift, which is 6:00 p.m. to 6:00 a.m., correct? 01:36 01:36 01:36
A. Yes. 01:36
Q. Did you -- did my clients work it out with the person who was working the opposite shift when the shift would begin and when it would end? 01:36 01:36 01:36
A. Yes. They both had to be in agreement, and then I okayed it. 01:36 01:36
Q. So you were the, I guess, the final arbiter on when the shift was worked and when it ended? 01:36 01:36
A. Yes. 01:36
Q. The -- what percentage on a -- what percentage of their workday was spent performing these duties that were, you know, attendant to the activities of daily living that we talked about, the dressing, the grooming, the feeding, the bathing, the toileting, the transferring, what percentage of their workday was dedicated to that stuff? 01:36 01:37 01:37 01:37 01:37 01:37 01:37
A. Well, that depends on the caregiver, and that was one of the reasons I supplied an example of some of the nursing notes of your clients, which show the limited amount of time that work was often performed. 01:37 01:37 01:37 01:37
Q. So what percentage, on average, do you believe 01:37

they performed those duties? 01:37
A. Actually did something? 01:37
Q. The duties that we just discussed. 01:37
A. It could have been 20 minutes, could have been two hours. You would have to look at the nurses notes or at their service notes. 01:37
Q. Who records the service notes? 01:37
A. They write them. 01:38
Q. So the caregiver writes the service notes. When do they write them? 01:38
A. They're supposed to be writing them as they perform their duties. 01:38
Q. Then how would they get the service notes to Park Cities? 01:38
A. I pick them up once a month. We have a chart that's left in the client's home. It has the plan of care, where we document daily work that we perform. 01:38
Q. Have you ever represented that my clients or other caregivers don't perform companionship services? Have you ever made that representation? 01:39
A. No. 01:39
Q. Has Park Cities recently changed the content on its Website? 01:39
A. We recently changed our Website altogether. 01:39
Q. How come? 01:39

A. Modified it, because we just weren't getting any response. There was too much content. No one was responding well to it. I needed to consolidate things and make it look cleaner. 01:39 01:39 01:39 01:39
Q. When were those changes made? 01:39
A. Over the summer. 01:39
Q. After this lawsuit was filed? 01:39
A. Yes. 01:40
Q. Did you -- did you maintain the content that was on your website before the changes? Do you have copies of it? 01:40 01:40 01:40
A. Do I have copies of the website? 01:40
Q. Copies of the content of the website -- 01:40
A. No. 01:40
Q. -- before the changes were made. 01:40
A. I have some that were used for advertising that came directly off our website, but that was very old advertising. 01:40 01:40 01:40
Q. Now, my clients were employed by -- 01:40
A. I think I have a cough drop. Would you like one? 01:41 01:41
Q. I appreciate that. No, I don't think that's going to help. 01:41 01:41
Now, my clients were employed by Park Cities. They weren't employed by your patient or the 01:41 01:41

families, correct?
A. Correct.
Q. And at no point were they ever employed by your patients or their families?
A. I don't know that to be true.
Q. Within the last three years you have no knowledge of them -- let me finish my question.
At no point during the period they worked for you are you aware of them being an employee of the patient or their families?
A. I have my suspicions.
Q. But you have no -- you didn't see it, you didn't hear it, you have no personal knowledge?
A. I actually do. I have a nurses note or a caregiver note written by Kilfa Jacobs on December 25 for my --
Q. What does that say?
A. She wrote the whole day's note that -- you should have it.
Q. Just for clarification, Ms. Jacobs isn't my client. I'm referring to Ms. Miller, Ms. Carmack and Ms. Aniagu.
A. Okay.
Q. So with that clarification, are you aware of Ms. Miller, Ms. Carmack, Ms. Aniagu at any point during

01:41 01:41 01:41 01:41 01:41 01:41 01:41 01:41 01:41 01:41 01:42 01:42 01:42 01:42 01:42 01:42 01:42 01:42 01:42 01:42 01:42 01:42 01:42 01:42 01:42

their employment with Park Cities being employed by any of your patients or their families? 01:42 01:42

A. No, not to my knowledge, yet. 01:42

Q. Let's go back to your visits with the patients. You mentioned that you had visited each patient once per week, correct? 01:43 01:43 01:43

A. On average. 01:43

Q. On average. How long did that visit last? 01:43

A. Depends on what their needs are. It can last 20 minutes, it can last two hours. 01:43 01:43

Q. So other than the service notes and your visits, you don't have any other way of actually knowing what my clients were doing with the patients or for the patients other than my clients' testimony; is that right? 01:43 01:44 01:44 01:44 01:44

A. Yes. Let me extend that. Unless someone reported to me, maybe an outgoing caregiver, gave a report on what she saw, which I often got, so I would get a report from caregivers. 01:44 01:44 01:44 01:44

Q. Okay. And how did Park Cities decide who my clients worked with, meaning the patients? 01:44 01:44

A. I assigned them, if they were available and a client came on. I tried to keep those who had been working for me for a long time working, so if they were available, if a patient had just died and someone came 01:44 01:45 01:45 01:45

A. It was made in November, activated in December of 2016.

Q. Okay. Why did you make that decision in November of 2016?

A. Because I was informed correctly of what the actual overtime obligations were to me.

Q. Who provided you with that advice?

A. Scheef & Stone. Jane Taber, I should clarify.

Q. Prior to November 2016, did any Park Cities employee ever receive overtime?

A. No.

Q. Let's talk about Ms. Miller. When did her employment with Park Cities end?

A. October of 2016, I think.

Q. Could it have been early November?

A. It could have been.

Q. Was that a resignation or a termination?

A. She resigned. She had the option of coming in after I witnessed her behavior so that we could discuss it, and I was going to give her a warning, and she opted not to.

Q. What behavior are you referring to?

A. Her behavior, the conversation that she had in front of my mother-in-law, which was completely inappropriate, loud, cursing.

following you, because there's a lot packed in there. It wasn't until Jane Taber at Scheef & Stone communicated with you, did you understand that you had to be paying overtime, correct? 02:00

A. Correct. 02:00

Q. Did you keep those text messages with Ms. Miller? 02:00

A. Yes. 02:00

Q. Have you turned those over? 02:00

A. I just actually managed to get this phone, this 900-year-old iPhone rebooted yesterday, so I can -- I don't know how to get them off of here because this is not a phone any longer, but they're on here, and as soon as Michael figures out how to do it, we'll have those for you. 02:00

Q. Okay. Any other communications with Ms. Miller about overtime in either October or November of 2016? 02:01

A. There was one conversation we had where Paychex had erroneously put her -- she got paid an extra, I think, $100 a month to carry the phone, and they had put it as overtime erroneously. And she talked about it then, said that she had been in HR, and that that's not overtime. I'm not quite sure what the conversation was. She brought it up then, but I 02:01

disregarded it because it was carrying the phone. It was not considered overtime. 02:01 02:01

Q. Sure. When was that, do you recall? 02:01

A. I have to really search through my phone. End of the year, you know, August, September, October. 02:01 02:01

Q. Of what year? 02:01

A. Of 2016, shortly before she left. 02:01

Q. So she received additional pay for carrying a phone for Park Cities? 02:01 02:01

A. Uh-huh, yes. 02:01

Q. And it's your testimony that Park Cities [sic] characterized it on her paycheck as overtime when it should have been characterized as something different, correct? 02:02 02:02 02:02 02:02

A. Exactly. 02:02

Q. What should it have been characterized as? 02:02

A. You would have to look back through the journals, because it was properly entered every other time but this one paycheck. 02:02 02:02 02:02

Q. Now, let me backtrack a little bit, because I don't think we've covered this. Ms. Miller was a CNA team lead or supervisor? 02:02 02:02 02:02

A. Yes. 02:02

Q. What additional responsibilities did she perform in that capacity that Ms. Carmack and 02:02 02:02

Ms. Aniagu did not perform? 02:02

A. She would answer the phones. If any of the caregivers were calling in sick, and if someone needed to be scheduled in their place she would handle that. 02:02

If a new caregiver was hired, she would do the orientation with me and help just determine if that caregiver needed help with some of the tasks. 02:02

Q. Any other duties? 02:02

A. No. 02:03

Q. Earlier you testified that your home is your business? 02:03

A. Yes. 02:03

Q. Or your business operates out of your home. Where would the orientation be performed for new employees? 02:03

A. At the time we did it with my mother-in-law, because that one was one of my family members, and I felt comfortable that we could do that there. 02:03

Q. Before your mother-in-law was a patient, where would you perform the orientations? 02:03

A. At Mr. Alley's home. 02:03

Q. So it would be on-the-job basically? 02:03

A. Yes, uh-huh. 02:03

Q. Was Ms. Miller provided additional 02:03

compensation for those additional responsibilities? 02:03
A. Yes. 02:03
Q. What did she receive for doing those? 02:03
A. She got time and a half for orientation. 02:03
Q. So in addition, I think you said she was $13 an hour? 02:03
A. Yes. 02:03
Q. So she received -- goodness, I went to law school to avoid math. 02:03
You're saying you paid her $19.50 an hour to do orientation? 02:04
A. Yes. 02:04
Q. Is that reflected in the payroll records? 02:04
A. I think so. I'm not sure -- I'm not sure if it was -- yeah, she got time and a half for orientation. It's been a while. 02:04
Q. Okay. And that was regardless of whether she worked 40 hours or not, correct? 02:04
A. Yes. 02:04
Q. And did she receive additional pay for anything else? 02:04
A. No. There were times that if I really needed someone to do something, I would offer them a bonus, but other than that, no. 02:04
Q. Okay. You mentioned that she got paid for 02:04

carrying the phone. What do you mean by that? 02:04
A. There was a particular phone that the CNAs knew to call if they had a scheduling issue, and she would answer it. 02:04 02:04 02:04
Q. Did she receive additional pay for that? 02:04
A. Yes. That's what I was saying, she got an extra, I think, $100 per month or paycheck. I don't recall right now, but she got extra. 02:04 02:04 02:04
Q. That too wasn't intended as overtime pay? 02:04
A. No. I have since been informed by the labor board that I have to change that, that we can't do that. 02:05 02:05 02:05
Q. Let me see if I can help out here. 02:05
(Deposition Exhibit Number 1 was marked.) 02:06
Q. (By Mr. Hersh) I'm handing you what's been marked as Deposition Exhibit 1. I'll just make a reference there. You -- what you're holding right now in every exhibit that you are going to receive is the official exhibit of this deposition. So I ask that you not write on it. And at the end of the deposition we're going to return those to the court reporter. Do you recognize that document? 02:06 02:06 02:06 02:06 02:06 02:06 02:06 02:06
A. Yes. 02:06
Q. What is it? 02:06
A. It's a text that I sent to, I'm assuming -- 02:06

the same amount they were making. And if they worked anything more than that, they were making even more. Some people worked six or seven days a week. So at that point they would be working considerably more. 02:26

Q. So Park Cities' aim was to continue paying your hourly employees the same amount, but in order to comply with overtime law, you were going to reduce their hourly pay so that when their hours over 40 were taken into consideration at time and a half, they were making the same amount; is that right? 02:26

A. Yes. 02:26

Q. Do you have any employees who refused to sign those new employment agreements? 02:26

A. Yes. 02:26

Q. Who? 02:26

A. Charlotte and Jovan. 02:26

Q. Anybody else? 02:26

A. I don't think so. 02:26

Q. When did Ms. Carmack's employment end? 02:27

A. I don't know the exact date. I don't know the exact date. I want to say December sometime. I'm sure she knows. 02:27

(Deposition Exhibit Number 4 was marked.) 02:27

Q. (By Mr. Hersh) Handing you what's been marked as Deposition Exhibit Number 4. Do you recognize that 02:27

document? 02:27
A. Yes. 02:27
Q. Have you seen this document before? 02:27
A. I'm sure I have. 02:28
Q. Look up at the top where it has the e-mail. I think earlier you testified that sharonsquick@verizon.net is your e-mail address, correct? 02:28 02:28 02:28 02:28
A. Yes. 02:28
Q. Look at the facsimile on there, (972) 570-1980. Is that Park Cities' fax number? 02:28 02:28
A. No, not any longer. 02:28
Q. Was it Park Cities' fax number at the time? 02:28
A. I'm not sure. I know we changed providers. I'm not sure exactly when we changed. 02:28 02:28
Q. Did you receive this letter sometime in late December? 02:28 02:28
A. As I said, I'm not sure, but I may have. I received a lot of documentation over that time period. 02:28 02:28
Q. Did you receive notice that Ms. Carmack and Ms. Aniagu and Ms. Miller had filed an overtime lawsuit against you? 02:28 02:29 02:29
A. Yes. 02:29
Q. Before it was served? 02:29
A. Before it was served, I don't know. 02:29

Q. Does Park Cities keep a record of fax transmissions received? 02:29
A. No. 02:29
Q. There's no record of that? Look at the second paragraph of the letter. "Park Cities Healthcare and you hereby are put on notice and advised to preserve - and not to destroy, alter or delete - any documents or information, including electronically stored information (such as e-mails, text messages, and other messaging sent through electronic means) that relate or may relate to my clients' employment with Park Cities Healthcare, their hours worked, their compensation, and any other matter that may be the subject of the litigation." Did I read that correctly? 02:29 02:30
A. Yes. 02:30
Q. You understand that that obligation extends not just to Park Cities but to you as well individually, correct? 02:30
A. Yes. 02:30
Q. Do you recall whether or not in response to this letter you or Mr. Clark reached out to my law firm or me? 02:30
A. I would assume that Mr. Clark did, but I don't know whether he did. You're here, so clearly he did. 02:30
MR. HERSH: I'm going to object to 02:30

A. It's an e-mail correspondence between myself and Charlotte Carmack. 02:42 02:42
Q. Okay. 02:42
A. I'm sorry, it's a text correspondence. 02:42
Q. Okay. And does this appear to be a true and correct copy? 02:42 02:42
A. Yes. 02:42
Q. Okay. So does this refresh your recollection, it appears you terminated her on January 14, 2017? 02:42 02:42
A. Yes. 02:42
Q. This was after she filed the overtime lawsuit, correct? 02:42 02:42
A. Yes. 02:42
Q. Do you know when the Whites -- let me back up. You mentioned Robert and -- is it Annelle? 02:42 02:42
A. Yes. 02:43
Q. Robert and Annelle White. When did they terminate their agreement with Park Cities? 02:43 02:43
A. February 19, 2017. 02:43
Q. Did they have to provide Park Cities with advance notice before doing that? 02:43 02:43
A. Yes, they did. 02:43
Q. When did they provide that notice? 02:43
A. January 19, maybe January 20. I'm not positive. 02:43 02:43

A. Well, clearly Stacy is, because she pulled this post off for me. 02:46 02:46
Q. Uh-huh. 02:46
A. That's all I would know. 02:46
Q. Is it a fair statement that at least in some small part, Ms. Carmack and Ms. Miller and Ms. Aniagu filing this overtime lawsuit motivated your decision to file the lawsuit against them in state court? 02:46 02:46 02:46 02:46
A. Not at all. 02:46
Q. When did Ms. Aniagu's employment end? You said it was February. Do you know more specifically whether it was the 19th or some other day? 02:46 02:46 02:46
A. I would have to look at a text stream. 02:46
Q. She was terminated or she resigned? 02:47
A. She resigned. 02:47
Q. Okay. She -- now she's one of the two individuals who didn't sign your new employment agreement, correct? 02:47 02:47 02:47
A. Correct. 02:47
Q. And how did she communicate to you that she was resigning? 02:47 02:47
A. She had -- they're supposed to send her timesheet in, and she sent in her schedule instead. And I said, "You know, this not your timesheet, difference being you need to total up your hours and 02:47 02:47 02:47 02:47

A. Yes.
Q. And when did you first learn about the home healthcare worker final rule?
A. I don't know.
Q. Is that something that Mr. Clark shared with you at the end of 2014?
A. I don't think so, but I don't recall.
Q. Okay. Do you know when the home care worker final rule came out?
A. No, I don't.
Q. Do you know how you learned about it?
A. No, I don't.
Q. Did you communicate with Mr. Clark or any other attorney regarding the home care worker final rule before your communications with Scheef & Stone in November 2016?
A. No.
Q. What was your understanding as to what the home care worker final rule required of Park Cities?
A. Until I spoke with Jane Taber, I didn't know.
Q. So you -- before you spoke with Ms. Taber you read the home care worker final rule, you just didn't understand it?
A. I didn't understand it. I had gone on -- actually, I had gone on the Department of Labor Website

trying to figure it out. I tried calling them and could not reach anyone. 03:11 03:11

It was very confusing to me. So that may have been where I first saw it. I don't know. 03:11 03:11

Q. Gotcha. And at that point where you're experiencing this confusion, you didn't reach out again to Mr. Clark or some other employment lawyer to help you understand it? 03:11 03:11 03:11 03:11

A. Jane Taber. 03:11

Q. Okay. So I think from the e-mails, Jane Taber was early November 2007. Pardon me. November 2016. But prior to that, it sounds like you knew about the home healthcare worker final rule prior to this e-mail? 03:11 03:11 03:12 03:12

A. Well, yes. I don't know if it was two hours prior to it or two days prior to it. I don't know. 03:12 03:12

Q. Could it have been two months or a year? 03:12

A. Probably not. I was pretty busy that year. 03:12

Q. Okay. 03:12

A. Trying to save my life and all, I really was not sitting at my -- I couldn't sit at all, so I was not at my desk researching online Websites. I wasn't doing anything except going to radiation and chemo. 03:12 03:12 03:12 03:12

Q. Were you continuing to operate your business during the period that you were taking chemo and radiation? 03:12 03:12 03:12

A. Yes. I changed my schedule quite a bit.
Q. Do you have a copy of the home care worker final rule?
A. I don't think so.
Q. Did you save it on your computer when you found it?
A. I don't even know that that's where I found it. I don't know how I learned about the final rule, so that would be no.
Q. You said you made a phone call to the Department of Labor?
A. I looked at their Website, tried calling the number, yes.
Q. And that would have been from your cell phone, your Park Cities Healthcare number?
A. Probably.
(Deposition Exhibit Number 9 was marked.)
Q. (By Mr. Hersh) Handing you what's been marked as Deposition Exhibit Number 9. Number 9 is another document that your attorney produced today. Do you recognize that?
A. Yes.
Q. What is it?
A. It's, again, the same e-mail from Jane Taber that I have forwarded to Stacey Kastner.

03:12 03:12 03:13 03:13 03:13 03:13 03:13 03:13 03:13 03:13 03:13 03:13 03:13 03:13 03:13 03:13 03:14 03:14 03:14 03:14 03:14 03:14 03:14 03:14 03:14

Q. Okay. This is an e-mail you sent to Ms. Kastner at Paychex on November 2016, right?
A. Yes.
Q. True and correct copy?
A. Yes.
Q. At the top it says -- pardon me. It's the middle of the page. You're telling Ms. Kastner, "From my attorney. We have to come up with a realistic formula by the next pay period." Do you see that?
A. Yes. And it should be, "This is from my attorney," and to Stacey who was my payroll gal, "We needed to come up with a realistic formula by the next pay period."
Q. So you were forwarding her the advice from Jane Taber?
A. Yes.
Q. To tell her, "We need to come up with a way to comply"?
A. Exactly.
Q. Okay. And her response was, "Thank you. I will review this with Nisha." That's her response?
A. Yes.
Q. Did Ms. Taber have any direct communications with the Paychex folks?
A. No.

Q. Did you pay the Scheef & Stone lawyers for the advice they provided you? 03:15 03:15
A. Yes. 03:15
Q. Or Park Cities? 03:15
A. Yes. 03:15
Q. How much did they charge you? 03:15
A. A couple of thousand dollars, $3,000. I don't know off the top of my head. 03:15 03:15
Q. Do you know what Ms. Taber's hourly rate was? 03:16
A. No, I don't. 03:16
Q. How about Mr. Bracken? 03:16
A. No. 03:16
Q. By the way, who is Doug Bracken? 03:16
A. An associate of hers that he brought in because he was the expert. 03:16 03:16
Q. Is he an associate, or is he a partner, do you know? 03:16 03:16
A. I don't know. 03:16
(Deposition Exhibit Number 10 was marked.) 03:16
Q. (By Mr. Hersh) Handing you what's been marked as Deposition Exhibit Number 10. This, too, is a document that your attorney produced today. Do you recognize it? 03:16 03:16 03:16 03:16
A. Yes. 03:16
Q. What is it? 03:16

as Deposition Exhibit Number 11. Is that your signature on the last page? 03:18 03:18

A. Yes, it is. 03:18

Q. Do you recognize this as the form you filed with the State of Texas changing the name of Park Cities Healthcare Consultants, LLC? 03:18 03:18 03:18

A. Yes. 03:18

Q. To Park Cities Healthcare, LLC? 03:18

A. Yes. 03:18

Q. Does it reflect that you formed -- or do you agree that you formed the entity in December 10, 2008? 03:18 03:18

A. I changed the name of the entity on December 10 -- I'm sorry, yes. I formed it December 10, 2008. 03:19 03:19 03:19

Q. And in fact, you changed the name in December of 2012. That's on the last page, correct? 03:19 03:19

A. Yes. 03:19

(Deposition Exhibit Number 12 was marked.) 03:20

Q. (By Mr. Hersh) Ms. Westen? 03:20

A. Yes. 03:21

Q. Handing you what's been marked as Deposition Exhibit Number 12. Earlier you testified that you're responsible for the content on the Park Cities website, correct? 03:21 03:21 03:21 03:21

A. Yes. 03:21

Q. Do you recognize this as the current content of Park Cities' website?

A. Yes.

Q. Is this a fair and accurate representation of the website?

A. This is prettier, but yes.

Q. I'll represent to you that pictures were printed out.

A. Yes.

Q. It says on the first page, "Our Team." It says, "Park Cities Healthcare is true private duty nursing. Only licensed RNs, LVNs and CNAs are used." Do you see that?

A. Yes.

Q. That's not true, is it?

A. We also use medical assistants. We did use a medical assistant, but at the time I made this, we no longer had her employed, so yes, it is true.

Q. And in fact, Ms. Aniagu is a medical assistant, correct?

A. Yes.

Q. She is not a CNA?

A. Correct.

Q. Do you have any other medical assistants employed with Park Cities?

03:21 03:21 03:21 03:21 03:21 03:21 03:21 03:21 03:21 03:21 03:21 03:21 03:21 03:21 03:21 03:21 03:21 03:22 03:22 03:22 03:22 03:22 03:22 03:22 03:22

A. No. 03:22
Q. Turn to the second to last page under "CNA Service." Do you see that? 03:22
A. Yes. 03:22
Q. It says, "Caregiving Services: A Certified Nurse Aid will stay in the patient's home to provide assistance with all activities of daily living. They will also perform cooking, light housekeeping and make sure ordered treatments and medications are provided on time." Did I read that correctly? 03:22
A. Yes. 03:22
Q. You wrote that? 03:22
A. Yes. 03:22
Q. That's intended to describe the responsibilities that are performed by Park Cities' CNAs, correct? 03:22
A. Yes. 03:22
Q. Is it a -- is that an accurate reflection of the primary job duties that they performed? 03:23
A. Yes. 03:23
(Deposition Exhibit Number 13 was marked.) 03:24
Q. (By Mr. Hersh) Handing you what's been marked as Deposition Exhibit Number 13. Do you recognize that as Jovan Aniagu's employment agreement? 03:24
A. Yes. 03:24

A. Yes.
Q. Is that your signature on the second page? 03:26
A. Yes. 03:26
Q. Have you understood all my questions today? 03:26
A. Yes. 03:26
Q. Have you provided truthful and complete testimony? 03:26
A. Yes. 03:26
Q. Do you need to make any change to your answers? 03:26
A. Not at this time. 03:26
MR. HERSH: I'll pass the witness. 03:26
MR. DONOHUE: We'll reserve questions until the time of hearing or trial. 03:26
MR. HERSH: Thank you. Thank you for your time. 03:26
THE WITNESS: You bet. 03:26
THE REPORTER: Off the record at 3:26 p.m. 03:27
(End of proceedings.)

______________________________
SIGNATURE OF THE WITNESS

STATE OF TEXAS )
COUNTY OF ________________)

Subscribed and sworn to before me, the undersigned authority, on this the _______________ day of _____________________, 2017.

______________________________ ,Notary Public
in and for the State of Texas.

My commission expires on: ____________________.

CHANGES BY THE WITNESS

Instructions to the witness: Please make any changes you wish to make on this page. Please do not write on the transcript pages.

PAGE AND LINE CHANGE TO:

SIGNATURE OF THE WITNESS

C E R T I F I C A T E

I, Lyenda Johnston, a Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the above and foregoing is a true and correct transcription of the testimony taken on the 20th day of October, 2017.

I further certify that pursuant to FRCP Rule 30(e) that the signature of the deponent:

____ was requested by the deponent or a party before the completion of the deposition, and that signature is to be before any notary public and returned within 30 days from the date of receipt of the transcript;

X was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

Certified to by me on this the 26th day of October, 2017.

Lyenda Johnston

Lyenda Johnston, CSR
Johnston Reporting, LLC
620 Arcadia Way
Rockwall, Texas 75087
(214) 454-4572
(972) 289-8069 fax
LJohnstonCSR@cs.com
Certification No. 2919.
Firm No. 716

Charge for the transcript and exhibits $______________.
To be paid by the Plaintiffs.

hersh law firm pc

[illegible] N. Hall St., Ste. [illegible]
Dallas, TX 75219
Tel. (214) 303-1022
Fax (214) 550-8170
www.hersh-law.com

December 27, 2016
PRIVATE AND TIME SENSITIVE

**VIA E-MAIL Sharonsquick@verizon.net**
**VIA FACSIMILE (972) 570-1980**

Sharon D. Quick
President and Individually
Park Cities Healthcare, LLC
410 San Jose St.
Irving, TX 75062-4610

Re: ***Federal Lawsuit for Overtime Compensation***

Dear Ms. Quick:

This law firm represents Charlotte Carmack, Javon Aniagu, and Teresa Miller. Yesterday, Ms. Carmack filed a lawsuit against Park Cities Healthcare, LLC and you on behalf of herself and others similarly situated to recover their unpaid overtime compensation, liquidated/double damages, attorneys fees, and costs. As a courtesy to you, I am attaching a copy of the lawsuit. Please direct all communications regarding my clients and the lawsuit to my attention.

Park Cities Healthcare and you hereby are put on notice and advised to preserve—and not to destroy, alter, or delete—any documents or information, including electronically stored information (such as e-mails, text messages, and other messaging sent through electronic means) that relate or may relate to my clients' employment with Park Cities Healthcare, their hours worked, their compensation, and any other matter that may be the subject of the litigation.

If you are interested in attempting to expeditiously resolve this matter and minimize the parties' expenses and fees, I invite you (or your counsel, if you have counsel) to contact me by **Wednesday, January 4, 2017**, to furnish me with a copy of Park Cities Healthcare's "Payroll Journal" reflecting each of my clients' hours worked and compensation on a weekly basis for the period from January 1, 2015 to the present.

Thank you for your prompt attention to this matter.

Yours truly,

Hersh Law Firm, P.C.

Barry S. Hersh
barry@hersh-law.com

EXHIBIT
4

*Board Certified in Labor and Employment Law*

# Welcome to Park Cities Healthcare

214.500.9839

## About Us

### Our team

Park Cities Healthcare is true private duty nursing. Only licensed RNs, LVNs and CNAs are used so that we can provide the exact care your personal physician orders while you are in your home.

EXHIBIT 12 PENGAD 800-631-6989

### Our History

As president of Park Cities Healthcare since 2008, Sharon Quick-Westen, RN has transformed private duty home healthcare. No longer willing to settle for what she had seen in more than 2 decades of nursing practice, she pushed the envelope and found a way to give patients exactly what they needed and wanted using her talented personnel and the patients own personal physician to allow everyone, regardless of the complexity of their needs, to stay in

their homes. In 2015 Sharon was featured as one of the Dynamic Women of Dallas in Modern Luxury Magazine for her success in modernizing home care.

## Our Services

Park Cities Healthcare is a true concierge nursing provider. We are the eyes and ears of your personal physician, so this means less visits to their office or the ER as we anticipate problems and coordinate the solution with your doctor before it becomes a crisis.

# List of Services

## Nursing Services

*In-home/bedside care for patients who need assistance with activities of daily living (ADLs) due to decline in health or discharge from hospital with skilled needs*

## Nursing Care
## 125.00/hour

RN Case Management: Includes weekly visit to assess patient, set up medication boxes, collect ordered labs and coordinate any needed updates or changes with physician and family.
125.00/visit 500.00/month
No charge for those on our full-time caregiving plan.

## CNA Service
## 18-20.00/hr

Caregiving Services: A Certified Nurse Aid will stay in the patients home to provide assistance with all activities of daily living (ADLs) They will also perform cooking, light housekeeping and make sure ordered treatments and medications are provided on time.
<84 hrs per week= 20.00/hr
>84 hrs per week18.00/hr. Note that this is considered fulltime caregiving service, and will include weekly RN visit at no charge.

---

NURSING STAFF ARE ALSO AVAILABLE FOR DRS OFFICE VISITS, TRANSPORTATION, AND AS AN IN-FLIGHT NURSING COMPANION FOR TRAVEL. YOU MAY ALSO REQUEST OTHER SERVICES AS NEEDED, AND WE WILL ALWAYS DO OUR BEST TO ACCOMMODATE.

# Contact Us

We proudly serve the entire DFW Metroplex

## Park Cities Healthcare

214.500.9839

## Hours

Normal Business hours are Monday-Friday 10am-6pm. On-call nurse available to current Park Cities clients 24/7

**CONTACT US FOR NO COST NURSING ASSESSMENT**

Copyright © 2017 Park Cities Healthcare - All Rights Reserved.

Powered by GoDaddy

December 2016? 01:55
A. Yes. 01:55
Q. Who? 01:55
A. Scheef & Stone. 01:55
Q. Okay. We mentioned them very briefly. Scheef & Stone is the one you spoke to in November 2016, correct? 01:55 01:55 01:55
A. Yes. 01:55
Q. Okay. Prior to Scheef & Stone did you have any attorney or other professional bill you for services in connection with advice about overtime obligations? 01:55 01:55 01:55 01:55
A. No. 01:55
Q. Have you attended any nursing or domestic service or home healthcare seminars or conferences where overtime obligations were discussed? 01:55 01:55 01:55
A. No. 01:55
Q. Why did you reclassify your home healthcare workers to non-exempt in December of 2016? 01:55 01:55
A. I don't recall that I did. 01:56
Q. Are you currently paying overtime to your hourly paid home healthcare workers when they work over 40 hours in a week? 01:56 01:56 01:56
A. Yes. 01:56
Q. When was that decision made? 01:56

THIS PAGE IS INTENTIONALLY BLANK

THIS PAGE IS INTENTIONALLY BLANK

# EXHIBIT 2

IN THE UNITED STATES COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLOTTE CARMACK, TERESA MILLER, AND JOVAN ANIAGU<br>Plaintiffs<br><br>v.<br><br>PARK CITIES HEALTHCARE, LLC and SHARON D. WESTEN (formerly SHARON D. QUICK)<br>Defendants | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO.<br><br>3:16-cv-03500-D |

# DECLARATION OF CHARLOTTE CARMACK

Pursuant to 28 U.S.C. § 1746, I make the following declaration subject to the penalties for perjury:

1. My name is Charlotte Carmack. I am over 18 years of age, of sound mind, and capable of making this declaration. I have personal knowledge of the facts stated herein and they are all true and correct.

2. I am the plaintiff that filed this overtime lawsuit against Park Cities Healthcare LLC ("Park Cities") and Sharon Westen (formerly Quick) ("Westen"). I signed a consent form to participate in this lawsuit. The consent form was filed with the court on December 27, 2016.

3. I am providing this declaration in support of Plaintiffs' motion for partial summary judgment. .

4. I worked for Park Cities two different times. The exact dates are a little unclear, but I believe the first time was from August/September 2011 to sometime in 2013. I believe the second time was from October 2014 to January 13, 2017. I took a personal leave from work in February 2015 until about June 2015. I did not work during my leave.

5. I was always employed by Park Cities as a Certified Nursing Aide ("CNA").

6. Westen interviewed me, hired me, set and enforced Park Cities' work rules, and fired me. She fired me on January 13, 2017.

7. At all times during my Park Cities employment, I was a full-time employee, paid by the hour, and reported to Westen as a Park Cities employee. Westen never classified an independent contractor.

8. In 2015 and the early to mid-part of 2016, my hour rate was $11.00 per hour. In August 2016, Westen increased to $12.00 per hour.

9. Except during my leave, I regularly worked over 40 a week during my Park Cities employment. When I worked over 40 hours a week, Park Cities paid me my straight hourly rate but did not pay me "time and a half" overtime.

10. Park Cities did not track my hours worked on the basis of a 7-day workweek. Instead, Park Cities tracked my hours and paid me based on a 14-day pay period.

11. Except for when I was on leave, Park Cities regularly scheduled me to work a 12-hour shift at least five days per week. Due to the needs of the clients however, my actual work hours varied each pay period.

12. During a shift, it was common for me to be completely alone with the client in the client's home, unless the client's family lived there or Westen or the family came to visit.

13. As a CNA for Park Cities, my job duties were pretty straightforward. I provided care for the clients of Park Cities in the client's personal home.

14. Here is a list of type of care that I provided for Park Cities' clients:

a. I took the client's vitals (blood pressure, pulse, and temperature), and recorded their fluids in/out. Sometimes, I also had to do finger sticks for testing the client's blood.

b. I also assisted the client with dressing, grooming, feeding, bathing, toileting, and transferring the client to/from bed.

c. I also assisted the client with activities that enabled the client to live at home, such as meal prep, doing light housework such as changing or cleaning the bedclothes, doing laundry, washing dishes, sweeping the floor, vacuuming, and mopping, and assisting the client with medication reminders.

d. I made the client's meals, and cleaned up after the meals.

15. The amount of time in 2015 and 2016 that I spent dressing, grooming, feeding, bathing, toileting, and transferring and doing meal prep, light housework, and medication reminders took up at least 90 percent of my hours worked per week. This means that, if I worked 60 hours in a seven-day week, then I spent more than 54 hours providing this type of care.

16. To perform these duties – especially the meal prep, light housework, and assisting with physical care and medications – I regularly used dishwashing liquid, paper towels, cleaning supplies like upholstery cleaner, trash bags, tissues, laundry detergent, mops, brooms, vacuum cleaners, latex gloves, and medical supplies like adhesive pads or band aids. Having used these things on a routine basis, I am not aware that any of them were made in Texas.

17. I also used fax machines and my personal smartphone (voice and text) to communicate with Westen during my Park Cities employment. In 2015 and 2016, I used a Samsung Galaxy smartphone. My phone was manufactured in South Korea. My voice/data carrier was Verizon Wireless. I used the Verizon Wireless app to send my phone payments to Verizon Wireless. I used the fax machine and smartphone to communicate with Westen, among other things, about work matters and the clients and, every two weeks, to submit a calendar to Westen reporting my hours worked for the preceding 14-day period.

18. Park Cities' clients were older individuals who were too sick or weak to care for themselves, and most likely would have been in a health care or nursing home if it was not for the care provided by Park Cities.

19. All of the duties I performed for Park Cities' clients was performed in the client's private home:

a. Ms. Bowles - I provided her care as a client of Park Cities from before January 2015 until my leave of absence in February 2015. She owned a condo and lived in it as her permanent home. The address was

6036-A Averill Way, Dallas TX, 75225. This was a two bedroom/1.5 bath single family home. She lived there alone.

b. Mr. Alley - I believe that I provided him care as a client of Park Cities from January 2015 until my leave of absence in February 2015. He owned a house and lived in it as his permanent home. It was a two-story home located at 3509 Purdue Ave., Dallas, TX. I don't know how many bedrooms or bathrooms it had. I cared for him on the first floor, and did not go upstairs. He lived there alone.

c. Mr. Alley and Ms. Westen - I provided Mr. Alley and Ms. Westen care as clients of Park Cities from June or July 2015 to about August 2015. This was at a single family home located at 17241 Marianne Circle, Dallas, TX 75252. This was a three bedroom/two bathroom house. Only Mr. Alley and Ms. Westen lived there. It was a rented home. I heard Sharon say that Ms. Westen's son, JR Westen rented the home from the home owner. JR Westen was not an owner of Park Cities and did not participate in Park Cities' management.[1]

d. Mr. White - I provided Mr. White care as a client of Park Cities from August 2015 until the end of my Park Cities employment. He owned a private home at 2828 Hood Street #1504, Dallas, TX 75219. This was a three bedroom/3.5 bathroom home. It was his permanent home. He lived there with his wife and, at some point, their daughter lived there too. Other than them, no one else lived there.

20. I did not live in the clients' homes and none of the clients was a family member of mine. I was not employed by any of them or their families during my Park Cities employment--just Park Cities.

21. Park Cities did not own, rent, or manage any of the private homes where I provided care to clients. I have no reason to believe that these clients would have been prohibited from living in their homes if they were not receiving care from Park Cities.

22. Park Cities also did not exercise control over the residences in which these clients lived or any term or condition of the living arrangements. I am not aware of Park Cities ever requiring a client to live in a specific apartment unit or

[1] JR Westen later married Defendant Sharon Quick in November 2015.

home in order to receive Park Cities' services, and, because Park Cities was not the landlord, Park Cities had no ability to evict any of the clients if the clients ceased to use Park Cities' services. For example, Mr. White's family fired Park Cities in early 2017 and Park Cities did not evict him from his home.

23. During this lawsuit, on October 23, 2017, my lawyer served Park Cities and Westen with Plaintiffs' 2nd Consolidated Discovery. A true and correct copy is attached to the declaration of Teresa Miller as Attachment "A."

24. This written discovery includes Request Nos. 1, 4, and 7, asking Park Cities to admit or deny the accuracy and completeness of Plaintiffs' hours worked and gross wages as memorialized in Attachments A, B, and C to their 2nd Consolidated Discovery for each of the Plaintiffs in this lawsuit. These hours worked and the gross pay figures for Park Cities' two-week pay periods were copied from Park Cities' pay records received in this case.

25. Using these figures and with the assistance of my lawyer, I have calculated how much overtime I am owed by Park Cities for the period from January 5, 2015 (Park Cities' first pay period in 2015) to the first week of December 2016 when Park Cities reduced my work hours before 40. Because Park Cities did not maintain adequate records of my working hours on a seven-day workweek basis, I have calculated the overtime wages I am owed based on Park Cities' 14-day pay period.

26. Rather than subtracting 40 hours worked for each seven-day workweek, I have subtracted 80 hours worked from every 14-day Park Cities pay period to determine the number of overtime hours. During this period described, I worked 1,432 overtime hours.

27. To determine my overtime rate, I divided my hourly rate by 2 (because Park Cities paid "straight time" for hours worked over 40 and only owes me the "one-half" component of "time-and-one-half").

28. Finally, to arrive at the amount of overtime back wages, for each 14-day pay period, I multiplied the number of overtime hours worked by the overtime rate.

29. After the math is done, I am owed $8,072.25 in back overtime wages for the for the period from January 5, 2015 to December 4, 2016. A true and correct

copy of the spreadsheet detailing the calculation described in this declaration is attached hereto as Attachment "A."

30. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 27th day of February, 2018.

Charlotte Carmack
Charlotte Carmack

**Charlotte Carmack**

| Defendants' DOC ID | Pay Period BEGINNING | Pay Period ENDING | Total Hours Worked | OT Hours Worked (- 80 hrs) | Gross Amount Paid, for hourly wages, orientation pay, and on call pay, if any. | Regular Rate of Pay (total pay / hrs) | Overtime Rate of Pay | OT Back Wages |
|---|---|---|---|---|---|---|---|---|
| 1190 | 10/13/14 | 10/26/14 | 159 | | | | | |
| 1188 | 10/27/14 | 11/9/14 | 99.5 | | | | | |
| 1186 | 11/10/14 | 11/23/14 | 84 | | | | | |
| 1183 | 11/24/14 | 12/7/14 | 72 | | | | | |
| 1181 | 12/8/14 | 12/21/14 | 120 | | | | | |
| 40 | 12/22/14 | 1/4/15 | 108 | | | | | |
| 48 | **1/5/15** | **1/18/15** | **120** | **40** | **$1,320.00** | **$11.00** | **$16.50** | $220.00 |
| 58 | 1/19/15 | 2/1/15 | 96 | 16 | $1,056.00 | $11.00 | $16.50 | $88.00 |
| 66 | 2/2/15 | 2/15/15 | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 74 | 2/16/15 | 3/1/15 | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 82 | 3/2/15 | 3/15/15 | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 91 | 3/16/15 | 3/29/15 | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 104 | 3/30/15 | 4/12/15 | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 105 | 4/13/15 | 4/26/15 | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 113 | 4/27/15 | 5/10/15 | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 124 | 5/11/15 | 5/24/15 | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 133 | 5/25/15 | 6/7/15 | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 144 | 6/8/15 | 6/21/15 | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 155 | 6/22/15 | 7/5/15 | 24 | 0 | $264.00 | $11.00 | $16.50 | $0.00 |
| 165 | 7/6/15 | 7/19/15 | 42.50 | 0 | $467.50 | $11.00 | $16.50 | $0.00 |
| 175 | 7/20/15 | 8/2/15 | 47.50 | 0 | $522.50 | $11.00 | $16.50 | $0.00 |
| 196 | 8/3/15 | 8/16/15 | 125 | 45 | $1,375.00 | $11.00 | $16.50 | $247.50 |
| 184 | 8/17/15 | 8/30/15 | 154.50 | 74.50 | $1,699.50 | $11.00 | $16.50 | $409.75 |
| 205 | 8/31/15 | 9/13/15 | 120 | 40 | $1,320.00 | $11.00 | $16.50 | $220.00 |
| 218 | 9/14/15 | 9/27/15 | 122 | 42 | $1,342.00 | $11.00 | $16.50 | $231.00 |
| 230 | 9/28/15 | 10/11/15 | 120 | 40 | $1,320.00 | $11.00 | $16.50 | $220.00 |
| 241 | 10/12/15 | 10/25/15 | 108 | 28 | $1,188.00 | $11.00 | $16.50 | $154.00 |
| 252 | 10/26/15 | 11/8/15 | 108 | 28 | $1,188.00 | $11.00 | $16.50 | $154.00 |
| 276 | 11/9/15 | 11/22/15 | 97 | 17 | $1,067.00 | $11.00 | $16.50 | $93.50 |
| 287 | 11/23/15 | 12/6/15 | 120 | 40 | $1,320.00 | $11.00 | $16.50 | $220.00 |
| 294 | 12/7/15 | 12/20/15 | 120 | 40 | $1,320.00 | $11.00 | $16.50 | $220.00 |
| 306 | 12/21/15 | 1/3/16 | 96 | 16 | $1,056.00 | $11.00 | $16.50 | $88.00 |
| 324 | 1/4/16 | 1/17/16 | 120 | 40 | $1,320.00 | $11.00 | $16.50 | $220.00 |
| 327 | 1/18/16 | 1/31/16 | 152 | 72 | $1,672.00 | $11.00 | $16.50 | $396.00 |
| 341 | 2/1/16 | 2/14/16 | 106.50 | 26.50 | $1,171.50 | $11.00 | $16.50 | $145.75 |
| 344 | 2/15/16 | 2/28/16 | 120 | 40 | $1,320.00 | $11.00 | $16.50 | $220.00 |
| 359 | 2/29/16 | 3/13/16 | 108 | 28 | $1,188.00 | $11.00 | $16.50 | $154.00 |
| 368 | 3/14/16 | 3/27/16 | 120 | 40 | $1,320.00 | $11.00 | $16.50 | $220.00 |
| 406 | 3/28/16 | 4/10/16 | 169 | 89 | $1,859.00 | $11.00 | $16.50 | $489.50 |
| 417 | 4/11/16 | 4/24/16 | 96 | 16 | $1,056.00 | $11.00 | $16.50 | $88.00 |
| 426 | 4/25/16 | 5/8/16 | 120 | 40 | $1,320.00 | $11.00 | $16.50 | $220.00 |
| 378 | 5/9/16 | 5/22/16 | 120 | 40 | $1,320.00 | $11.00 | $16.50 | $220.00 |
| 437 | 5/23/16 | 6/5/16 | 108 | 28 | $1,188.00 | $11.00 | $16.50 | $154.00 |
| 459 | 6/6/16 | 6/19/16 | 96 | 16 | $1,056.00 | $11.00 | $16.50 | $88.00 |
| 464 | 6/20/16 | 7/3/16 | 121.50 | 41.50 | $1,336.50 | $11.00 | $16.50 | $228.25 |
| 472 | 7/4/16 | 7/17/16 | 96 | 16 | $1,056.00 | $11.00 | $16.50 | $88.00 |
| 480 | 7/18/16 | 7/31/16 | 120 | 40 | $1,320.00 | $11.00 | $16.50 | $220.00 |
| 489 | 8/1/16 | 8/14/16 | 157 | 77 | $1,884.00 | $12.00 | $18.00 | $462.00 |
| 498 | 8/15/16 | 8/28/16 | 144 | 64 | $1,728.00 | $12.00 | $18.00 | $384.00 |
| 510 | 8/29/16 | 9/11/16 | 103.50 | 23.50 | $1,242.00 | $12.00 | $18.00 | $141.00 |
| 552 | 9/12/16 | 9/25/16 | 120 | 40 | $1,440.00 | $12.00 | $18.00 | $240.00 |
| 562 | 9/26/16 | 10/9/16 | 144 | 64 | $1,728.00 | $12.00 | $18.00 | $384.00 |
| 571 | 10/10/16 | 10/23/16 | 108 | 28 | $1,296.00 | $12.00 | $18.00 | $168.00 |
| 587 | 10/24/16 | 11/6/16 | 120 | 40 | $1,440.00 | $12.00 | $18.00 | $240.00 |
| 596 | 11/7/16 | 11/20/16 | 120 | 40 | $1,440.00 | $12.00 | $18.00 | $240.00 |
| 604 | 11/21/16 | 12/4/16 | 96 | 16 | $1,152.00 | $12.00 | $18.00 | $96.00 |

Attach. "A" to MSJ Ex. 2

| Defendants' DOC ID | Pay Period BEGINNING | Pay Period ENDING | Total Hours Worked | OT Hours Worked (- 80 hrs) | Gross Amount Paid, for hourly wages, orientation pay, and on call pay, if any. | Regular Rate of Pay (total pay / hrs) | Overtime Rate of Pay | OT Back Wages |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| **2 Year Total** | | | | 1,432 | | | | $8,072.25 |
| | | | | | | | | |
| | | | | | | | | |

# EXHIBIT 3

IN THE UNITED STATES COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLOTTE CARMACK, TERESA MILLER, AND JOVAN ANIAGU<br>Plaintiffs<br><br>v.<br><br>PARK CITIES HEALTHCARE, LLC and SHARON D. WESTEN (formerly SHARON D. QUICK)<br>Defendants | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO.<br><br>3:16-cv-03500-D |

DECLARATION OF TERESA MILLER

Pursuant to 28 U.S.C. § 1746, I make the following declaration subject to the penalties for perjury:

1. My name is Teresa Miller. I am over 18 years of age, of sound mind, and capable of making this declaration. I have personal knowledge of the facts stated herein and they are all true and correct.

2. I am one of the three plaintiffs in this overtime lawsuit against Park Cities Healthcare LLC ("Park Cities") and Sharon Westen (formerly Quick) ("Westen"). I signed a consent form to participate in this lawsuit. The consent form was filed with the court on January 4, 2017.

3. I make this declaration in support of Plaintiffs' motion for partial summary judgment.

4. I worked for Park Cities from roughly April 2013 to November 2, 2016 as a Certified Nursing Aide ("CNA"). From about May 2015 to the end of my employment, I held the title of CNA supervisor. This just meant that, in addition to my CNA duties, I also assisted Westen with new employee orientation and carried an on-call cellphone in case one of the other CNAs called in sick or was unable to work as scheduled.

5. I resigned from Park Cities on November 2, 2016.

6. During my Park Cities employment, I was always a full-time employee, paid by the hour, and reported to Westen as a Park Cities employee. Park Cities never classified me as an independent contractor.

7. From January 1, 2015 to the end of my employment, my hour rate of pay was between $11.00 per hour and $12.50 per hour. I received additional pay when I was considered a CNA supervisor. It was an additional $50.00 per pay period to carry Park Cities' on-call phone and I was paid an hourly rate that varied during my employment for the hours I spent assisting Westen with new employee orientation.

8. I regularly worked over 40 a week during my Park Cities employment. When I did, Park Cities paid me my straight hourly rate but did not pay me "time and a half" overtime pay for the hours worked over 40 in a week.

9. Park Cities did not track my hours worked based on a 7-day workweek. Rather, Park Cities tracked my pay and hours on the basis of a 14-day pay period.

10. Except for when I was on vacation, Park Cities regularly scheduled me to work a 12-hour shift at least five days per week but, due to the needs of the client, my actual work hours varied. I sometimes worked six or more days a week.

11. During a shift, it was common for me to be completely alone with the client in the client's home, unless the client's family lived there, or if Westen, the family, or a medical professional came to visit.

12. Except as I have explained above, my job duties as a CNA and CNA supervisor were the same. I provided care for the clients of Park Cities in the client's private home.

13. This means that I provided care to Park Cities' clients by taking their vitals (blood pressure, pulse, and temperature), recorded their fluids in/out, and, occasionally, administered finger sticks for testing the client's blood. I also assisted the client with dressing, grooming, feeding, bathing, toileting, and transferring the client to/from bed. I also assisted the client with instrumental activities of daily living that enabled the client to live at home, such as meal prep, doing light housework such as changing or cleaning the bedclothes, doing laundry, washing

dishes, sweeping the floor, vacuuming, and mopping, and assisting the client medication reminders.

14. The amount of time that I spent assisting the client with activities of daily living (such as dressing, grooming, feeding, bathing, toileting, and transferring) and instrumental activities of daily living (such as meal preparation, light housework, and assistance with the physical taking of medications) in 2015 and 2016 consumed 75 percent or more of my hours worked per week. This means that, if I worked 60 hours in a week, then I easily spent more than 45 hours providing care to assist the client with activities of daily living and instrumental activities of daily living.

15. To provide care to Park Cities' clients – especially my duties doing meal preparation, light housework, and assisting with physical care and medications – I handled and used things such as dish soap, paper towels, trash bags, detergents, mops, brooms, vacuum cleaners, and medical supplies. Having used these goods on a routine basis, I am not aware that any of them were made in Texas.

16. In connection with my Park Cities employment, I also used fax machines and my personal smartphone (voice and text) to communicate with Westen. In 2015 and 2016, I used a Samsung Galaxy smartphone. My research shows that the phone was manufactured in South Korea. My voice/data carrier was Sprint. I used the Sprint app to send my phone payments to Sprint's Carol Stream, IL location. I used the fax machine and smartphone to communicate with Westen, among other things, about work matters and the clients and, every two weeks, to submit a calendar to Westen reporting my hours worked the previous 14 days.

17. Park Cities' clients generally are older and too sick or weak to care for themselves, and most likely would be in a health care facility if it was not for the care provided by Park Cities.

18. All of the duties I performed for Park Cities' clients was performed in the client's private home (a house, condo, or apartment). This included:

a. Ms. Bowles - I provided her care as a client of Park Cities from around May 2014 to February 2015. She owned a condo and lived in it as her permanent home. This was a two bedroom/two bath single family home. She lived there by herself. The address of her condo was 6036A Averill Way, Dallas, TX. 75225.

b. Mr. Alley and Ms. Westen - I recall providing them care as clients of Park Cities from approximately March 2015 to the end of my employment. Initially, I just cared for Mr. Alley in the house that he owned as his permanent home. It was a two-story home located at 3509 Purdue Ave., Dallas, TX. I don't know how many bedrooms or bathrooms it had because I mostly cared for him on the first floor and I never went upstairs. This was a single family home in north Dallas. Then, Mr. Alley moved to a private house at 17241 Marianne Circle, Dallas, TX 75252 that he rented with Ms. Westen. Mr. Alley and Ms. Westen lived there as their permanent home. Later, sometime in June 2016 or so, Ms. Westen and Mr. Alley moved to a smaller two bedroom/two bathroom apartment that they rented at the Remington located in Irving, TX.

19. I did not live in the clients' homes and none of the clients was a family member of mine. I was not employed by any of them or their families--just Park Cities.

20. Based on the duration of my employment as a Park Cities employee, my position, and my observations at the clients' homes, I know that Park Cities did not own, rent, or manage any of the private houses or apartments where I provided care to Park Cities' clients. I have no reason to believe that these clients would have been prohibited from living in their private homes if they were not receiving care from Park Cities.

21. Park Cities also did not exercise control over the private homes in which these clients lived or any other term or condition of the living arrangements. I am not aware of Park Cities ever requiring a client to live in a specific apartment unit or home in order to receive Park Cities' services, and, because Park Cities was not the landlord, Park Cities had no way to evict any of the clients if the clients ceased to use Park Cities' services.

22. With regard to 17241 Marianne Circle, that was a three bedroom/two and a half bathroom 2,200 square foot private home. The client's son, JR Westen rented the home. JR Westen was not an owner of Park Cities and did not participate in Park Cities' management. I know that JR rented the home because, when the sheriff or constable came to serve the eviction papers there, I heard the sheriff ask for JR Westen and saw the eviction notice. The sheriff handed them to

me. No one else lived at 17241 Marianne Circle other than Mr. Alley or Ms. Westen. JR and his mother were not related to Mr. Alley.

23. On October 23, 2017, my lawyer served Park Cities and Westen with Plaintiffs' 2nd Consolidated Discovery. A true and correct copy is attached to this declaration as Attachment "A."

24. This written discovery includes Request Nos. 1, 4, and 7, asking Park Cities to admit or deny the accuracy and completeness of Plaintiffs' hours worked and gross wages as memorialized in Attachments A, B, and C to their 2nd Consolidated Discovery for each of the Plaintiffs in this lawsuit. These hours worked and the gross pay figures for Park Cities' two-week pay periods were copied from Park Cities' pay records received in this case. Defendants did not serve responses or objections to Plaintiffs' 2nd Consolidated Discovery.

25. Using these figures and with the assistance of my lawyer, I have calculated how much overtime I am owed by Park Cities for the period from January 5, 2015 (Park Cities' first pay period in 2015) to the end of my employment. Because Park Cities did not maintain records of my working hours on a seven-day workweek basis, I have calculated the overtime wages I am owed based on Park Cities' 14-day pay period.

26. Rather than subtracting 40 hours worked for each seven-day workweek, I have subtracted 80 hours worked from every 14-day Park Cities pay period to determine the number of overtime hours. For 2015 and 2016, I worked 2,066.25 overtime hours.

27. To determine my regular rate of pay, I have taken the total amount of gross wages that I received in each 14-day Park Cities pay period (excluding payment for holiday pay and expense reimbursements, if any) and divided that amount by the total number of hours recorded for the same 14-day pay period.

28. To determine my overtime rate, I divided the regular rate calculated above by 2 (because Park Cities paid "straight time" for hours worked over 40 and only owes me the "one-half" component of "time-and-one-half").

29. Finally, to arrive at the amount of overtime back wages, for each 14-day pay period, I multiplied the number of overtime hours worked by the overtime rate.

30. After the math is done, I am owed $12,774.67 in back overtime wages for the for the period from January 5, 2015 to the end of my Park Cities employment. A true and correct copy of the spreadsheet detailing the calculation described in this declaration is attached hereto as Attachment "B."

31. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 26 day of February, 2018.

Teresa Miller

Teresa Miller

**From:** **Barry Hersh** bshersh@hersh-law.com
**Subject:** Plaintiffs' 2nd Consolidated Discovery
**Date:** October 23, 2017 at 8:14 PM
**To:** Michael Donohue mdonohue@fflawoffice.com

BH

Mike,

Attached please find Plaintiffs' 2d Consolidated Discovery to Defendants. Also, please notify me when Defendants will be producing the DOL documents, the video clip of Ms. Miller, and text messages between Ms. Quick-Westen and my clients.

As always, please do not hesitate to contact me with questions or comments.

PDF

171023 P's 2d Consol...co.pdf

Barry S. Hersh

Board Certified in Labor and Employment Law
Texas Board of Legal Specialization

Hersh Law Firm, PC
3626 N. Hall St., Suite 800
Dallas, TX 75219-5133
www.hersh-law.com

T: (214) 303-1022
F: (214) 550-8170

NOTICE - This e-mail may be privileged or confidential. If you received this e-mail in error, please reply to notify the sender (only) and delete the message. No attorney-client relationship is created between any e-mail recipient and the sender unless and until the law firm and the recipient sign a written representation agreement.

IN THE UNITED STATES COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLOTTE CARMACK et al., Plaintiffs | § § § | CIVIL ACTION NO. |
| v. | § § | 3:16-cv-03500-D |
| PARK CITIES HEALTHCARE, LLC et al. Defendants | § § § § | |

PLAINTIFF'S 2nd CONSOLIDATED DISCOVERY TO DEFENDANTS

To: Defendants, Park Cities Healthcare, LLC and Sharon Quick Westen, by and through their attorney of record, Michael D. Donohue, 5301 Spring Valley Road, Suite 200, Dallas, TX 75254, (f) 972-776-5313, (e) mdonohue@fflawoffice.com

Pursuant to FED. R. CIV. P. 26, 33, 34, and 36, Plaintiff hereby requires Defendant Park Cities Healthcare, LLC and Defendant Sharon Quick Westen to respond to these written discovery requests within the time period set by the Federal Rules of Civil Procedure. Unless otherwise agreed, production of documents shall be made at the office of Plaintiff's counsel, Barry S. Hersh, Hersh Law Firm P.C., 3626 N. Hall St., Suite 800, Dallas, TX 75219.

Respectfully submitted,

HERSH LAW FIRM, P.C.

Barry S. Hersh
State Bar No. 24001114

*Board Certified in Labor and Employment Law*
*Texas Board of Legal Specialization*

3626 N. Hall St., Suite 800
Dallas, Texas 75219
Telephone: (214) 303-1022
Telecopier: (214) 550-8170

E-mail: bshersh@hersh-law.com

ATTORNEY FOR PLAINTIFF

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served below to all counsel of record for Defendant via facsimile and electronic mail on this the 23rd day of October, 2017.

Michael D. Donohue
5301 Spring Valley Road, Suite 200
Dallas, TX 75254
(f) 972-776-5313
(e) mdonohue@fflawoffice.com

/s/ Barry S. Hersh

___________________________________

Barry S. Hersh

## DEFINITIONS AND INSTRUCTIONS

The term "Plaintiffs" refers to Plaintiffs Charlotte Carmack, Teresa Miller, and Jovan Aniagu, and include their agents, representatives, and attorneys.

The term "Park Cities Healthcare" refers to Defendant Park Cities Healthcare, LLC and includes its managerial level employees, agents, representatives, and attorneys, and all persons acting on behalf of it.

The term "Quick" refers to Defendant Sharon Quick Westen and includes her agents, representatives, and attorneys, and all persons acting on her behalf.

The terms "Defendants" or "you" refer to Defendant Park Cities Healthcare, LLC and/or Defendant Sharon Quick Westen, as the case may be.

The term "Complaint" refers to the First Amended Complaint filed by Plaintiff against Defendants in this action and includes any later filed amendments or/and supplements to such pleading.

The term "Answer" refers to the Original Answer filed by Defendants in this action and includes any later filed amendments or/and supplements to such pleading.

The term "FLSA" refers to the Fair Labor Standards Act of 1938, as amended, § 29 U.S.C. §§ 201, *et seq*.

The term "person" includes a natural person, firm, association, organization, partnership, limited liability partnership, joint venture, limited liability company, business, trust, corporation, professional corporation, legal or public entity, and all predecessors or successors in interest.

The term "document," whether used in singular or plural form, means all documents and things discoverable under the FED. R. CIV. P., and includes the original and any non-identical copies of handwriting, typewriting, printing, photographing, magnetic impulse, mechanical or electronic recording, or other form of data compilation upon any tangible thing and form of communicating or representation, including letters, words, pictures, sounds, or symbols, or combinations of them. This includes written or graphic matter of every kind or description, however produced or reproduced, whether in draft or final, original or reproduction, signed or unsigned, and regardless of whether approved, signed, sent, received, redrafted or executed, including, but not limited to, written communications, e-mails, attachments to e-mails, text messages, and messaging transmitted via social media (and other media maintained on a back-up tape, computer, network, or server), letters, correspondence, memoranda, minutes, notes, photographs, slides, videotapes, motion pictures, tapes or sound records, recordings of any type, contracts, agreements, financial records, performance reports, memoranda of telephone conversations or personal conversations, diaries, desk calendars, interoffice

communications, reports, studies, bills, receipts, personnel records, checks, checkbooks, personal expense accounts, plans, blueprints, drawings, or material similar to any of the foregoing, however denominated and by whomever prepared or to whomever addressed, which are in Defendants' possession, custody or control. UNLESS OTHERWISE AGREED, ELECTRONICALLY MAINTAINED DOCUMENTS AND TANGIBLE THINGS SHOULD BE PRODUCED IN THEIR NATIVE FORMAT.

The term "identify," when used in reference to a document (whether it exists or previously existed), shall include the following: 1) the type of document (e.g., e-mail, letter, memorandum, receipt, invoice, schedule, report, chart, photography, handwritten note, etc.); 2) the title or heading that appears on the document, if any; 3) the date of the document; 4) the author(s) of the document; 5) the addressee of the document; and 6) the location of the document and/or the person who last had or has custody over the document. If any of the foregoing information is not available, state any other available means of identifying such document. Alternatively, for documents being produced in this litigation, identifying documents and tangible things by Bates-labeled number alone is sufficient.

The plural shall include the singular and the singular shall include the plural. The terms "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive. The use of the word "including" shall be construed without limitation. "All" means "any and all." "Any" means "any and all." "Each" means "any and all."

A request for all "documents" that "relate to" or "concern" a subject extends to include each "document" making a statement about, referencing, mentioning, referring to, discussing, describing, reflecting, evidencing, identifying, dealing with, consisting of, constituting, or in any way pertaining to the subject, in whole or in part.

Captions, headings, or bolded or italicize font contained herein are for convenience and reference only and in no way define, describe, extend, or limit the scope any request.

Whenever any request calls for the production of a document or communication to which Defendants claim privilege, include (1) the identification of such document or communication, (2) the dates of the communication or document, (3) the identity of the persons who were parties to the communications, (4) the fact that Defendants claim privilege and the basis asserted for such claim. Defendants further are hereby requested to provide a Privilege Log in accordance with the Federal Rules of Civil Procedure.

Each of the following requests is continuing in nature. If Defendants later obtain, or become aware of, any further information or documents pertaining to these requests, Defendants are requested to supplement your responses in accordance with the Federal Rules of Civil Procedure.

For each document produced or made available in response to these Requests, and unless otherwise directed, Defendants are instructed to organize and label such documents to identify each such request to which the documents correspond or, in the alternative, specify in writing the Bates-label range of documents being produced for each respective request.

CONSOLIDATED DISCOVERY REQUESTS

PLAINTIFF TERESA MILLER

1. REQUEST FOR ADMISSION: Admit that Attachment "A" truly and accurately reflects the hours worked and gross amounts paid to Plaintiff Teresa Miller as set forth in Defendant Park Cities Healthcare's pay records for the pay periods beginning April 14, 2014 and ending November 7, 2016.

   For purposes of this Request, the term "gross amounts paid" means payment of hourly wages, orientation pay, and on call pay, but excludes payment for holiday pay and expense reimbursements, if any.

2. INTERROGATORY: If your answer to No. 1 is anything but an unqualified admission, state the hours worked and gross amounts paid for each pay period that you believe supports your contention that the Attachment is not a true and accurate reflection of hours worked or gross amounts paid. Otherwise, if your answer to No. 1 is an unqualified admission, you may disregard this request.

3. REQUEST FOR PRODUCTION: Produce each document you rely on to support your answer to No. 2.

PLAINTIFF CHARLOTTE MILLER

4. REQUEST FOR ADMISSION: Admit that Attachment "B" truly and accurately reflects the hours worked and gross amounts paid to Plaintiff Charlotte Miller as set forth in Defendant Park Cities Healthcare's pay records for the pay periods beginning October 13, 2014 and ending December 5, 2016.

   For purposes of this Request, the term "gross amounts paid" means payment of hourly wages, orientation pay, and on call pay, but excludes payment for holiday pay and expense reimbursements, if any.

5. INTERROGATORY: If your answer to No. 4 is anything but an unqualified admission, state the hours worked and gross amounts paid for each pay period that you believe supports your contention that the Attachment is not a true and accurate reflection of hours worked or gross amounts paid. Otherwise, if your answer to No. 4 is an unqualified admission, you may disregard this request.

6. REQUEST FOR PRODUCTION: Produce each document you rely on to support

your answer to No. 5.

PLAINTIFF JOVAN ANIAGU

7. REQUEST FOR ADMISSION: Admit that Attachment "C" truly and accurately reflects the hours worked and gross amounts paid to Plaintiff Jovan Aniagu as set forth in Defendant Park Cities Healthcare's pay records for the pay periods beginning December 23, 2013 and ending December 5, 2016.

   For purposes of this Request, the term "gross amounts paid" means payment of hourly wages, orientation pay, and on call pay, but excludes payment for holiday pay and expense reimbursements, if any.

8. INTERROGATORY: If your answer to No. 7 is anything but an unqualified admission, state the hours worked and gross amounts paid for each pay period that you believe supports your contention that the Attachment is not a true and accurate reflection of hours worked or gross amounts paid. Otherwise, if your answer to No. 7 is an unqualified admission, you may disregard this request.

9. REQUEST FOR PRODUCTION: Produce each document you rely on to support your answer to No. 8.

TELEPHONE CALLS

10. REQUEST FOR PRODUCTION: Produce a copy of all documents, including monthly phone records, reflecting any telephone calls between Defendant Sharon Quick Westen—on the one hand—and the U.S. Department of Labor/Wage and Hour Division, attorney Jane Taber, attorney Douglas Bracken, or attorney Stephen Clark—on the other hand. Be sure the records reflect the dates of such calls, the telephone numbers of the participants in such calls, and the duration of the calls. This request is limited to the period from January 1, 2014 to December 26, 2016.

11. INTERROGATORY. Identify the cellphone service provider(s) (e.g., Verizon, T-Mobile, AT&T, etc.) that Sharon Quick Westen used for cellphone number (214) 500-9839 during the period from January 1, 2014 to December 26, 2016. If more than one cellphone service provider was used, please identify the dates each such service provider was used.

[End of document]

# ATTACHMENT A

Teresa Miller

| Defendants' DOC ID | Pay Period BEGINNING | Pay Period ENDING | Total Hours Worked | Gross Amount Paid, for hourly wages, orientation pay, and on call pay, if any. | | | |
|---|---|---|---|---|---|---|---|
| 1220 | 4/14/14 | 4/27/14 | 48 | $528.00 | | | |
| 1217 | 4/28/14 | 5/11/14 | 106 | $1,166.00 | | | |
| 1215 | 5/12/14 | 5/25/14 | 120 | $1,320.00 | | | |
| 1212 | 5/26/14 | 6/8/14 | 108 | $1,188.00 | | | |
| 1209 | 6/9/14 | 6/22/14 | 0 | $0.00 | | | |
| 1207 | 6/23/14 | 7/6/14 | 107.25 | $1,179.75 | | | |
| 1205 | 7/7/14 | 7/20/14 | 96 | $1,056.00 | | | |
| 1203 | 7/21/14 | 8/3/14 | 83.75 | $921.25 | | | |
| 1201 | 8/4/14 | 8/17/14 | 96 | $1,056.00 | | | |
| 1199 | 8/18/14 | 8/31/14 | 96 | $1,056.00 | | | |
| 1198 | 9/1/14 | 9/14/14 | 96 | $1,056.00 | | | |
| 1195 | 9/15/14 | 9/28/14 | 118.75 | $1,306.25 | | | |
| 1193 | 9/29/14 | 10/12/14 | 121 | $1,331.00 | | | |
| 1191 | 10/13/14 | 10/26/14 | 132 | $1,452.00 | | | |
| 1188 | 10/27/14 | 11/9/14 | 108 | $1,188.00 | | | |
| 1186 | 11/10/14 | 11/23/14 | 96.50 | $1,061.50 | | | |
| 1183 | 11/24/14 | 12/7/14 | 114 | $1,254.00 | | | |
| 1181 | 12/8/14 | 12/21/14 | 121 | $1,331.00 | | | |
| 40 | 12/22/14 | 1/4/15 | 120 | $1,320.00 | | | |
| 48 | 1/5/15 | 1/18/15 | 121 | $1,331.00 | | | |
| 58 | 1/19/15 | 2/1/15 | 120 | $1,320.00 | | | |
| 66 | 2/2/15 | 2/15/15 | 132.50 | $1,457.50 | | | |
| 74 | 2/16/15 | 3/1/15 | 58.50 | $643.50 | | | |
| 82 | 3/2/15 | 3/15/15 | 97.25 | $1,069.75 | | | |
| 91 | 3/16/15 | 3/29/15 | 96.25 | $1,058.75 | | | |
| 104 | 3/30/15 | 4/12/15 | 119.75 | $1,308.95 | | | |
| 105 | 4/13/15 | 4/26/15 | 94.75 | $1,092.25 | | | |
| 113 | 4/27/15 | 5/10/15 | 128 | $1,502.00 | | | |
| 124 | 5/11/15 | 5/24/15 | 108 | $1,346.00 | | | |
| 133 | 5/25/15 | 6/7/15 | 108 | $1,346.00 | | | |
| 144 | 6/8/15 | 6/21/15 | 121 | $1,502.00 | | | |
| 155 | 6/22/15 | 7/5/15 | 124 | $1,538.00 | | | |
| 165-166 | 7/6/15 | 7/20/15 | 134.50 | $1,664.00 | | | |
| 175 | 7/21/15 | 8/3/15 | 104.25 | $1,301.00 | | | |
| 196 | 8/4/15 | 8/17/15 | 147 | $1,766.00 | | | |
| 184-185 | 8/18/15 | 8/31/15 | 182.75 | $2,201.00 | | | |
| 205-206 | 9/1/15 | 9/14/15 | 145.5 | $1,796.00 | | | |
| 218-219 | 9/15/15 | 9/28/15 | 120 | $1,490.00 | | | |
| 230-231 | 9/29/15 | 10/12/15 | 60 | $770.00 | | | |
| 241 | 10/13/15 | 10/26/15 | 131 | $1,672.00 | | | |
| 252-253 | 10/27/15 | 11/9/15 | 122 | $1,465.00 | | | |
| 276 | 11/10/15 | 11/23/15 | 120 | $1,515.00 | | | |
| 287-288 | 11/24/15 | 12/7/15 | 120.75 | $1,499.00 | | | |
| 294-295 | 12/8/15 | 12/21/15 | 120 | $1,538.00 | | | |

| Defendants' DOC ID | Pay Period BEGINNING | Pay Period ENDING | Total Hours Worked | Gross Amount Paid, for hourly wages, orientation pay, and on call pay, if any. | | | |
|---|---|---|---|---|---|---|---|
| 306-307 | 12/22/15 | 1/4/16 | 135 | $1,670.00 | | | |
| 315 | 1/5/16 | 1/18/16 | 120 | $1,514.00 | | | |
| 327-328 | 1/19/16 | 2/1/16 | 120 | $1,490.00 | | | |
| 341-342 | 2/2/16 | 2/19/16 | 120 | $1,490.00 | | | |
| 344-345 | 2/20/16 | 2/29/16 | 121 | $1,502.00 | | | |
| 359 | 3/1/16 | 3/14/16 | 132 | $1,634.00 | | | |
| 368-369 | 3/15/16 | 3/28/16 | 124.50 | $1,568.00 | | | |
| 406 | 3/29/16 | 4/11/16 | 120 | $1,490.00 | | | |
| 426 | 4/12/16 | 4/25/16 | 132 | $1,634.00 | | | |
| 426 | 4/26/16 | 5/9/16 | 128.5 | $1,616.00 | | | |
| 378 | 5/10/16 | 5/23/16 | 120.5 | $1,496.00 | | | |
| 437 | 5/24/16 | 6/6/16 | 120 | $1,490.00 | | | |
| 459 | 6/7/16 | 6/20/16 | 120 | $1,490.00 | | | |
| 464 | 6/21/16 | 7/4/16 | 120 | $1,490.00 | | | |
| 472 | 7/5/16 | 7/18/16 | 132 | $1,731.25 | | | |
| 480 | 7/19/16 | 8/1/16 | 133 | $1,662.50 | | | |
| 489 | 8/2/16 | 8/15/16 | 145.5 | $1,918.75 | | | |
| 498 | 8/16/16 | 8/29/16 | 133.50 | $1,718.75 | | | |
| 510 | 8/30/16 | 9/12/16 | 132 | $1,743.75 | | | |
| 552 | 9/13/16 | 9/26/16 | 143.50 | $1,890.63 | | | |
| 562 | 9/27/16 | 10/10/16 | 132 | $1,700.00 | | | |
| 571 | 10/11/16 | 10/24/16 | 147.50 | $1,893.75 | | | |
| 587 | 10/25/16 | 11/7/16 | 95.5 | $1,214.71 | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

# ATTACHMENT B

Charlotte Carmack

| Defendants' DOC ID | Pay Period BEGINNING | Pay Period ENDING | Total Hours Worked | Gross Amount Paid, for hourly wages, orientation pay, and on call pay, if any. | | | |
|---|---|---|---|---|---|---|---|
| 1190 | 10/13/14 | 10/26/14 | 159 | $1,749.00 | | | |
| 1188 | 10/27/14 | 11/9/14 | 99.5 | $1,094.50 | | | |
| 1186 | 11/10/14 | 11/23/14 | 84 | $924.00 | | | |
| 1183 | 11/24/14 | 12/7/14 | 72 | $792.00 | | | |
| 1181 | 12/8/14 | 12/21/14 | 120 | $1,320.00 | | | |
| 40 | 12/22/14 | 1/4/15 | 108 | $1,188.00 | | | |
| 48 | 1/5/15 | 1/18/15 | 120 | $1,320.00 | | | |
| 58 | 1/19/15 | 2/1/15 | 96 | $1,056.00 | | | |
| 66 | 2/2/15 | 2/15/15 | 0 | $0.00 | | | |
| 74 | 2/16/15 | 3/1/15 | 0 | $0.00 | | | |
| 82 | 3/2/15 | 3/15/15 | 0 | $0.00 | | | |
| 91 | 3/16/15 | 3/29/15 | 0 | $0.00 | | | |
| 104 | 3/30/15 | 4/12/15 | 0 | $0.00 | | | |
| 105 | 4/13/15 | 4/26/15 | 0 | $0.00 | | | |
| 113 | 4/27/15 | 5/10/15 | 0 | $0.00 | | | |
| 124 | 5/11/15 | 5/24/15 | 0 | $0.00 | | | |
| 133 | 5/25/15 | 6/7/15 | 0 | $0.00 | | | |
| 144 | 6/8/15 | 6/21/15 | 0 | $0.00 | | | |
| 155 | 6/22/15 | 7/5/15 | 24 | $264.00 | | | |
| 165 | 7/6/15 | 7/20/15 | 42.50 | $467.50 | | | |
| 175 | 7/21/15 | 8/3/15 | 47.50 | $522.50 | | | |
| 196 | 8/4/15 | 8/17/15 | 125 | $1,375.00 | | | |
| 184 | 8/18/15 | 8/31/15 | 154.50 | $1,699.50 | | | |
| 205 | 9/1/15 | 9/14/15 | 120 | $1,320.00 | | | |
| 218 | 9/15/15 | 9/28/15 | 122 | $1,342.00 | | | |
| 230 | 9/29/15 | 10/12/15 | 120 | $1,320.00 | | | |
| 241 | 10/13/15 | 10/26/15 | 108 | $1,188.00 | | | |
| 252 | 10/27/15 | 11/9/15 | 108 | $1,188.00 | | | |
| 276 | 11/10/15 | 11/23/15 | 97 | $1,067.00 | | | |
| 287 | 11/24/15 | 12/7/15 | 120 | $1,320.00 | | | |
| 294 | 12/8/15 | 12/21/15 | 120 | $1,320.00 | | | |
| 306 | 12/22/15 | 1/4/16 | 96 | $1,056.00 | | | |
| 324 | 1/5/16 | 1/18/16 | 120 | $1,320.00 | | | |
| 327 | 1/19/16 | 2/1/16 | 152 | $1,672.00 | | | |
| 341 | 2/2/16 | 2/19/16 | 106.50 | $1,171.50 | | | |
| 344 | 2/20/16 | 2/29/16 | 120 | $1,320.00 | | | |
| 359 | 3/1/16 | 3/14/16 | 108 | $1,188.00 | | | |
| 368 | 3/15/16 | 3/28/16 | 120 | $1,320.00 | | | |
| 406 | 3/29/16 | 4/11/16 | 169 | $1,859.00 | | | |
| 417 | 4/12/16 | 4/25/16 | 96 | $1,056.00 | | | |
| 426 | 4/26/16 | 5/9/16 | 120 | $1,320.00 | | | |
| 378 | 5/10/16 | 5/23/16 | 120 | $1,320.00 | | | |
| 437 | 5/24/16 | 6/6/16 | 108 | $1,188.00 | | | |
| 459 | 6/7/16 | 6/20/16 | 96 | $1,056.00 | | | |
| 464 | 6/21/16 | 7/4/16 | 121.50 | $1,336.50 | | | |
| 472 | 7/5/16 | 7/18/16 | 96 | $1,056.00 | | | |
| 480 | 7/19/16 | 8/1/16 | 120 | $1,320.00 | | | |
| 489 | 8/2/16 | 8/15/16 | 157 | $1,884.00 | | | |
| 498 | 8/16/16 | 8/29/16 | 144 | $1,728.00 | | | |

| Defendants' DOC ID | Pay Period BEGINNING | Pay Period ENDING | Total Hours Worked | Gross Amount Paid, for hourly wages, orientation pay, and on call pay, if any. | | | |
|---|---|---|---|---|---|---|---|
| 510 | 8/30/16 | 9/12/16 | 103.50 | $1,242.00 | | | |
| 552 | 9/13/16 | 9/26/16 | 120 | $1,440.00 | | | |
| 562 | 9/27/16 | 10/10/16 | 144 | $1,728.00 | | | |
| 571 | 10/11/16 | 10/24/16 | 108 | $1,296.00 | | | |
| 587 | 10/25/16 | 11/7/16 | 120 | $1,440.00 | | | |
| 596 | 11/8/16 | 11/21/16 | 120 | $1,440.00 | | | |
| 604 | 11/22/16 | 12/5/16 | 96 | $1,152.00 | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

# ATTACHMENT C

Jovan Aniagu (Banks)

| Defendants' DOC ID | Pay Period BEGINNING | Pay Period ENDING | Total Hours Worked | Gross Amount Paid, for hourly wages, orientation pay, and on call pay, if any. | | | |
|---|---|---|---|---|---|---|---|
| 1240 | 12/23/13 | 1/5/14 | 144 | $1,728.00 | | | |
| 1238 | 1/6/14 | 1/19/14 | 120 | $1,440.00 | | | |
| 1236 | 1/20/14 | 2/2/14 | 120 | $1,440.00 | | | |
| 1233 | 2/3/14 | 2/16/14 | 120 | $1,440.00 | | | |
| 1230 | 2/17/14 | 3/2/14 | 84 | $1,008.00 | | | |
| 1227 | 3/3/14 | 3/16/14 | 108 | $1,296.00 | | | |
| 1225 | 3/17/14 | 3/30/14 | 104 | $1,248.00 | | | |
| 1223 | 3/31/14 | 4/13/14 | 103 | $1,236.00 | | | |
| 1220 | 4/14/14 | 4/27/14 | 110 | $1,320.00 | | | |
| 1217 | 4/28/14 | 5/11/14 | 98 | $1,176.00 | | | |
| 1215 | 5/12/14 | 5/25/14 | 48 | $576.00 | | | |
| 1212 | 5/26/14 | 6/8/14 | 72 | $864.00 | | | |
| 1209 | 6/9/14 | 6/22/14 | 96 | $1,152.00 | | | |
| 1207 | 6/23/14 | 7/6/14 | 70 | $840.00 | | | |
| 1205 | 7/7/14 | 7/20/14 | 96 | $1,152.00 | | | |
| 1203 | 7/21/14 | 8/3/14 | 81 | $972.00 | | | |
| 1201 | 8/4/14 | 8/17/14 | 36 | $432.00 | | | |
| 1199 | 8/18/14 | 8/31/14 | 72 | $864.00 | | | |
| 1198 | 9/1/14 | 9/14/14 | 72 | $864.00 | | | |
| 1195 | 9/15/14 | 9/28/14 | 110.5 | $1,326.00 | | | |
| 1193 | 9/29/14 | 10/12/14 | 96 | $1,152.00 | | | |
| 1190 | 10/13/14 | 10/26/14 | 132 | $1,584.00 | | | |
| 1188 | 10/27/14 | 11/9/14 | 108 | $1,296.00 | | | |
| 1186 | 11/10/14 | 11/23/14 | 96 | $1,152.00 | | | |
| 1183 | 11/24/14 | 12/7/14 | 54 | $648.00 | | | |
| 1181 | 12/8/14 | 12/21/14 | 0 | $0.00 | | | |
| 40 | 12/22/14 | 1/4/15 | 0 | $0.00 | | | |
| 48 | 1/5/15 | 1/18/15 | 0 | $0.00 | | | |
| 58 | 1/19/15 | 2/1/15 | 12 | $144.00 | | | |
| 66 | 2/2/15 | 2/15/15 | 84 | $1,008.00 | | | |
| 74 | 2/16/15 | 3/1/15 | 82 | $984.00 | | | |
| 82 | 3/2/15 | 3/15/15 | 28 | $336.00 | | | |
| 91 | 3/16/15 | 3/29/15 | 95 | $1,140.00 | | | |
| 104 | 3/30/15 | 4/12/15 | 72 | $864.00 | | | |
| 105 | 4/13/15 | 4/26/15 | 128.50 | $1,542.00 | | | |
| 113 | 4/27/15 | 5/10/15 | 109.50 | $1,314.00 | | | |
| 124 | 5/11/15 | 5/24/15 | 132 | $1,584.00 | | | |
| 133 | 5/25/15 | 6/7/15 | 134.50 | $1,614.00 | | | |
| 144 | 6/8/15 | 6/21/15 | 158 | $1,896.00 | | | |
| 155 | 6/22/15 | 7/5/15 | 147 | $1,764.00 | | | |
| 165 | 7/6/15 | 7/20/15 | 121 | $1,452.00 | | | |
| 175 | 7/21/15 | 8/3/15 | 93 | $1,116.00 | | | |
| 196 | 8/4/15 | 8/17/15 | 96 | $1,188.00 | | | |
| 184 | 8/18/15 | 8/31/15 | 127.50 | $1,530.00 | | | |
| 205 | 9/1/15 | 9/14/15 | 145 | $1,740.00 | | | |
| 218 | 9/15/15 | 9/28/15 | 142 | $1,704.00 | | | |
| 230 | 9/29/15 | 10/12/15 | 120 | $1,440.00 | | | |
| 241 | 10/13/15 | 10/26/15 | 142 | $1,704.00 | | | |

| Defendants' DOC ID | Pay Period BEGINNING | Pay Period ENDING | Total Hours Worked | Gross Amount Paid, for hourly wages, orientation pay, and on call pay, if any. | | | |
|---|---|---|---|---|---|---|---|
| 252 | 10/27/15 | 11/9/15 | 180.5 | $2,166.00 | | | |
| 276 | 11/10/15 | 11/23/15 | 179 | $2,148.00 | | | |
| 287 | 11/24/15 | 12/7/15 | 96 | $1,152.00 | | | |
| 294 | 12/8/15 | 12/21/15 | 120 | $1,440.00 | | | |
| 306 | 12/22/15 | 1/4/16 | 132 | $1,584.00 | | | |
| 324 | 1/5/16 | 1/18/16 | 132 | $1,584.00 | | | |
| 327 | 1/19/16 | 2/1/16 | 96 | $1,152.00 | | | |
| 341 | 2/2/16 | 2/19/16 | 120 | $1,440.00 | | | |
| 344 | 2/20/16 | 2/29/16 | 120 | $1,440.00 | | | |
| 359 | 3/1/16 | 3/14/16 | 120 | $1,440.00 | | | |
| 368 | 3/15/16 | 3/28/16 | 93 | $1,116.00 | | | |
| 406 | 3/29/16 | 4/11/16 | 95 | $1,804.00 | | | |
| 417 | 4/12/16 | 4/25/16 | 120 | $1,440.00 | | | |
| 426 | 4/26/16 | 5/9/16 | 120 | $1,440.00 | | | |
| 378 | 5/10/16 | 5/23/16 | 96 | $1,152.00 | | | |
| 437 | 5/24/16 | 6/6/16 | 124 | $1,488.00 | | | |
| 459 | 6/7/16 | 6/20/16 | 120 | $1,440.00 | | | |
| 464 | 6/21/16 | 7/4/16 | 108 | $1,296.00 | | | |
| 472 | 7/5/16 | 7/18/16 | 132 | $1,584.00 | | | |
| 480 | 7/19/16 | 8/1/16 | 120 | $1,440.00 | | | |
| 489 | 8/2/16 | 8/15/16 | 156 | $1,872.00 | | | |
| 498 | 8/16/16 | 8/29/16 | 120 | $1,440.00 | | | |
| 510 | 8/30/16 | 9/12/16 | 112.50 | $1,350.00 | | | |
| 552 | 9/13/16 | 9/26/16 | 144 | $1,728.00 | | | |
| 562 | 9/27/16 | 10/10/16 | 108 | $1,296.00 | | | |
| 571 | 10/11/16 | 10/24/16 | 120 | $1,440.00 | | | |
| 587 | 10/25/16 | 11/7/16 | 120 | $1,458.00 | | | |
| 596 | 11/8/16 | 11/21/16 | 120 | $1,440.00 | | | |
| 604 | 11/22/16 | 12/5/16 | 102 | $1,224.00 | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**Teresa Miller**

| Defendants' DOC ID | Pay Period BEGINNING | Pay Period ENDING | Total Hours Worked | Overtime Hours Worked (-80 hrs) | Gross Amount Paid, for hourly wages, orientation pay, and on call pay, if any. | Regular Rate of Pay (total pay / hrs) | Overtime Rate of Pay | OT Back Wages |
|---|---|---|---|---|---|---|---|---|
| 1220 | 4/14/14 | 4/27/14 | 48 | | | | | |
| 1217 | 4/28/14 | 5/11/14 | 106 | | | | | |
| 1215 | 5/12/14 | 5/25/14 | 120 | | | | | |
| 1212 | 5/26/14 | 6/8/14 | 108 | | | | | |
| 1209 | 6/9/14 | 6/22/14 | 0 | | | | | |
| 1207 | 6/23/14 | 7/6/14 | 107.25 | | | | | |
| 1205 | 7/7/14 | 7/20/14 | 96 | | | | | |
| 1203 | 7/21/14 | 8/3/14 | 83.75 | | | | | |
| 1201 | 8/4/14 | 8/17/14 | 96 | | | | | |
| 1199 | 8/18/14 | 8/31/14 | 96 | | | | | |
| 1198 | 9/1/14 | 9/14/14 | 96 | | | | | |
| 1195 | 9/15/14 | 9/28/14 | 118.75 | | | | | |
| 1193 | 9/29/14 | 10/12/14 | 121 | | | | | |
| 1191 | 10/13/14 | 10/26/14 | 132 | | | | | |
| 1188 | 10/27/14 | 11/9/14 | 108 | | | | | |
| 1186 | 11/10/14 | 11/23/14 | 96.50 | | | | | |
| 1183 | 11/24/14 | 12/7/14 | 114 | | | | | |
| 1181 | 12/8/14 | 12/21/14 | 121 | | | | | |
| 40 | 12/22/14 | 1/4/15 | 120 | | | | | |
| **48** | **1/5/15** | **1/18/15** | **121** | **41** | **$1,331.00** | **$11.00** | **$16.50** | **$225.50** |
| 58 | 1/19/15 | 2/1/15 | 120 | 40 | $1,320.00 | $11.00 | $16.50 | $220.00 |
| 66 | 2/2/15 | 2/15/15 | 132.50 | 52.50 | $1,457.50 | $11.00 | $16.50 | $288.75 |
| 74 | 2/16/15 | 3/1/15 | 58.50 | 0 | $643.50 | $11.00 | $16.50 | $0.00 |
| 82 | 3/2/15 | 3/15/15 | 97.25 | 17.25 | $1,069.75 | $11.00 | $16.50 | $94.88 |
| 91 | 3/16/15 | 3/29/15 | 96.25 | 16.25 | $1,058.75 | $11.00 | $16.50 | $89.38 |
| 104 | 3/30/15 | 4/12/15 | 119.75 | 39.75 | $1,308.95 | $10.93 | $16.40 | $217.25 |
| 105 | 4/13/15 | 4/26/15 | 94.75 | 14.75 | $1,092.25 | $11.53 | $17.29 | $85.02 |
| 113 | 4/27/15 | 5/10/15 | 128 | 48 | $1,502.00 | $11.73 | $17.60 | $281.63 |
| 124 | 5/11/15 | 5/24/15 | 108 | 28 | $1,346.00 | $12.46 | $18.69 | $174.48 |
| 133 | 5/25/15 | 6/7/15 | 108 | 28 | $1,346.00 | $12.46 | $18.69 | $174.48 |
| 144 | 6/8/15 | 6/21/15 | 121 | 41 | $1,502.00 | $12.41 | $18.62 | $254.47 |
| 155 | 6/22/15 | 7/5/15 | 124 | 44 | $1,538.00 | $12.40 | $18.60 | $272.87 |
| 165-166 | 7/6/15 | 7/19/15 | 134.50 | 54.50 | $1,664.00 | $12.37 | $18.56 | $337.13 |
| 175 | 7/20/15 | 8/2/15 | 104.25 | 24.25 | $1,301.00 | $12.48 | $18.72 | $151.32 |
| 196 | 8/3/15 | 8/16/15 | 147 | 67 | $1,766.00 | $12.01 | $18.02 | $402.46 |
| 184-185 | 8/17/15 | 8/30/15 | 182.75 | 102.75 | $2,201.00 | $12.04 | $18.07 | $618.75 |
| 205-206 | 8/31/15 | 9/13/15 | 145.5 | 65.5 | $1,796.00 | $12.34 | $18.52 | $404.25 |
| 218-219 | 9/14/15 | 9/27/15 | 120 | 40 | $1,490.00 | $12.42 | $18.63 | $248.33 |
| 230-231 | 9/28/15 | 10/11/15 | 60 | 0 | $770.00 | $12.83 | $19.25 | $0.00 |
| 241 | 10/12/15 | 10/25/15 | 131 | 51 | $1,672.00 | $12.76 | $19.15 | $325.47 |
| 252-253 | 10/26/15 | 11/8/15 | 122 | 42 | $1,465.00 | $12.01 | $18.01 | $252.17 |
| 276 | 11/9/15 | 11/22/15 | 120 | 40 | $1,515.00 | $12.63 | $18.94 | $252.50 |
| 287-288 | 11/23/15 | 12/6/15 | 120.75 | 40.75 | $1,499.00 | $12.41 | $18.62 | $252.94 |
| 294-295 | 12/7/15 | 12/20/15 | 120 | 40 | $1,538.00 | $12.82 | $19.23 | $256.33 |
| 306-307 | 12/21/15 | 1/3/16 | 135 | 55 | $1,670.00 | $12.37 | $18.56 | $340.19 |
| 315 | 1/4/16 | 1/17/16 | 120 | 40 | $1,514.00 | $12.62 | $18.93 | $252.33 |
| 327-328 | 1/18/16 | 1/31/16 | 120 | 40 | $1,490.00 | $12.42 | $18.63 | $248.33 |
| 341-342 | 2/1/16 | 2/14/16 | 120 | 40 | $1,490.00 | $12.42 | $18.63 | $248.33 |
| 344-345 | 2/15/16 | 2/28/16 | 121 | 41 | $1,502.00 | $12.41 | $18.62 | $254.47 |
| 359 | 2/29/16 | 3/13/16 | 132 | 52 | $1,634.00 | $12.38 | $18.57 | $321.85 |
| 368-369 | 3/14/16 | 3/27/16 | 124.50 | 44.50 | $1,568.00 | $12.59 | $18.89 | $280.22 |

| Defendants' DOC ID | Pay Period BEGINNING | Pay Period ENDING | Total Hours Worked | Overtime Hours Worked (-80 hrs) | Gross Amount Paid, for hourly wages, orientation pay, and on call pay, if any. | Regular Rate of Pay (total pay / hrs) | Overtime Rate of Pay | OT Back Wages |
|---|---|---|---|---|---|---|---|---|
| **406** | 3/28/16 | 4/10/16 | 120 | 40 | $1,490.00 | $12.42 | $18.63 | $248.33 |
| **426** | 4/11/16 | 4/24/16 | 132 | 52 | $1,634.00 | $12.38 | $18.57 | $321.85 |
| **426** | 4/25/16 | 5/8/16 | 128.5 | 48.5 | $1,616.00 | $12.58 | $18.86 | $304.96 |
| **378** | 5/9/16 | 5/22/16 | 120.5 | 40.5 | $1,496.00 | $12.41 | $18.62 | $251.40 |
| **437** | 5/23/16 | 6/5/16 | 120 | 40 | $1,490.00 | $12.42 | $18.63 | $248.33 |
| **459** | 6/6/16 | 6/19/16 | 120 | 40 | $1,490.00 | $12.42 | $18.63 | $248.33 |
| **464** | 6/20/16 | 7/3/16 | 120 | 40 | $1,490.00 | $12.42 | $18.63 | $248.33 |
| **472** | 7/4/16 | 7/17/16 | 132 | 52 | $1,731.25 | $13.12 | $19.67 | $341.00 |
| **480** | 7/18/16 | 7/31/16 | 133 | 53 | $1,662.50 | $12.50 | $18.75 | $331.25 |
| **489** | 8/1/16 | 8/14/16 | 145.5 | 65.5 | $1,918.75 | $13.19 | $19.78 | $431.88 |
| **498** | 8/15/16 | 8/28/16 | 133.50 | 53.50 | $1,718.75 | $12.87 | $19.31 | $344.39 |
| **510** | 8/29/16 | 9/11/16 | 132 | 52 | $1,743.75 | $13.21 | $19.82 | $343.47 |
| **552** | 9/12/16 | 9/25/16 | 143.50 | 63.50 | $1,890.63 | $13.18 | $19.76 | $418.31 |
| **562** | 9/26/16 | 10/9/16 | 132 | 52 | $1,700.00 | $12.88 | $19.32 | $334.85 |
| **571** | 10/10/16 | 10/23/16 | 147.50 | 67.50 | $1,893.75 | $12.84 | $19.26 | $433.32 |
| **587** | 10/24/16 | 11/6/16 | 95.5 | 15.5 | $1,214.71 | $12.72 | $19.08 | $98.58 |
| | | | | | | | | |
| **2 year Total** | | | | 2,066.25 | | | | $12,774.67 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Attach. "B" to MSJ Ex. 3
App. 0104

# EXHIBIT 4

IN THE UNITED STATES COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLOTTE CARMACK, TERESA MILLER, AND JOVAN ANIAGU<br>Plaintiffs | § § § § | CIVIL ACTION NO. |
| v. | § § | 3:16-cv-03500-D |
| PARK CITIES HEALTHCARE, LLC and SHARON D. WESTEN (formerly SHARON D. QUICK)<br>Defendants | § § § § | |

DECLARATION OF JOVAN ANIAGU

Pursuant to 28 U.S.C. § 1746, I make the following declaration subject to the penalties for perjury:

1. My name is Jovan Aniagu. I previously used the name Jovan Banks. I am over 18 years of age, of sound mind, and capable of making this declaration. I have personal knowledge of the facts stated herein and they are all true and correct.

2. I am one of the three plaintiffs in this overtime violation lawsuit against Park Cities Healthcare LLC ("Park Cities") and Sharon Westen (formerly Quick) ("Westen"). I signed a consent form to participate in this lawsuit. The consent form was filed with the court on December 27, 2016.

3. This declaration is made in support of Plaintiffs' motion for partial summary judgment.

4. I worked for Park Cities from sometime in mid 2011 to February 2017. I resigned on or about February 17, 2017.

5. I was always employed by Park Cities as a Caregiver/Medical Assistant.

6. I was always a full-time employee, paid by the hour, and reported to Westen as a Park Cities employee. Park Cities never classified me as an independent contractor.

7. Park Cities paid me $12.00 per hour from 2014 to the end of my employment.

8. I regularly worked over 40 a week while working for Park Cities, but Park Cities did not pay me "time and a half" overtime for hours over 40 in a week. I just got straight time.



Scanned by CamScanner

9. Park Cities paid me based on a 14-day pay period. Park Cities did not track my hours worked based on a 7-day workweek.

10. Park Cities scheduled me to work a 12-hour shift at least five days per week but, due to the needs of the client, my actual work hours varied each pay period.

11. During my working time, I was usually alone with the client in the client's home, unless the client's family lived there or the family or Westen came to visit.

12. Even though I am a Medical Assistant, I performed the same work as Park Cities' CNAs. I was a caregiver. I provided care for the clients of Park Cities in the client's home.

13. I provided Park Cities' clients with the following types of care:

a. I took their vitals (blood pressure, pulse, and temperature). I also did finger pricks for testing the client's blood glucose.

b. I recorded their fluids in/out.

c. I assisted the client with dressing, grooming, feeding, bathing, toileting, and transferring the client to/from bed.

d. I assisted the client with activities that enabled the client to live at home. This included meal prep, doing light housework such as changing or cleaning the bed sheets, doing laundry, washing dishes, sweeping the floor, vacuuming, and mopping), and assisting the client with medication reminders; and

e. I made the client's meals, and cleaned up after the meals.

14. The amount of work hours I spent in 2015 and 2016 dressing, grooming, feeding, bathing, toileting, and transferring the client to/from bed and doing meal prep, light housework, and medication reminders, on average, took up at least 90 percent of my hours worked per week.

15. To perform these duties – especially the meal prep, light housework, and assisting with physical care and medications – I frequently handled and used dishwashing liquid, paper towels, cleaning supplies, trash bags, tissues, laundry detergent, mops, brooms, vacuum cleaners, latex gloves, and medical supplies like adhesive pads or band aids. Having used these things on a regular basis, I am not aware that any of them being made in Texas.

16. I also used fax machines and my personal smartphone (voice and text) to communicate with Westen as part of my Park Cities work. In 2015 and 2016, I used a ZTE Max and/or a Samsung Galaxy smartphone. My research shows that the ZTE Max was manufactured in China. The Samsung Galaxy was manufactured in Korea, Vietnam, China, Brazil, Indonesia, or India. My voice/data carrier was T-Mobile. I used the T-Mobile website to send my payments to one of two T-Mobile addresses: St. Louis, MO or Cincinnati, OH. I used the fax machine and smartphone to communicate with Westen about work matters and the clients and,



Scanned by CamScanner

every two weeks, to submit a calendar to Westen reporting my hours worked for the previous 14 days.

17. The Park Cities' clients I cared for were too sick or weak to care for themselves, and most likely would be in a nursing home if it was not for the care provided by Park Cities.

18. All of the duties I performed for Park Cities' clients was performed in the client's private home. In 2015, this was Mr. Alley, Ms. Bowles, Mr. Alley and Ms. Westen together (only until about July 2015), Mr. Bennett, and then beginning in August 2015 to the end of the year, Mr. White exclusively. In 2016, I spent all or almost all of my working time caring for Mr. White.

a. I provided care for Mr. Alley as a client of Park Cities at the house he owned and lived in as his permanent home. It was a two-story home located at 3509 Purdue Ave., Dallas, TX. I recall that it had 3 bedrooms and three bathrooms. I cared for him on the first floor, and didn't really go upstairs. He lived there alone.

b. I provided care for Ms. Bowles as a client of Park Cities in the condo she owned and lived in as her permanent home. The address was 6036-A Averill Way, Dallas, TX 75225. This was a two bedroom/1.5 bath single family home. She lived there alone.

c. I provided care for Mr. Alley and Ms. Westen for a brief period in 2015 at a single family home located at 17241 Marianne Circle, Dallas, TX 75252. This was a three bedroom house, but only Mr. Alley and Ms. Westen lived there. It was a rented home.

d. I provided care for Mr. Bennett as a client of Park Cities at the house he owned or rented and lived in as his permanent home. It was located off of Proton Drive in either Dallas or Addison, TX. I treated him downstairs and never went upstairs so I don't know how many bedrooms or bathrooms. His wife lived there with him. Other than his wife, no one else lived there.

e. I provided care for Mr. White as a client of Park Cities at his home at 2828 Hood Street #1504, Dallas, TX 75219. This was a three bedroom/3.5 bathroom home. He lived there with his wife and, later, his daughter lived there. Other than that, no one else lived there. It was his permanent home until he passed away.

19. I did not live in the clients' homes and none of the clients was a family member of mine. I was not employed by any of the clients or their families during my Park Cities employment; just Park Cities.

20. Park Cities did not own, rent, or manage any of the private homes where I provided care to clients. I have no reason to believe that these clients would have been prohibited from living in their homes if they were not receiving care from Park Cities. After all, it was their private home.



Scanned by CamScanner

21. Park Cities did not exercise control over the homes in which these clients lived, or any term or condition of the living arrangements. I am not aware of Park Cities ever requiring a client to live in a specific apartment unit or home in order to receive Park Cities' services.

22. During this lawsuit, my lawyer served Park Cities with a spreadsheet listing the work hours and gross pay (excluding payment for holiday bonus and expense reimbursements, if any) that I received from Park Cities. These hours worked and the gross pay figures for Park Cities' two-week pay periods were copied from Park Cities' pay records received in this lawsuit.

23. On October 23, 2017, my lawyer served Park Cities and Westen with Plaintiffs' 2nd Consolidated Discovery. A true and correct copy is attached as Attachment A to Teresa Miller's declaration. A copy of the spreadsheet listing my work hours and gross pay was attached to Plaintiffs' 2nd Consolidated Discovery.

24. Using these figures for hours worked and pay received from our 2nd Consolidated Discovery and with the assistance of my lawyer, I have calculated how much overtime I am owed by Park Cities for the period from January 5, 2015 (Park Cities' first pay period in 2015) to December 4, 2016. Because Park Cities did not maintain adequate records of my working hours on a seven-day workweek basis, I have calculated the overtime wages I am owed based on Park Cities' 14-day pay period.

25. Rather than subtracting 40 hours worked for each seven-day workweek, I have subtracted 80 hours worked from every 14-day Park Cities pay period to determine the number of overtime hours.

26. During this period described, I worked approximately 1,903 overtime hours.

27. To determine my overtime rate, I divided my hourly rate by 2 (because Park Cities paid "straight time" for hours worked over 40 and only owes me the "one-half" component of "time-and-one-half").

28. Finally, to arrive at the amount of overtime back wages, for each 14-day pay period, I multiplied the number of overtime hours worked by the overtime rate.

29. After the math is done, Park Cities did not pay me $11,476.42 in overtime wages for the period from January 5, 2015 to December 4, 2016. A true and correct copy of the spreadsheet detailing the calculation described in this declaration is attached hereto as Attachment "A."

30. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.





Scanned by CamScanner

Executed on this 27 day of February, 2018.

Jovan Aniagu
Jovan Aniagu





Scanned by CamScanner

**Jovan Aniagu (Banks)**

| Defendants' DOC ID | Pay Period BEGINNING | Pay Period ENDING | Total Hours Worked | Overtime Hours Worked (- 80 hrs) | Gross Amount Paid, for hourly wages, orientation pay, and on call pay, if any. | Regular Rate of Pay (total pay / hrs) | Overtime Rate of Pay | OT Back Wages |
|---|---|---|---|---|---|---|---|---|
| 1240 | 12/23/13 | 1/5/14 | 144 | | | | | |
| 1238 | 1/6/14 | 1/19/14 | 120 | | | | | |
| 1236 | 1/20/14 | 2/2/14 | 120 | | | | | |
| 1233 | 2/3/14 | 2/16/14 | 120 | | | | | |
| 1230 | 2/17/14 | 3/2/14 | 84 | | | | | |
| 1227 | 3/3/14 | 3/16/14 | 108 | | | | | |
| 1225 | 3/17/14 | 3/30/14 | 104 | | | | | |
| 1223 | 3/31/14 | 4/13/14 | 103 | | | | | |
| 1220 | 4/14/14 | 4/27/14 | 110 | | | | | |
| 1217 | 4/28/14 | 5/11/14 | 98 | | | | | |
| 1215 | 5/12/14 | 5/25/14 | 48 | | | | | |
| 1212 | 5/26/14 | 6/8/14 | 72 | | | | | |
| 1209 | 6/9/14 | 6/22/14 | 96 | | | | | |
| 1207 | 6/23/14 | 7/6/14 | 70 | | | | | |
| 1205 | 7/7/14 | 7/20/14 | 96 | | | | | |
| 1203 | 7/21/14 | 8/3/14 | 81 | | | | | |
| 1201 | 8/4/14 | 8/17/14 | 36 | | | | | |
| 1199 | 8/18/14 | 8/31/14 | 72 | | | | | |
| 1198 | 9/1/14 | 9/14/14 | 72 | | | | | |
| 1195 | 9/15/14 | 9/28/14 | 110.5 | | | | | |
| 1193 | 9/29/14 | 10/12/14 | 96 | | | | | |
| 1190 | 10/13/14 | 10/26/14 | 132 | | | | | |
| 1188 | 10/27/14 | 11/9/14 | 108 | | | | | |
| 1186 | 11/10/14 | 11/23/14 | 96 | | | | | |
| 1183 | 11/24/14 | 12/7/14 | 54 | | | | | |
| 1181 | 12/8/14 | 12/21/14 | 0 | | | | | |
| 40 | 12/22/14 | 1/4/15 | 0 | | | | | |
| ***48*** | ***1/5/15*** | ***1/18/15*** | ***0*** | ***0*** | ***$0.00*** | ***$0.00*** | ***$0.00*** | ***$0.00*** |
| 58 | 1/19/15 | 2/1/15 | 12 | 0 | $144.00 | $12.00 | $18.00 | $0.00 |
| 66 | 2/2/15 | 2/15/15 | 84 | 4 | $1,008.00 | $12.00 | $18.00 | $24.00 |
| 74 | 2/16/15 | 3/1/15 | 82 | 2 | $984.00 | $12.00 | $18.00 | $12.00 |
| 82 | 3/2/15 | 3/15/15 | 28 | 0 | $336.00 | $12.00 | $18.00 | $0.00 |
| 91 | 3/16/15 | 3/29/15 | 95 | 15 | $1,140.00 | $12.00 | $18.00 | $90.00 |
| 104 | 3/30/15 | 4/12/15 | 72 | 0 | $864.00 | $12.00 | $18.00 | $0.00 |
| 105 | 4/13/15 | 4/26/15 | 128.50 | 48.50 | $1,542.00 | $12.00 | $18.00 | $291.00 |
| 113 | 4/27/15 | 5/10/15 | 109.50 | 29.50 | $1,314.00 | $12.00 | $18.00 | $177.00 |
| 124 | 5/11/15 | 5/24/15 | 132 | 52 | $1,584.00 | $12.00 | $18.00 | $312.00 |
| 133 | 5/25/15 | 6/7/15 | 134.50 | 54.50 | $1,614.00 | $12.00 | $18.00 | $327.00 |
| 144 | 6/8/15 | 6/21/15 | 158 | 78 | $1,896.00 | $12.00 | $18.00 | $468.00 |
| 155 | 6/22/15 | 7/5/15 | 147 | 67 | $1,764.00 | $12.00 | $18.00 | $402.00 |
| 165 | 7/6/15 | 7/19/15 | 121 | 41 | $1,452.00 | $12.00 | $18.00 | $246.00 |
| 175 | 7/20/15 | 8/2/15 | 93 | 13 | $1,116.00 | $12.00 | $18.00 | $78.00 |
| 196 | 8/3/15 | 8/16/15 | 96 | 16 | $1,188.00 | $12.38 | $18.56 | $99.00 |
| 184 | 8/17/15 | 8/30/15 | 127.50 | 47.50 | $1,530.00 | $12.00 | $18.00 | $285.00 |
| 205 | 8/31/15 | 9/13/15 | 145 | 65 | $1,740.00 | $12.00 | $18.00 | $390.00 |
| 218 | 9/14/15 | 9/27/15 | 142 | 62 | $1,704.00 | $12.00 | $18.00 | $372.00 |
| 230 | 9/28/15 | 10/11/15 | 120 | 40 | $1,440.00 | $12.00 | $18.00 | $240.00 |
| 241 | 10/12/15 | 10/25/15 | 142 | 62 | $1,704.00 | $12.00 | $18.00 | $372.00 |
| 252 | 10/26/15 | 11/8/15 | 180.5 | 100.5 | $2,166.00 | $12.00 | $18.00 | $603.00 |
| 276 | 11/9/15 | 11/22/15 | 179 | 99 | $2,148.00 | $12.00 | $18.00 | $594.00 |
| 287 | 11/23/15 | 12/6/15 | 96 | 16 | $1,152.00 | $12.00 | $18.00 | $96.00 |
| 294 | 12/7/15 | 12/20/15 | 120 | 40 | $1,440.00 | $12.00 | $18.00 | $240.00 |
| 306 | 12/21/15 | 1/3/16 | 132 | 52 | $1,584.00 | $12.00 | $18.00 | $312.00 |
| 324 | 1/4/16 | 1/17/16 | 132 | 52 | $1,584.00 | $12.00 | $18.00 | $312.00 |
| 327 | 1/18/16 | 1/31/16 | 96 | 16 | $1,152.00 | $12.00 | $18.00 | $96.00 |
| 341 | 2/1/16 | 2/14/16 | 120 | 40 | $1,440.00 | $12.00 | $18.00 | $240.00 |

| Defendants' DOC ID | Pay Period BEGINNING | Pay Period ENDING | Total Hours Worked | Overtime Hours Worked (- 80 hrs) | Gross Amount Paid, for hourly wages, orientation pay, and on call pay, if any. | Regular Rate of Pay (total pay / hrs) | Overtime Rate of Pay | OT Back Wages |
|---|---|---|---|---|---|---|---|---|
| 344 | 2/15/16 | 2/28/16 | 120 | 40 | $1,440.00 | $12.00 | $18.00 | $240.00 |
| 359 | 2/29/16 | 3/13/16 | 120 | 40 | $1,440.00 | $12.00 | $18.00 | $240.00 |
| 368 | 3/14/16 | 3/27/16 | 93 | 13 | $1,116.00 | $12.00 | $18.00 | $78.00 |
| 406 | 3/28/16 | 4/10/16 | 95 | 15 | $1,804.00 | $18.99 | $28.48 | $142.42 |
| 417 | 4/11/16 | 4/24/16 | 120 | 40 | $1,440.00 | $12.00 | $18.00 | $240.00 |
| 426 | 4/25/16 | 5/8/16 | 120 | 40 | $1,440.00 | $12.00 | $18.00 | $240.00 |
| 378 | 5/9/16 | 5/22/16 | 96 | 16 | $1,152.00 | $12.00 | $18.00 | $96.00 |
| 437 | 5/23/16 | 6/5/16 | 124 | 44 | $1,488.00 | $12.00 | $18.00 | $264.00 |
| 459 | 6/6/16 | 6/19/16 | 120 | 40 | $1,440.00 | $12.00 | $18.00 | $240.00 |
| 464 | 6/20/16 | 7/3/16 | 108 | 28 | $1,296.00 | $12.00 | $18.00 | $168.00 |
| 472 | 7/4/16 | 7/17/16 | 132 | 52 | $1,584.00 | $12.00 | $18.00 | $312.00 |
| 480 | 7/18/16 | 7/31/16 | 120 | 40 | $1,440.00 | $12.00 | $18.00 | $240.00 |
| 489 | 8/1/16 | 8/14/16 | 156 | 76 | $1,872.00 | $12.00 | $18.00 | $456.00 |
| 498 | 8/15/16 | 8/28/16 | 120 | 40 | $1,440.00 | $12.00 | $18.00 | $240.00 |
| 510 | 8/29/16 | 9/11/16 | 112.50 | 32.50 | $1,350.00 | $12.00 | $18.00 | $195.00 |
| 552 | 9/12/16 | 9/25/16 | 144 | 64 | $1,728.00 | $12.00 | $18.00 | $384.00 |
| 562 | 9/26/16 | 10/9/16 | 108 | 28 | $1,296.00 | $12.00 | $18.00 | $168.00 |
| 571 | 10/10/16 | 10/23/16 | 120 | 40 | $1,440.00 | $12.00 | $18.00 | $240.00 |
| 587 | 10/24/16 | 11/6/16 | 120 | 40 | $1,458.00 | $12.15 | $18.23 | $243.00 |
| 596 | 11/7/16 | 11/20/16 | 120 | 40 | $1,440.00 | $12.00 | $18.00 | $240.00 |
| 604 | 11/21/16 | 12/4/16 | 102 | 22 | $1,224.00 | $12.00 | $18.00 | $132.00 |
| | | | | | | | | |
| 2 Year Total | | | | 1,903 | | | | $11,476.42 |
| | | | | | | | | |
| | | | | | | | | |

Attach. "A" to MSJ Ex. 4

App. 0112

# EXHIBIT 5

Case 3:16-cv-03500-D Document 15 Filed 03/20/17 Page 1 of 9 PageID 41

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **CHARLOTTE CARMACK,** individually And on behalf of others similarly situated | § | |
| | § | |
| Plaintiff, | § | |
| | § | **Civil Action No. 3:16-cv-03500-D** |
| v. | § | (Jury Demanded) |
| | § | |
| **PARK CITIES HEALTHCARE, LLC, and SHARON D. QUICK**, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS' ORIGINAL ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT -COLLECTIVE ACTION AND COUNTERCLAIM**

**TO THE HONORABLE U.S. DISTRICT JUDGE:**

**COMES NOW,** Park Cities Healthcare LLC ("PCHC") and Sharon D. Quick-Westen ("Quick") (collectively, "Defendants"), and submit their Original Answer to Plaintiffs' First Amended Complaint under 29 U.S.C. §201 *et seq.* for alleged overtime wage violations, as follows:

## I.
## Admissions and Denials[1]

1. Defendants admit that Plaintiffs' action is purportedly brought under the referenced provisions of the Fair Labor Standards Act (FLSA). Defendants admit that Charlotte Carmack (Carmack) is a nurse's aide who formerly worked for PCHC in rendering home health services to clients of PCHC, who is a provider of home health services. The remaining allegations are denied.

2. Defendants are unable to either admit or deny these allegations because no time period is specified. To the extent that further response is required, such allegations are denied.

[1] Defendant's responses are to the allegations in the referenced paragraph numbers in the Amended Complaint.

Case 3:16-cv-03500-D Document 15 Filed 03/20/17 Page 2 of 9 PageID 42

3. Defendants deny these allegations.

4. Defendants admit that Carmack is an individual named as the party plaintiff in this action. Defendants are unable to admit or deny the remaining allegations.

5. Defendants admit that purported "Class members" consist of those persons who according to the complaint, have consented and opted in to this action, which to-date consist of Carmack, Teresa Miller, and Jovan Aniagu, all former employees of PCHC. The remaining allegations are denied.

6. Defendants admit the stated allegations.

7. Defendants admit that Quick is an individual who resides within the Northern District of Texas, and is represented by the undersigned counsel.

8. Defendants admit this Court has jurisdiction over the stated federal claim in this matter.

9. Defendants admit venue lies within the Northern District of Texas.

10. Defendants admit that it was the former employer of Plaintiff Carmack and the referenced opt-in members.

11. Defendant Quick denies she was the employer of Plaintiff Carmack and the referenced opt-in members, as PCHC was their former employer. Defendant Quick further:

a. Admits the stated allegations;

b. Admits the stated allegations;

c. Admits she has made decisions affecting the operations of PCHC in her capacity as President of PCHC;

d. Admits she, in her capacity as President of PCHC, made decisions as to employment, pay, work hours, and policies for PCHC.

Case 3:16-cv-03500-D Document 15 Filed 03/20/17 Page 3 of 9 PageID 43

e. Admits that she participated in the decision whether or not to pay overtime to Plaintiff and the opt-in members based on her understanding of the law in effect at the time of their employment.

12. Defendants aver the allegations in par. 12 are statements of law, rather than statements of fact. To the extent further response is required, such allegations are denied.

13. Defendants are unable to either admit or deny these allegations, as the referenced website no longer exists.

14. Defendants are unable to either admit or deny these allegations, as the referenced website no longer exists.

15. Admit 1st sentence. As to remaining allegations, see response to paragraph 11(a)-(e).

16. Admit 1st sentence. Deny remaining allegations.

17. Admit that Carmack's duties could include these services, depending on the patient.

18. Admit that Carmack's duties could include these services, depending on the patient; deny remaining allegations.

19. Admit 1st sentence. Deny remaining allegations.

20. Admit that for workweeks prior to January 1, 2015, PCHC paid Carmack straight time for all hours worked. Admit that for some workweeks after January 1, 2015, PCHC paid Carmack straight time for hours in excess of 40 hours per week.

21. Unable to admit or deny, as no time period is specified.

22. Such allegations are denied.

23. No separate answer is required to this paragraph. Defendants rely on their specified answers to each preceding paragraph.

Case 3:16-cv-03500-D Document 15 Filed 03/20/17 Page 4 of 9 PageID 44

24. Deny allegations other than Plaintiff and referenced opt-in members were employed by PCHC as home health employees at various periods of time in the three year period preceding the filing of this action.

25. Deny as to 1st sentence. Admit that pay records will show hours reported as worked by PCHC employees.

26. Such allegations are denied.

27. Such allegations are denied.

28. Such allegations are denied.

29. Such allegations are denied.

30. Such allegations are denied.

31. No separate answer is required to this paragraph. Defendants rely on their specified answers to each preceding paragraph.

32. Such allegations are denied.

33. Such allegations are denied.

34. Defendants aver the allegations in paragraph 34 are statements of law, rather than statements of fact. To the extent further response is required, such allegations are denied.

35. Defendants aver the allegations in paragraph 35 are statements of law, rather than statements of fact. To the extent further response is required, such allegations are denied.

36. Defendants aver the allegations in paragraph 36 are statements of law, rather than statements of fact. To the extent further response is required, such allegations are denied.

37. Such allegations are denied.

38. No response is required to this statement. Defendants acknowledge that Plaintiff and the opt-in members have demanded a trial by jury in this action.

Case 3:16-cv-03500-D Document 15 Filed 03/20/17 Page 5 of 9 PageID 45

39. To the extent a response is required, Defendants deny that Plaintiff and the opt-in members are entitled to the relief requested.

**II.**

**Affirmative Defenses**

40. Defendant Quick denies she is an individual employer or joint employer of Plaintiff and the opt-in members.

41. Defendants deny that this matter should proceed as a collective action, as presently there are 2 opt-in members besides Plaintiff. One of the elements of maintaining a class action is a showing by the plaintiff that the class is so numerous that joinder of all members is impracticable. Cf. *Kase v. Salomon Smith Barney Inc.,* 218 F.R.D. 149, 154 (S.D.Tex. 2003) (granting motion to decertify class under Rule 23). In addition to lack of numerosity, Plaintiffs have failed to address the commonality, typicality and the adequacy of representation requirements beyond their conclusory allegations in the complaint. See, *Hall v. Burk,* 2002 U.S. Dist. LEXIS 4163 at *9 (N.D. Tex. Mar. 12, 2002) (B. Sanders, J.) (denying motion to conditionally certify class).

42. Defendants would show that PCHC's gross revenues for calendar years 2014-2016 were less than $500,000.00, Plaintiff and the opt-in member's work activities were intrastate in nature, and that any interstate commerce activities associated with Plaintiff and the opt-in members do not rise to the level that the Court should apply interstate commerce to exercise jurisdiction under the FLSA, particularly where entity coverage is lacking.

43. Defendants would show that there were no recordkeeping or intentional violations of the FLSA by them.

44. Defendants would show that both Plaintiff Carmack and opt-in member Jovan Ariagu are inappropriate class representatives, as both violated their non-solicitation obligations to Defendants under their employment agreements with PCHC.

45. Defendants assert that Plaintiff Carmack and the opt-in members claims may only be for the two years immediately preceding the filing of their complaint, as there was no intentional violation of the FLSA by Defendants.

46. Defendants assert that Plaintiff Carmack and the opt-in members are not entitled to recover any expert or attorneys' fees and expenses in this matter.

47. Defendants assert the companionship-services exemption under 29 C.F.R. § 552.109(a) and the holding of the U.S. Supreme Court in *Long Island Care at Home, Ltd. v. Coke,* 551 U.S. 158 (2007) as a defense to any claim for overtime pay for hours worked prior to the effective date (December 31, 2015 (phase 2)) of enforcement of DOL's final regulation, *Application of the FLSA to Domestic Service,* 78 Fed.Reg. 60,454-55.

48. Defendants assert that Carmack and opt-in member Jovan Ariagu, while still employed by PCHC, and in direct violation of their non-solicitation obligations to Defendants under their respective employment agreements, allowed another former employee of PCHC, Kay Jacobs Suell, and her company, Keeping Dignity, to provide home health services to an existing client of PCHC, Robert White, while still under contract with PCHC.

50. Based on a Facebook posting on January 9, 2017, Carmack was announced as the new manager of Keeping Dignity's staff team, and Jovan Ariagu joined such company as a staff member providing services to a direct competitor of PCHC and soliciting existing patients of PCHC, in direct violation of their non-solicitation obligations to Defendants under their respective employment agreements.

Case 3:16-cv-03500-D Document 15 Filed 03/20/17 Page 7 of 9 PageID 47

51. Defendants would show that as a result of their conduct, the Whites terminated further home health patient services by PCHC, to the direct damage and detriment of Defendants, who plead such damages as a complete, or alternatively, partial offset to any recovery obtained by Plaintiff Carmack and opt-in member Jovan Ariagu based on their claim for overtime pay in this matter.

**III.**
**Counterclaim for Damages against Plaintiff Carmack and opt-in Member Jovan Ariagu**

1. Plaintiff Carmack and opt-in member Jovan Ariagu upon becoming employed by PCHC, both executed written employment agreements with PCHC.

2. Those agreements provided that during their employment period with PCHC, they would not accept or assist in the procurement of any business from any patient, client, customer or employee of PCHC for the purpose of competing with PCHC, or solicit any patient, client, customer or employee of PCHC in such a way as to cause any detriment to PCHC.

3. These agreements further provided that if litigation arose from the agreement, the parties agreed to reimburse the prevailing party's reasonable attorneys' fees, court costs, and all other expenses, whether or not taxable by the court as costs, in addition to any other relief to which the prevailing party is entitled.

4. Defendants assert that Carmack and opt-in member Jovan Ariagu, while still employed by PCHC, and in direct violation of their non-solicitation obligations to Defendants under their respective employment agreements, allowed another former employee of PCHC, Kay Jacobs Suell, and her company, Keeping Dignity, to provide home health services to an existing client of PCHC, Robert White, while still under contract with PCHC.

5. Based on a Facebook posting on January 9, 2017, Carmack was announced as the new manager of Keeping Dignity's staff team, and Jovan joined such company as a staff member

working under Carmack and Suell providing services for a direct competitor of PCHC and soliciting existing patients of PCHC, in direct violation of their non-solicitation obligations to Defendants under their respective employment agreements.

6. Defendants would show that as a result of their conduct, the Whites terminated further home health patient services by PCHC, to the direct damage and detriment of Defendants, who seek recovery of the loss of business suffered by PCHC, together with reasonable attorneys' fees, court costs, and all other expenses, whether or not taxable by the court as costs, in addition to any other relief to which the Court determines Defendants may be justly entitled.

7. Defendants demand trial by jury on their Counterclaim.

WHEREFORE, PREMISES CONSIDERED, Defendants PCHC and Quick pray that upon final hearing hereof, that Plaintiffs take nothing by their action against Defendants, that Plaintiffs' request for certification of a collective action be denied, that Defendants PCHC and Quick have judgment against Plaintiff Charlotte Carmack and opt-in member Jovan Ariagu for damages they caused to Defendants PCHC and Quick by violating their non-solicitation agreements, together with interest on the judgment, that Defendants PCHC and Quick recover their reasonable attorneys' fees and expenses, costs of Court, expert fees, and such other and further relief to which Defendants PCHC and Quick may be justly entitled.

Respectfully submitted,

*/s/*
Steven E. Clark
Texas Bar No. 04294800
sclark@dfwlaborlaw.com

CLARK FIRM PLLC
10000 N. Central Expressway, Suite 400
Dallas, Texas 75231
(214) 890-4066 office
(214) 890-4013 fax
(214) 853-5458 efax

ATTORNEYS FOR DEFENDANTS
PARK CITIES HEALTHCARE LLC and
SHARON D. QUICK

**CERTIFICATE OF SERVICE**

The undersigned certifies Plaintiff's counsel, Barry Hersh, has been served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3), and by email on this 20th day of March, 2017.

Steven E. Clark

# EXHIBIT 6

**From:** **Barry Hersh** bshersh@hersh-law.com
**Subject:** Plaintiffs' 2nd Consolidated Discovery
**Date:** October 23, 2017 at 8:14 PM
**To:** Michael Donohue mdonohue@fflawoffice.com

BH

Mike,

Attached please find Plaintiffs' 2d Consolidated Discovery to Defendants. Also, please notify me when Defendants will be producing the DOL documents, the video clip of Ms. Miller, and text messages between Ms. Quick-Westen and my clients.

As always, please do not hesitate to contact me with questions or comments.

PDF

171023 P's 2d Consol...co.pdf

Barry S. Hersh

Board Certified in Labor and Employment Law
Texas Board of Legal Specialization

Hersh Law Firm, PC
3626 N. Hall St., Suite 800
Dallas, TX 75219-5133
www.hersh-law.com

T: (214) 303-1022
F: (214) 550-8170

NOTICE - This e-mail may be privileged or confidential. If you received this e-mail in error, please reply to notify the sender (only) and delete the message. No attorney-client relationship is created between any e-mail recipient and the sender unless and until the law firm and the recipient sign a written representation agreement.

IN THE UNITED STATES COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLOTTE CARMACK et al., Plaintiffs | § § § | CIVIL ACTION NO. |
| v. | § | 3:16-cv-03500-D |
| PARK CITIES HEALTHCARE, LLC et al. Defendants | § § § § § § | |

PLAINTIFF'S 2nd CONSOLIDATED DISCOVERY TO DEFENDANTS

To: Defendants, Park Cities Healthcare, LLC and Sharon Quick Westen, by and through their attorney of record, Michael D. Donohue, 5301 Spring Valley Road, Suite 200, Dallas, TX 75254, (f) 972-776-5313, (e) mdonohue@fflawoffice.com

Pursuant to FED. R. CIV. P. 26, 33, 34, and 36, Plaintiff hereby requires Defendant Park Cities Healthcare, LLC and Defendant Sharon Quick Westen to respond to these written discovery requests within the time period set by the Federal Rules of Civil Procedure. Unless otherwise agreed, production of documents shall be made at the office of Plaintiff's counsel, Barry S. Hersh, Hersh Law Firm P.C., 3626 N. Hall St., Suite 800, Dallas, TX 75219.

Respectfully submitted,

HERSH LAW FIRM, P.C.

Barry S. Hersh
State Bar No. 24001114

*Board Certified in Labor and Employment Law*
*Texas Board of Legal Specialization*

3626 N. Hall St., Suite 800
Dallas, Texas 75219
Telephone: (214) 303-1022
Telecopier: (214) 550-8170

E-mail: bshersh@hersh-law.com

ATTORNEY FOR PLAINTIFF

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served below to all counsel of record for Defendant via facsimile and electronic mail on this the 23rd day of October, 2017.

Michael D. Donohue
5301 Spring Valley Road, Suite 200
Dallas, TX 75254
(f) 972-776-5313
(e) mdonohue@fflawoffice.com

/s/ Barry S. Hersh

Barry S. Hersh

DEFINITIONS AND INSTRUCTIONS

The term "Plaintiffs" refers to Plaintiffs Charlotte Carmack, Teresa Miller, and Jovan Aniagu, and include their agents, representatives, and attorneys.

The term "Park Cities Healthcare" refers to Defendant Park Cities Healthcare, LLC and includes its managerial level employees, agents, representatives, and attorneys, and all persons acting on behalf of it.

The term "Quick" refers to Defendant Sharon Quick Westen and includes her agents, representatives, and attorneys, and all persons acting on her behalf.

The terms "Defendants" or "you" refer to Defendant Park Cities Healthcare, LLC and/or Defendant Sharon Quick Westen, as the case may be.

The term "Complaint" refers to the First Amended Complaint filed by Plaintiff against Defendants in this action and includes any later filed amendments or/and supplements to such pleading.

The term "Answer" refers to the Original Answer filed by Defendants in this action and includes any later filed amendments or/and supplements to such pleading.

The term "FLSA" refers to the Fair Labor Standards Act of 1938, as amended, § 29 U.S.C. §§ 201, *et seq*.

The term "person" includes a natural person, firm, association, organization, partnership, limited liability partnership, joint venture, limited liability company, business, trust, corporation, professional corporation, legal or public entity, and all predecessors or successors in interest.

The term "document," whether used in singular or plural form, means all documents and things discoverable under the FED. R. CIV. P., and includes the original and any non-identical copies of handwriting, typewriting, printing, photographing, magnetic impulse, mechanical or electronic recording, or other form of data compilation upon any tangible thing and form of communicating or representation, including letters, words, pictures, sounds, or symbols, or combinations of them. This includes written or graphic matter of every kind or description, however produced or reproduced, whether in draft or final, original or reproduction, signed or unsigned, and regardless of whether approved, signed, sent, received, redrafted or executed, including, but not limited to, written communications, e-mails, attachments to e-mails, text messages, and messaging transmitted via social media (and other media maintained on a back-up tape, computer, network, or server), letters, correspondence, memoranda, minutes, notes, photographs, slides, videotapes, motion pictures, tapes or sound records, recordings of any type, contracts, agreements, financial records, performance reports, memoranda of telephone conversations or personal conversations, diaries, desk calendars, interoffice

communications, reports, studies, bills, receipts, personnel records, checks, checkbooks, personal expense accounts, plans, blueprints, drawings, or material similar to any of the foregoing, however denominated and by whomever prepared or to whomever addressed, which are in Defendants' possession, custody or control. UNLESS OTHERWISE AGREED, ELECTRONICALLY MAINTAINED DOCUMENTS AND TANGIBLE THINGS SHOULD BE PRODUCED IN THEIR NATIVE FORMAT.

The term "identify," when used in reference to a document (whether it exists or previously existed), shall include the following: 1) the type of document (e.g., e-mail, letter, memorandum, receipt, invoice, schedule, report, chart, photography, handwritten note, etc.); 2) the title or heading that appears on the document, if any; 3) the date of the document; 4) the author(s) of the document; 5) the addressee of the document; and 6) the location of the document and/or the person who last had or has custody over the document. If any of the foregoing information is not available, state any other available means of identifying such document. Alternatively, for documents being produced in this litigation, identifying documents and tangible things by Bates-labeled number alone is sufficient.

The plural shall include the singular and the singular shall include the plural. The terms "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive. The use of the word "including" shall be construed without limitation. "All" means "any and all." "Any" means "any and all." "Each" means "any and all."

A request for all "documents" that "relate to" or "concern" a subject extends to include each "document" making a statement about, referencing, mentioning, referring to, discussing, describing, reflecting, evidencing, identifying, dealing with, consisting of, constituting, or in any way pertaining to the subject, in whole or in part.

Captions, headings, or bolded or italicize font contained herein are for convenience and reference only and in no way define, describe, extend, or limit the scope any request.

Whenever any request calls for the production of a document or communication to which Defendants claim privilege, include (1) the identification of such document or communication, (2) the dates of the communication or document, (3) the identity of the persons who were parties to the communications, (4) the fact that Defendants claim privilege and the basis asserted for such claim. Defendants further are hereby requested to provide a Privilege Log in accordance with the Federal Rules of Civil Procedure.

Each of the following requests is continuing in nature. If Defendants later obtain, or become aware of, any further information or documents pertaining to these requests, Defendants are requested to supplement your responses in accordance with the Federal Rules of Civil Procedure.

For each document produced or made available in response to these Requests, and unless otherwise directed, Defendants are instructed to organize and label such documents to identify each such request to which the documents correspond or, in the alternative, specify in writing the Bates-label range of documents being produced for each respective request.

CONSOLIDATED DISCOVERY REQUESTS

PLAINTIFF TERESA MILLER

1. REQUEST FOR ADMISSION: Admit that Attachment "A" truly and accurately reflects the hours worked and gross amounts paid to Plaintiff Teresa Miller as set forth in Defendant Park Cities Healthcare's pay records for the pay periods beginning April 14, 2014 and ending November 7, 2016.

   For purposes of this Request, the term "gross amounts paid" means payment of hourly wages, orientation pay, and on call pay, but excludes payment for holiday pay and expense reimbursements, if any.

2. INTERROGATORY: If your answer to No. 1 is anything but an unqualified admission, state the hours worked and gross amounts paid for each pay period that you believe supports your contention that the Attachment is not a true and accurate reflection of hours worked or gross amounts paid. Otherwise, if your answer to No. 1 is an unqualified admission, you may disregard this request.

3. REQUEST FOR PRODUCTION: Produce each document you rely on to support your answer to No. 2.

PLAINTIFF CHARLOTTE MILLER

4. REQUEST FOR ADMISSION: Admit that Attachment "B" truly and accurately reflects the hours worked and gross amounts paid to Plaintiff Charlotte Miller as set forth in Defendant Park Cities Healthcare's pay records for the pay periods beginning October 13, 2014 and ending December 5, 2016.

   For purposes of this Request, the term "gross amounts paid" means payment of hourly wages, orientation pay, and on call pay, but excludes payment for holiday pay and expense reimbursements, if any.

5. INTERROGATORY: If your answer to No. 4 is anything but an unqualified admission, state the hours worked and gross amounts paid for each pay period that you believe supports your contention that the Attachment is not a true and accurate reflection of hours worked or gross amounts paid. Otherwise, if your answer to No. 4 is an unqualified admission, you may disregard this request.

6. REQUEST FOR PRODUCTION: Produce each document you rely on to support

your answer to No. 5.

PLAINTIFF JOVAN ANIAGU

7. REQUEST FOR ADMISSION: Admit that Attachment "C" truly and accurately reflects the hours worked and gross amounts paid to Plaintiff Jovan Aniagu as set forth in Defendant Park Cities Healthcare's pay records for the pay periods beginning December 23, 2013 and ending December 5, 2016.

   For purposes of this Request, the term "gross amounts paid" means payment of hourly wages, orientation pay, and on call pay, but excludes payment for holiday pay and expense reimbursements, if any.

8. INTERROGATORY: If your answer to No. 7 is anything but an unqualified admission, state the hours worked and gross amounts paid for each pay period that you believe supports your contention that the Attachment is not a true and accurate reflection of hours worked or gross amounts paid. Otherwise, if your answer to No. 7 is an unqualified admission, you may disregard this request.

9. REQUEST FOR PRODUCTION: Produce each document you rely on to support your answer to No. 8.

TELEPHONE CALLS

10. REQUEST FOR PRODUCTION: Produce a copy of all documents, including monthly phone records, reflecting any telephone calls between Defendant Sharon Quick Westen—on the one hand—and the U.S. Department of Labor/Wage and Hour Division, attorney Jane Taber, attorney Douglas Bracken, or attorney Stephen Clark—on the other hand. Be sure the records reflect the dates of such calls, the telephone numbers of the participants in such calls, and the duration of the calls. This request is limited to the period from January 1, 2014 to December 26, 2016.

11. INTERROGATORY. Identify the cellphone service provider(s) (e.g., Verizon, T-Mobile, AT&T, etc.) that Sharon Quick Westen used for cellphone number (214) 500-9839 during the period from January 1, 2014 to December 26, 2016. If more than one cellphone service provider was used, please identify the dates each such service provider was used.

[End of document]

# ATTACHMENT A

Teresa Miller

| Defendants' DOC ID | Pay Period BEGINNING | Pay Period ENDING | Total Hours Worked | Gross Amount Paid, for hourly wages, orientation pay, and on call pay, if any. | | | |
|---|---|---|---|---|---|---|---|
| 1220 | 4/14/14 | 4/27/14 | 48 | $528.00 | | | |
| 1217 | 4/28/14 | 5/11/14 | 106 | $1,166.00 | | | |
| 1215 | 5/12/14 | 5/25/14 | 120 | $1,320.00 | | | |
| 1212 | 5/26/14 | 6/8/14 | 108 | $1,188.00 | | | |
| 1209 | 6/9/14 | 6/22/14 | 0 | $0.00 | | | |
| 1207 | 6/23/14 | 7/6/14 | 107.25 | $1,179.75 | | | |
| 1205 | 7/7/14 | 7/20/14 | 96 | $1,056.00 | | | |
| 1203 | 7/21/14 | 8/3/14 | 83.75 | $921.25 | | | |
| 1201 | 8/4/14 | 8/17/14 | 96 | $1,056.00 | | | |
| 1199 | 8/18/14 | 8/31/14 | 96 | $1,056.00 | | | |
| 1198 | 9/1/14 | 9/14/14 | 96 | $1,056.00 | | | |
| 1195 | 9/15/14 | 9/28/14 | 118.75 | $1,306.25 | | | |
| 1193 | 9/29/14 | 10/12/14 | 121 | $1,331.00 | | | |
| 1191 | 10/13/14 | 10/26/14 | 132 | $1,452.00 | | | |
| 1188 | 10/27/14 | 11/9/14 | 108 | $1,188.00 | | | |
| 1186 | 11/10/14 | 11/23/14 | 96.50 | $1,061.50 | | | |
| 1183 | 11/24/14 | 12/7/14 | 114 | $1,254.00 | | | |
| 1181 | 12/8/14 | 12/21/14 | 121 | $1,331.00 | | | |
| 40 | 12/22/14 | 1/4/15 | 120 | $1,320.00 | | | |
| 48 | 1/5/15 | 1/18/15 | 121 | $1,331.00 | | | |
| 58 | 1/19/15 | 2/1/15 | 120 | $1,320.00 | | | |
| 66 | 2/2/15 | 2/15/15 | 132.50 | $1,457.50 | | | |
| 74 | 2/16/15 | 3/1/15 | 58.50 | $643.50 | | | |
| 82 | 3/2/15 | 3/15/15 | 97.25 | $1,069.75 | | | |
| 91 | 3/16/15 | 3/29/15 | 96.25 | $1,058.75 | | | |
| 104 | 3/30/15 | 4/12/15 | 119.75 | $1,308.95 | | | |
| 105 | 4/13/15 | 4/26/15 | 94.75 | $1,092.25 | | | |
| 113 | 4/27/15 | 5/10/15 | 128 | $1,502.00 | | | |
| 124 | 5/11/15 | 5/24/15 | 108 | $1,346.00 | | | |
| 133 | 5/25/15 | 6/7/15 | 108 | $1,346.00 | | | |
| 144 | 6/8/15 | 6/21/15 | 121 | $1,502.00 | | | |
| 155 | 6/22/15 | 7/5/15 | 124 | $1,538.00 | | | |
| 165-166 | 7/6/15 | 7/20/15 | 134.50 | $1,664.00 | | | |
| 175 | 7/21/15 | 8/3/15 | 104.25 | $1,301.00 | | | |
| 196 | 8/4/15 | 8/17/15 | 147 | $1,766.00 | | | |
| 184-185 | 8/18/15 | 8/31/15 | 182.75 | $2,201.00 | | | |
| 205-206 | 9/1/15 | 9/14/15 | 145.5 | $1,796.00 | | | |
| 218-219 | 9/15/15 | 9/28/15 | 120 | $1,490.00 | | | |
| 230-231 | 9/29/15 | 10/12/15 | 60 | $770.00 | | | |
| 241 | 10/13/15 | 10/26/15 | 131 | $1,672.00 | | | |
| 252-253 | 10/27/15 | 11/9/15 | 122 | $1,465.00 | | | |
| 276 | 11/10/15 | 11/23/15 | 120 | $1,515.00 | | | |
| 287-288 | 11/24/15 | 12/7/15 | 120.75 | $1,499.00 | | | |
| 294-295 | 12/8/15 | 12/21/15 | 120 | $1,538.00 | | | |

| Defendants' DOC ID | Pay Period BEGINNING | Pay Period ENDING | Total Hours Worked | Gross Amount Paid, for hourly wages, orientation pay, and on call pay, if any. | | | |
|---|---|---|---|---|---|---|---|
| 306-307 | 12/22/15 | 1/4/16 | 135 | $1,670.00 | | | |
| 315 | 1/5/16 | 1/18/16 | 120 | $1,514.00 | | | |
| 327-328 | 1/19/16 | 2/1/16 | 120 | $1,490.00 | | | |
| 341-342 | 2/2/16 | 2/19/16 | 120 | $1,490.00 | | | |
| 344-345 | 2/20/16 | 2/29/16 | 121 | $1,502.00 | | | |
| 359 | 3/1/16 | 3/14/16 | 132 | $1,634.00 | | | |
| 368-369 | 3/15/16 | 3/28/16 | 124.50 | $1,568.00 | | | |
| 406 | 3/29/16 | 4/11/16 | 120 | $1,490.00 | | | |
| 426 | 4/12/16 | 4/25/16 | 132 | $1,634.00 | | | |
| 426 | 4/26/16 | 5/9/16 | 128.5 | $1,616.00 | | | |
| 378 | 5/10/16 | 5/23/16 | 120.5 | $1,496.00 | | | |
| 437 | 5/24/16 | 6/6/16 | 120 | $1,490.00 | | | |
| 459 | 6/7/16 | 6/20/16 | 120 | $1,490.00 | | | |
| 464 | 6/21/16 | 7/4/16 | 120 | $1,490.00 | | | |
| 472 | 7/5/16 | 7/18/16 | 132 | $1,731.25 | | | |
| 480 | 7/19/16 | 8/1/16 | 133 | $1,662.50 | | | |
| 489 | 8/2/16 | 8/15/16 | 145.5 | $1,918.75 | | | |
| 498 | 8/16/16 | 8/29/16 | 133.50 | $1,718.75 | | | |
| 510 | 8/30/16 | 9/12/16 | 132 | $1,743.75 | | | |
| 552 | 9/13/16 | 9/26/16 | 143.50 | $1,890.63 | | | |
| 562 | 9/27/16 | 10/10/16 | 132 | $1,700.00 | | | |
| 571 | 10/11/16 | 10/24/16 | 147.50 | $1,893.75 | | | |
| 587 | 10/25/16 | 11/7/16 | 95.5 | $1,214.71 | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

# ATTACHMENT B

Charlotte Carmack

| Defendants' DOC ID | Pay Period BEGINNING | Pay Period ENDING | Total Hours Worked | Gross Amount Paid, for hourly wages, orientation pay, and on call pay, if any. | | | |
|---|---|---|---|---|---|---|---|
| 1190 | 10/13/14 | 10/26/14 | 159 | $1,749.00 | | | |
| 1188 | 10/27/14 | 11/9/14 | 99.5 | $1,094.50 | | | |
| 1186 | 11/10/14 | 11/23/14 | 84 | $924.00 | | | |
| 1183 | 11/24/14 | 12/7/14 | 72 | $792.00 | | | |
| 1181 | 12/8/14 | 12/21/14 | 120 | $1,320.00 | | | |
| 40 | 12/22/14 | 1/4/15 | 108 | $1,188.00 | | | |
| 48 | 1/5/15 | 1/18/15 | 120 | $1,320.00 | | | |
| 58 | 1/19/15 | 2/1/15 | 96 | $1,056.00 | | | |
| 66 | 2/2/15 | 2/15/15 | 0 | $0.00 | | | |
| 74 | 2/16/15 | 3/1/15 | 0 | $0.00 | | | |
| 82 | 3/2/15 | 3/15/15 | 0 | $0.00 | | | |
| 91 | 3/16/15 | 3/29/15 | 0 | $0.00 | | | |
| 104 | 3/30/15 | 4/12/15 | 0 | $0.00 | | | |
| 105 | 4/13/15 | 4/26/15 | 0 | $0.00 | | | |
| 113 | 4/27/15 | 5/10/15 | 0 | $0.00 | | | |
| 124 | 5/11/15 | 5/24/15 | 0 | $0.00 | | | |
| 133 | 5/25/15 | 6/7/15 | 0 | $0.00 | | | |
| 144 | 6/8/15 | 6/21/15 | 0 | $0.00 | | | |
| 155 | 6/22/15 | 7/5/15 | 24 | $264.00 | | | |
| 165 | 7/6/15 | 7/20/15 | 42.50 | $467.50 | | | |
| 175 | 7/21/15 | 8/3/15 | 47.50 | $522.50 | | | |
| 196 | 8/4/15 | 8/17/15 | 125 | $1,375.00 | | | |
| 184 | 8/18/15 | 8/31/15 | 154.50 | $1,699.50 | | | |
| 205 | 9/1/15 | 9/14/15 | 120 | $1,320.00 | | | |
| 218 | 9/15/15 | 9/28/15 | 122 | $1,342.00 | | | |
| 230 | 9/29/15 | 10/12/15 | 120 | $1,320.00 | | | |
| 241 | 10/13/15 | 10/26/15 | 108 | $1,188.00 | | | |
| 252 | 10/27/15 | 11/9/15 | 108 | $1,188.00 | | | |
| 276 | 11/10/15 | 11/23/15 | 97 | $1,067.00 | | | |
| 287 | 11/24/15 | 12/7/15 | 120 | $1,320.00 | | | |
| 294 | 12/8/15 | 12/21/15 | 120 | $1,320.00 | | | |
| 306 | 12/22/15 | 1/4/16 | 96 | $1,056.00 | | | |
| 324 | 1/5/16 | 1/18/16 | 120 | $1,320.00 | | | |
| 327 | 1/19/16 | 2/1/16 | 152 | $1,672.00 | | | |
| 341 | 2/2/16 | 2/19/16 | 106.50 | $1,171.50 | | | |
| 344 | 2/20/16 | 2/29/16 | 120 | $1,320.00 | | | |
| 359 | 3/1/16 | 3/14/16 | 108 | $1,188.00 | | | |
| 368 | 3/15/16 | 3/28/16 | 120 | $1,320.00 | | | |
| 406 | 3/29/16 | 4/11/16 | 169 | $1,859.00 | | | |
| 417 | 4/12/16 | 4/25/16 | 96 | $1,056.00 | | | |
| 426 | 4/26/16 | 5/9/16 | 120 | $1,320.00 | | | |
| 378 | 5/10/16 | 5/23/16 | 120 | $1,320.00 | | | |
| 437 | 5/24/16 | 6/6/16 | 108 | $1,188.00 | | | |
| 459 | 6/7/16 | 6/20/16 | 96 | $1,056.00 | | | |
| 464 | 6/21/16 | 7/4/16 | 121.50 | $1,336.50 | | | |
| 472 | 7/5/16 | 7/18/16 | 96 | $1,056.00 | | | |
| 480 | 7/19/16 | 8/1/16 | 120 | $1,320.00 | | | |
| 489 | 8/2/16 | 8/15/16 | 157 | $1,884.00 | | | |
| 498 | 8/16/16 | 8/29/16 | 144 | $1,728.00 | | | |

| Defendants' DOC ID | Pay Period BEGINNING | Pay Period ENDING | Total Hours Worked | Gross Amount Paid, for hourly wages, orientation pay, and on call pay, if any. | | | |
|---|---|---|---|---|---|---|---|
| 510 | 8/30/16 | 9/12/16 | 103.50 | $1,242.00 | | | |
| 552 | 9/13/16 | 9/26/16 | 120 | $1,440.00 | | | |
| 562 | 9/27/16 | 10/10/16 | 144 | $1,728.00 | | | |
| 571 | 10/11/16 | 10/24/16 | 108 | $1,296.00 | | | |
| 587 | 10/25/16 | 11/7/16 | 120 | $1,440.00 | | | |
| 596 | 11/8/16 | 11/21/16 | 120 | $1,440.00 | | | |
| 604 | 11/22/16 | 12/5/16 | 96 | $1,152.00 | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

# ATTACHMENT C

Jovan Aniagu (Banks)

| Defendants' DOC ID | Pay Period BEGINNING | Pay Period ENDING | Total Hours Worked | Gross Amount Paid, for hourly wages, orientation pay, and on call pay, if any. | | | |
|---|---|---|---|---|---|---|---|
| 1240 | 12/23/13 | 1/5/14 | 144 | $1,728.00 | | | |
| 1238 | 1/6/14 | 1/19/14 | 120 | $1,440.00 | | | |
| 1236 | 1/20/14 | 2/2/14 | 120 | $1,440.00 | | | |
| 1233 | 2/3/14 | 2/16/14 | 120 | $1,440.00 | | | |
| 1230 | 2/17/14 | 3/2/14 | 84 | $1,008.00 | | | |
| 1227 | 3/3/14 | 3/16/14 | 108 | $1,296.00 | | | |
| 1225 | 3/17/14 | 3/30/14 | 104 | $1,248.00 | | | |
| 1223 | 3/31/14 | 4/13/14 | 103 | $1,236.00 | | | |
| 1220 | 4/14/14 | 4/27/14 | 110 | $1,320.00 | | | |
| 1217 | 4/28/14 | 5/11/14 | 98 | $1,176.00 | | | |
| 1215 | 5/12/14 | 5/25/14 | 48 | $576.00 | | | |
| 1212 | 5/26/14 | 6/8/14 | 72 | $864.00 | | | |
| 1209 | 6/9/14 | 6/22/14 | 96 | $1,152.00 | | | |
| 1207 | 6/23/14 | 7/6/14 | 70 | $840.00 | | | |
| 1205 | 7/7/14 | 7/20/14 | 96 | $1,152.00 | | | |
| 1203 | 7/21/14 | 8/3/14 | 81 | $972.00 | | | |
| 1201 | 8/4/14 | 8/17/14 | 36 | $432.00 | | | |
| 1199 | 8/18/14 | 8/31/14 | 72 | $864.00 | | | |
| 1198 | 9/1/14 | 9/14/14 | 72 | $864.00 | | | |
| 1195 | 9/15/14 | 9/28/14 | 110.5 | $1,326.00 | | | |
| 1193 | 9/29/14 | 10/12/14 | 96 | $1,152.00 | | | |
| 1190 | 10/13/14 | 10/26/14 | 132 | $1,584.00 | | | |
| 1188 | 10/27/14 | 11/9/14 | 108 | $1,296.00 | | | |
| 1186 | 11/10/14 | 11/23/14 | 96 | $1,152.00 | | | |
| 1183 | 11/24/14 | 12/7/14 | 54 | $648.00 | | | |
| 1181 | 12/8/14 | 12/21/14 | 0 | $0.00 | | | |
| 40 | 12/22/14 | 1/4/15 | 0 | $0.00 | | | |
| 48 | 1/5/15 | 1/18/15 | 0 | $0.00 | | | |
| 58 | 1/19/15 | 2/1/15 | 12 | $144.00 | | | |
| 66 | 2/2/15 | 2/15/15 | 84 | $1,008.00 | | | |
| 74 | 2/16/15 | 3/1/15 | 82 | $984.00 | | | |
| 82 | 3/2/15 | 3/15/15 | 28 | $336.00 | | | |
| 91 | 3/16/15 | 3/29/15 | 95 | $1,140.00 | | | |
| 104 | 3/30/15 | 4/12/15 | 72 | $864.00 | | | |
| 105 | 4/13/15 | 4/26/15 | 128.50 | $1,542.00 | | | |
| 113 | 4/27/15 | 5/10/15 | 109.50 | $1,314.00 | | | |
| 124 | 5/11/15 | 5/24/15 | 132 | $1,584.00 | | | |
| 133 | 5/25/15 | 6/7/15 | 134.50 | $1,614.00 | | | |
| 144 | 6/8/15 | 6/21/15 | 158 | $1,896.00 | | | |
| 155 | 6/22/15 | 7/5/15 | 147 | $1,764.00 | | | |
| 165 | 7/6/15 | 7/20/15 | 121 | $1,452.00 | | | |
| 175 | 7/21/15 | 8/3/15 | 93 | $1,116.00 | | | |
| 196 | 8/4/15 | 8/17/15 | 96 | $1,188.00 | | | |
| 184 | 8/18/15 | 8/31/15 | 127.50 | $1,530.00 | | | |
| 205 | 9/1/15 | 9/14/15 | 145 | $1,740.00 | | | |
| 218 | 9/15/15 | 9/28/15 | 142 | $1,704.00 | | | |
| 230 | 9/29/15 | 10/12/15 | 120 | $1,440.00 | | | |
| 241 | 10/13/15 | 10/26/15 | 142 | $1,704.00 | | | |

| Defendants' DOC ID | Pay Period BEGINNING | Pay Period ENDING | Total Hours Worked | Gross Amount Paid, for hourly wages, orientation pay, and on call pay, if any. | | | |
|---|---|---|---|---|---|---|---|
| 252 | 10/27/15 | 11/9/15 | 180.5 | $2,166.00 | | | |
| 276 | 11/10/15 | 11/23/15 | 179 | $2,148.00 | | | |
| 287 | 11/24/15 | 12/7/15 | 96 | $1,152.00 | | | |
| 294 | 12/8/15 | 12/21/15 | 120 | $1,440.00 | | | |
| 306 | 12/22/15 | 1/4/16 | 132 | $1,584.00 | | | |
| 324 | 1/5/16 | 1/18/16 | 132 | $1,584.00 | | | |
| 327 | 1/19/16 | 2/1/16 | 96 | $1,152.00 | | | |
| 341 | 2/2/16 | 2/19/16 | 120 | $1,440.00 | | | |
| 344 | 2/20/16 | 2/29/16 | 120 | $1,440.00 | | | |
| 359 | 3/1/16 | 3/14/16 | 120 | $1,440.00 | | | |
| 368 | 3/15/16 | 3/28/16 | 93 | $1,116.00 | | | |
| 406 | 3/29/16 | 4/11/16 | 95 | $1,804.00 | | | |
| 417 | 4/12/16 | 4/25/16 | 120 | $1,440.00 | | | |
| 426 | 4/26/16 | 5/9/16 | 120 | $1,440.00 | | | |
| 378 | 5/10/16 | 5/23/16 | 96 | $1,152.00 | | | |
| 437 | 5/24/16 | 6/6/16 | 124 | $1,488.00 | | | |
| 459 | 6/7/16 | 6/20/16 | 120 | $1,440.00 | | | |
| 464 | 6/21/16 | 7/4/16 | 108 | $1,296.00 | | | |
| 472 | 7/5/16 | 7/18/16 | 132 | $1,584.00 | | | |
| 480 | 7/19/16 | 8/1/16 | 120 | $1,440.00 | | | |
| 489 | 8/2/16 | 8/15/16 | 156 | $1,872.00 | | | |
| 498 | 8/16/16 | 8/29/16 | 120 | $1,440.00 | | | |
| 510 | 8/30/16 | 9/12/16 | 112.50 | $1,350.00 | | | |
| 552 | 9/13/16 | 9/26/16 | 144 | $1,728.00 | | | |
| 562 | 9/27/16 | 10/10/16 | 108 | $1,296.00 | | | |
| 571 | 10/11/16 | 10/24/16 | 120 | $1,440.00 | | | |
| 587 | 10/25/16 | 11/7/16 | 120 | $1,458.00 | | | |
| 596 | 11/8/16 | 11/21/16 | 120 | $1,440.00 | | | |
| 604 | 11/22/16 | 12/5/16 | 102 | $1,224.00 | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

# EXHIBIT 7

**U.S. Department of Labor**

Wage and Hour Division
Southwest Regional Office
A. Maceo Smith Federal Building
525 S. Griffin Street, Room 800
Dallas, TX 75202-5007
Telephone: (214) 749-2000

21 December 2017

Mr. Barry S. Hersh
**Hersh Law Firm**
3626 N. Hall St, Suite 800
Dallas, TX 75219

Re: Freedom of Information Act Request #845325
Park Cities Healthcare, LLC (Case ID 1806981)

Dear Mr. Hersh,

The Regulation at 29 CFR Part 70 contains the general rules of the Department of Labor for providing access to information from the records of the Department. These regulations implement 5 U.S.C. § 552, the Freedom of Information Act, and the policy of the Department to disseminate information on matters of interest to the public.

Therefore, pursuant to your Freedom of Information Act (FOIA) request dated 14 November 2017, I am providing copies of disclosable documents contained in our Park Cities Healthcare, LLC investigation file(s). On 4 December 2017 you were provided by email a statement of authorization to be sign by your client, as of today no statement of authorization has been received from you. Therefore your FOIA request has been processed as a third party request.

Furthermore, you have been placed in the "Commercial" category for possible payment of fees. Pursuant to the Department's regulations at 29 CFR § 70.40(c)(4), charges assessed for requesters in the "Commercial" category may be for search, review and reproduction costs. There is a fee of 15 cents per page. There is a charge of $5 per quarter hour for clerical search time, and $10 per quarter hour for professional search and/or review time.

209 documents (approximate number) were withheld in their entirety from release from the 333 available documents.

The types of documents withheld in their entirety consist of:

Intake Documents (Exemption 7c and 7d)

Letters (Exemption 7c and 7d)

Interview Statements (Exemption 7c and 7d)

Commercial & Financial Documents (Exemption 4)

Personnel Related Documents / Information (Exemption 6, 7c)

Employee Listings (Exemption 7c)

Investigative Techniques and Procedures (Exemption 7e)

Deletions were made in the documents as indicated, pursuant to Exemptions 4, 5, 6, 7(c), 7(d) and 7(e).

Commercial / Financial matters (Exemptions 4)

Internal forms, memoranda and Deliberate Process Privilege (Exemption 5)

Personnel, medical and similar files (Exemption 6)

Provides protection of personal information (Exemption 7c)

Protects the identity of a Confidential Source (Exemption 7d)

Investigative Techniques and Procedures (Exemption 7e)

Exemption 4 of the FOIA protects the withholding of "trade secrets, commercial or financial information obtained from a person that is privileged or confidential". This exemption covers two broad categories of information in federal agency records: (1) trade secrets; and (2) information that is (a) commercial or financial and (b) obtained from a person, and (c) privileged and confidential.

Likewise, I have not disclosed the annual dollar volume, the number of employees from several documents and copies of financial information from the file. This information is considered to be commercial and/or financial information which can be withheld pursuant to Exemption 4.

However, before releasing commercial or financial information we must go through the EO12600 process. This process includes advising the submitter of the commercial information, that we have a Freedom of Information Act request and soliciting views as to whether disclosure would cause substantial harm if the information is released. With that in mind, if you wish to obtain such documents please notify my office and we will began the EO12600 process; otherwise, we will consider our response to your request to be complete and no additional correspondence between us is warranted.

Exemption 5 of the FOIA protects "inter-agency or Intra-agency internal forms, memorandums or letters, which would not be available by law to a party other than an agency in litigation with the agency. It permits the withholding of opinions, views, conclusions and recommendations in writhing by staff members to preserve the full and frank exchange of ideas, which are necessary for the effective functioning of the Government.

Exemption 6 of the FOIA permits the government to withhold all information about individuals in "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy.

Exemption 7(c) permits the withholding of information, which would constitute an unwarranted invasion of personal privacy. This includes names of persons and personal information relating to them that may become part of an investigative file.

Exemption 7(d) permits the withholding of "records or information compiled for law enforcement purposes which could reasonably be expected to disclose the identity of a confidential source.

Exemption 7(e) affords protection to all law enforcement information that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."

There are no fees associated with fulfilling this request.

It is the Labor Department's policy to disclose information to the maximum practicable extent. In this regard it should be noted that the Department has authority to waive certain exemptions in appropriate circumstances. The records responsive to your request have been reviewed and had it been determined that the public interest underlying an exemption would not be frustrated by waiving the exemption, in order to foster DOL's policy of maximum disclosure, the exemption would have been waived.

If you need any further assistance or would like to discuss any aspect of your request please do not hesitate to contact Dallas Region Office, FOIA Professional Joel Saavedra at 214-749-2025 or at saavedra.joel@dol.gov. If he cannot assist you or you have further concerns you cannot resolve with him, please contact the DOL FOIA Public Liaison, Thomas Hicks, at 202-693-5427 or by email at hicks.thomas@dol.gov.

Alternatively, you may contact the Office of Government Information Services National Archives and Records Administration (OGIS) to inquire about the mediation services they offer. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road, College Park, MD 20740-6001. You can also reach that office by e-mail at ogis@nara.gov, by phone at 202-741- 5770, by fax at 202-741-5769, or by calling toll-free at 1-877-684-6448.

Finally, if you are not satisfied with the response to this request, you may administratively appeal by writing to the Solicitor of Labor within 90 days from the date of this letter. The appeal must state in writing the grounds for the appeal, and it may include any supporting statements or arguments, but such statements are not required. In order to facilitate processing of the appeal, please include your mailing address and daytime telephone number, as well as a copy of the initial request and copy of this letter. The envelope and letter of the appeal should be clearly marked "Freedom of Information Act Appeal."

Any amendment to the appeal must be made in writing and received prior to a decision. The appeal should be addressed to the Solicitor of Labor, Division of Management and Administrative Legal Services, U.S. Department of Labor, 200Constitution Avenue, NW, Room N2420, Washington, DC 20210. Appeals may also be submitted by email to foiaappeal@dol.gov. Appeals submitted to any other email address will not be accepted.

I trust this information is responsive to your request.

Sincerely,

Craig L. Jackson

CRAIG L. JACKSON
Disclosure Officer

Enclosures

**Steven E. Clark**
Attorney

Clark Firm PLLC

10000 N.Central Expwy., Suite 400
Dallas, TX 75231
Phone: 214-890-4066
sclark@dfwlaborlaw.com
Efax: 214-853-5458 Fax:214-890-4013

**Park Cities Healthcare**
Private Duty Nursing
Concierge Home Health
In-home Caregiving Services

**Sharon Quick-Westen, RN**
President
C-214.500.9839
F-972-252-3376
www.parkcitieshealthcare.com

Transmittal Form | **U.S Department of Labor**
Employment Standards Administration

***DATE:*** ***December 6, 2017***

***TO:*** ***Southwest Regional Office***
***Freedom of Information Act Request***
***ATTN: FOIA Section – Joel M. Saavedra***

***FROM:*** ***ADD Jesus Valdez***

***Dallas DO***

***MANAGER'S SIGNATURE:***

***OFFICE:*** ***Dallas District Office***

***SUBJECT:*** ***FOIA Records Request December 5, 2017, Park Cities Healthcare Case #1806981***

U.S. Department of Labor
Wage Hour Division
Regional Office

DEC 07 2017

WH-136

# WHISARD Compliance Action Report

## U.S. Department of Labor
Wage and Hour Division

Case ID: *1806981*
Originating District: *Dallas TX District Office*
Local Filing Number: *2017-167-19012*
Investigating. District: *Dallas TX District Office*
WHMIS Case Number:
Lead Investigator: [redacted] Ex 6 & Ex 7(c)
Registration Date: *11/16/2016*
Assignment Date: *12/01/2016*

## Employer Information

Trade Name: *Park City Healthcare, LLC*
Address: *401 Saint Jose Blvd*
*Irving, TX75038*

Legal Name: *Park City Healthcare, LLC*
EIN: *26-3871622*
County: *Dallas*
NAICS Code: *621610*
No. Of Employees: [redacted]

## Investigation Information

Period Investigated From: *01/04/2015*
To: *01/03/2017*
Investigation Type: [redacted] Ex 7(e)
Investigation Tool: *Full Investigation*
Compliance Status: *Agree to Comply*

BNPI:
Reinvestigation: ☐
Recurring Violation: ☐
Future Compliance Agreed: ☑
Involved in AG: ☐

## Recommended Action:

BWFS: ☐
CMP: ☐
Litigation: ☐
Civil Action: ☐
Criminal Action: ☐
Submit For Opinion: ☐

RO/NO Review: ☐
Follow Up Investigation: ☐
Other Action: ☑
Denial of Future Certificate: ☐
BW Payment Deadline:
Trailer forms attached: ☐

## CL

| Violation / Compliance Status | Violations | EEs ATP | BWs Computed | BWs Agreed | LDs Computed | LDs Agreed | CMPs* |
|---|---|---|---|---|---|---|---|
| *No Violation found for this act / Compliance (no violations found)* | | | | | $0.00 | $0.00 | |
| | | | | | | | |

# WHISARD Compliance Action Report

## FLSA

| Violation / Compliance Status | Violations | EEs ATP | BWs Computed | BWs Agreed | LDs Computed | LDs Agreed | CMPs* |
|---|---|---|---|---|---|---|---|
| *Failure to pay proper overtime / Agree to Comply* | *11* | *11* | *$17,927.26* | *$0.00* | *$0.00* | *$0.00* | |
| *Failure to keep accurate records / Agree to Comply* | *1* | *0* | *$0.00* | *$0.00* | *$0.00* | *$0.00* | |
| ***FLSA Totals:*** | *11* | *11* | *$17,927.26* | *$0.00* | *$0.00* | *$0.00* | |
| ***Total Violations Under FLSA:*** | | *12* | | | | | *$0.00* |

** CMPs computed do not necessarily indicate CMPs assessed.*

| | | | |
|---|---|---|---|
| Unduplicated Employees Found: | *11* | Unduplicated Employees Agreed: | *0* |
| Total Amount BWs Computed: | *$17,927.26* | Total Amount BWs Agreed: | *$0.00* |
| Total Amount LDs Computed: | *$0.00* | Total Amount LDs Agreed: | *$0.00* |

**Conclusions & Recommendations:**

***37.50 hrs, ind cov (Domestic Employment), RK/OT vio, ST for OT, failure to include bonus into the RR, TTL BWs $17,927.26 found for 11 ees, ER ATC but RTP, pub given, REC - SLM & possible section 16 & 17.***

Ex 6 & Ex 7(c)

WHI Signature: [redacted] Date: 05/08/2017

Reviewed By: D. Edwards Date: 5/17/17

Narrative Addendum

Park Cities Healthcare – 1806981

Attorney Steven Clark was contacted in June to discuss the case. He advised that the employer had sought new counsel and Michael Donohue was now representing the firm. Discussions with Mr. Donohue resulted in a confirmation about an agreement to future compliance, but no firm commitment regarding back wage payments. In September, a final answer regarding the back wages was requested by 10/5/17. Mr. Donahue had been advised that either DOL would pursue litigation or advise employees of their rights under Section 16b.

[redacted] Ex 7(e)

Gary Edwards
ADD
11/27/17

Park Cities Healthcare
Case ID: 1806981

2017-167-19012
Park Cities Healthcare, LLC
401 Saint Jose Blvd,
Irving, TX 75038
Tel: 214-500-9839
EIN #: 26-3871622

## FLSA Narrative

### Coverage

*Identity*

Subject is a home health care agency engaged in providing skilled nurses and certified nursing assistants for patients who reside at their private home (See exhibit C-2 & E-15). The company was formed in Texas under the legal name of Park cities Healthcare Consultants, LLC on 12/10/2008 and amended its legal name to Park Cities Healthcare, LLC on 12/3/2012. The business is owned and run by Ms. Sharon Diane Quick who is a register nurse. (See exhibit C-1, 19, 20, & 21)

The company has an annual gross receipt of Ex 4 in 2014, Ex 4 in 2015, and Ex 4 (See exhibit C-4, 5, & 6). Therefore, 3(s)(1)(A) enterprise coverage under the FLSA was not applicable. However, those employees who regularly provide personal care and nursing services in and about a patient's private home are covered individually under the section 202(a)5 of the FLSA.

The company has a total of [redacted] employees and no branch office. (See exhibit C-1 & E-1)

The period of investigation is from 01/04/2015 through 01/03/2017

*3D employer*

Ms. Sharon Diane Quick is the owner who runs the business and manages the employees. She is defined as 3D employer of the FLSA (See exhibit C-1, & B-1 through 9).

*Principal*

The principal in the investigation is Mr. Steven Clark, who is an attorney of Clark Firm PLLC to represent the employer. Mr. Clark can be reached at his direct line 214-890-4066 and email address: sclark@dfwlaborlaw.com.

*Investigative History*

No history case was found within Whisard database.

*MODO:*

Park Cities Healthcare
Case ID: 1806981

The company is located in Irving, Texas. Dallas DO is the MODO.

**Exemptions**

*Applicable*

*Non Applicable*

FLSA section 13(a) 15 –This exemption was not applicable to any domestic service employees who provided companionship service to elderly people or patients who need assistance in caring for themselves through a third party employer.

**Status of Compliance**

Ex 7(d)

*Section 6- Minimum Wage*

No violation was found for those domestic service employees who regularly made more than $2,000 a year or worked over 8 hours a week through review of the records and interview.

*Section 7- Overtime*

Violations were found under this section through interviews and review of records for the domestic services employees. These employees regularly worked 12 hours shift and more than 40 hours a week. They were paid straight time for overtime. In addition, non-discretionary bonus was not included into their regular rate for overtime calculation. (See exhibit B-1 through 9, & D-7 through 119)

WHI [redacted] computed additional half time for overtime based on the records provided by the employer. WHI [redacted] did not compute any back wages for the non-enforcement period between 1/1/2015 through 11/11/2015. A total of 11 employees are due back wages in the amount of $17,927.26 (See exhibit A-1 through 4).

*Section 11- Record Keeping*

Violation was found under this section through the review of records as a result of above overtime violations. In addition, the employer failed to provide time records for review.

*Section 12- Child Labor*

No violation was found through employee interviews.

**Disposition**

A final conference was held on 05/04/2017 at the attorney's office with the employer, Ms. Sharon Quick, and her representative, Attorney Steven Clark, present. WHI [redacted] represented Department of Labor, Wage and Hour Division.

At the beginning of the conference, WHI [redacted] asked if Ms. Quick was aware of the new home care rule. Ms. Quick indicated that at the beginning when people started talking about the new rule, she consulted with Mr. Steven Clark and was advised it was put on-hold. She also indicated that she could not follow through after then because she was diagnosed with cancer in the beginning of 2016. She further indicated that immediately after she found it out in November of 2016, she changed her pay practice.

WHI [redacted] explained the individual coverage under the domestic employment. Ms. Quick indicated that she wanted Mr. Clark to address that. Mr. Clark indicated that he understood DOL's position but did not necessarily agree to it. WHI [redacted] asked if they wanted WHI [redacted] to explain the findings since they could not agree to the coverage. Mr. Clark indicated that to understand DOL's findings was the reason for them to be there in the meeting.

WHI [redacted] explained the change of home care rule and that the third party could no longer claim companionship exemption. WHI [redacted] also explained the 20% rule for the general house work in the regulation before 2015. Mr. Clark and Ms. Quick indicated that they understood.

WHI [redacted] presented the findings under Section 6, 7, 11, & 12 of the FLSA. WHI [redacted] explained overtime violations. WHI [redacted] explained that the non-discretionary bonus needs to be included into the regular rate for overtime purpose. The bonus was discussed. Mr. Clark indicated that they understood. Overtime violation resulting from paying straight time for overtime was discussed. Ms. Quick indicated that she believed she paid fair to her employees because they were paid higher than industry rate and more than time and a half of the minimum wage. She further indicated that she started paying overtime after she found out the change of the rule. Ms. Quick and Mr. Clark indicated that they would continue to be in compliance in the future.

WHI [redacted] explained record keeping violations. Ms. Quick indicated that the employees recorded their hours on the calendars and she was not aware of that she had to provide it for review. WHI [redacted] explained the records keeping requirements. Ms. Quick and Ms. Clark indicated that they understood and would be in compliance.

WHI [redacted] asked if they would consider resolving the back wages issue. Mr. Clark indicated that they would not agree to resolve the back wages but would like to know DOL's findings. WHI [redacted] presented the back wages. Mr. Clark stated that WHI could submit the case as a refusal. WHI [redacted] explained to Ms. Quick the possible outcomes of a refusal case. Ms. Quick indicated that she understood.

The meeting was ended.

**Publications Provided:**

The following publications were provided to Ms. Sharon Quick throughout the course of investigation:

1. WH 1261 (Records to be kept by Employers).
2. WH 1312 (Hours worked under the FLSA of 1938, as amended)
3. WH 1325 (Overtime Compensation under the FLSA)
4. WH1281 (FLSA Exec. Admin, Professional or Outside Sales Regs)
5. Fact Sheets # 44, 77A, 79E, 79D, & 79A

**Recommendation:**

Ex 5 [redacted]

Ex 6 & Ex 7(c) [redacted]

Wage and Hour Investigator
05/05/2017

# Summary of Unpaid Wages

**U.S. Department of Labor**
Wage and Hour Division

| | | | |
|---|---|---|---|
| **Office Address:** | Dallas TX District Office<br>Dallas District Office<br>1701 E. Lamar<br>Suite 270<br>Arlington, TX 76006<br>817-861-2150 | **Investigator:**<br>Ex 6 & Ex 7(c) [redacted] | **Date:**<br>05/03/2017 |
| | | **Employer Fed Tax ID Number:** 26-3871622 | |

| 1. Name | 2. Address | 3. Period Covered by Work Week Ending Dates | 4. Act(s) | 5. BWs Due | Total |
|---|---|---|---|---|---|
| Ex 6 & Ex 7(c) [redacted] | | | FLSA | $1,595.00 | $1,595.00 |
| | | | | $1,595.00 | $1,595.00 |
| | | | FLSA | $445.50 | $445.50 |
| | | | | $445.50 | $445.50 |
| | | | FLSA | $4,614.50 | $4,614.50 |
| | | | | $4,614.50 | $4,614.50 |
| | | | FLSA | $1,732.50 | $1,732.50 |
| | | | | $1,732.50 | $1,732.50 |
| | | | FLSA | $22.00 | $22.00 |
| | | | | $22.00 | $22.00 |
| | | | FLSA | $1,029.66 | $1,029.66 |
| | | | | $1,029.66 | $1,029.66 |

| | | | | |
|---|---|---|---|---|
| **I agree to pay the listed employees the amount due shown above by**<br><br>**Signed:** __________<br><br>**Date:** __________ | **Employer Name and Address:**<br>Park City Healthcare, LLC<br>Park City Healthcare, LLC<br>401 Saint Jose Blvd<br>Irving TX 75038 | **Subtotal:** | $9,439.16 | $9,439.16 |

Form WH-56

# Summary of Unpaid Wages

**U.S. Department of Labor**
Wage and Hour Division

| | | | |
|---|---|---|---|
| **Office Address:** | Dallas TX District Office<br>Dallas District Office<br>1701 E. Lamar<br>Suite 270<br>Arlington, TX 76006<br>817-861-2150 | **Investigator:** Ex 6 & Ex 7(c) [redacted] | **Date:** 05/03/2017 |
| | | **Employer Fed Tax ID Number:** 26-3871622 | |

| 1. Name | 2. Address | 3. Period Covered by Work Week Ending Dates | 4. Act(s) | 5. BWs Due | Total |
|---|---|---|---|---|---|
| Ex 6 & Ex 7(c) [redacted] | | | FLSA | $100.10 | $100.10 |
| | | | | $100.10 | $100.10 |
| | | | FLSA | $2,464.50 | $2,464.50 |
| | | | | $2,464.50 | $2,464.50 |
| | | | FLSA | $1,803.00 | $1,803.00 |
| | | | | $1,803.00 | $1,803.00 |
| | | | FLSA | $3,666.75 | $3,666.75 |
| | | | | $3,666.75 | $3,666.75 |
| | | | FLSA | $453.75 | $453.75 |
| | | | | $453.75 | $453.75 |

| | | | | |
|---|---|---|---|---|
| **I agree to pay the listed employees the amount due shown above by**<br><br>**Signed:** ____________<br><br>**Date:** ____________ | **Employer Name and Address:**<br>Park City Healthcare, LLC<br>Park City Healthcare, LLC<br>401 Saint Jose Blvd<br>Irving TX 75038 | **Subtotal:** | $8,488.10 | $8,488.10 |
| | | **Total:** | $17,927.26 | $17,927.26 |

Form WH-56

THIS PAGE IS INTENTIONALLY BLANK

# EXHIBIT 8

IN THE UNITED STATES COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLOTTE CARMACK, TERESA MILLER, AND JOVAN ANIAGU<br>Plaintiffs | § | CIVIL ACTION NO. |
| v. | § | 3:16-cv-03500-D |
| PARK CITIES HEALTHCARE, LLC and SHARON D. WESTEN (formerly SHARON D. QUICK)<br>Defendants | § | |

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

Plaintiffs Charlotte Carmack, Teresa Miller, and Jovan Aniagu bring this Second Amended Complaint against Defendant Park Cities Healthcare, LLC ("Park Cities") and its founder and president Defendant Sharon D. Westen ("Westen"), and show as follows:

## I. SUMMARY

1. This is an action brought pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq*. ("FLSA" or "Act"). Plaintiffs are two certified nursing aides and a medical aide who worked for Defendants as hourly-paid employees to provide medically related services and care to Defendants' patient-clients. Defendant Park Cities—a provider of home health services—contracted with the patient-clients receiving these services (or their families) and is a third-party employer or employees engaged in companionship-type services.

2. Plaintiffs regularly worked for Defendants in excess of 40 hours per week. When they did, Defendants did not pay them an overtime premium of at a rate of one and one-half times their regular rate of pay for all hours worked over 40 in a week. Rather, Defendants only paid them "straight" time.

Case 3:16-cv-03500-D Document 34 Filed 12/05/17 Page 2 of 13 PageID 211

3. After Plaintiffs brought this action, Defendants retaliated against Plaintiffs Carmack and Aniagu and continue to retaliate against them. Defendants terminated Carmack's employment in January 2017 and, now, Defendant Park Cities maintains a retaliatory lawsuit against Carmack and Aniagu in state court for allegedly breaching their Park Cities employment agreement. Defendant Westen recently testified under oath that she had no information to support that either Carmack or Aniagu solicited her clients or disclosed/used Park Cities' confidential information before Defendant Park Cities filed the lawsuit against them.

4. Plaintiffs bring this action because Defendants have violated the overtime pay and anti-retaliation provisions of FLSA. Plaintiffs seek recovery of their unpaid overtime compensation, an equal amount of liquidated damages, lost wages, punitive damages, attorney fees, and costs. Defendants' actions in violation of the FLSA are "willful."

## II. PARTIES

5. Plaintiff Charlotte Carmack is an individual who resides in Tarrant County, TX. She consents to be a party plaintiff in this action and her consent form is on file with this Court.

6. Plaintiff Teresa Miller is an individual who resides in Dallas County, TX. She consents to be a party plaintiff in this action and her consent form is on file with this Court.

7. Plaintiff Jovan Aniagu is an individual who resides in Dallas County, TX. She consents to be a party plaintiff in this action and her consent form is on file with this Court.

8. Defendant Park Cities Healthcare, LLC ("Park Cities") is a Texas limited

liability corporation actively doing business in the State of Texas, including in this district. Defendant Park Cities is represented by counsel and already has accepted service to appear in this action.

9. Defendant Sharon D. Westen ("Westen") is an individual who resides in Dallas County, TX. Defendant Westen already is represented by counsel and already has accepted service to appear in this action.

## III. JURISDICTION AND VENUE

10. This Court has original jurisdiction over this action because Plaintiffs assert claims arising under federal law.

11. Venue is proper in this district because it the judicial district where a substantial part of the events or omissions giving rise to the claim occurred, Defendants employed Plaintiffs in this district, and Defendants conduct business in this district.

## IV. COVERAGE

12. At all times material to this action, Defendant Park Cities has acted, directly or indirectly, in the interest of an employer with respect to Plaintiffs.

13. At all times material to this action, Defendant Westen has acted, directly or indirectly, in the interest of an employer in relation to Plaintiffs. For example, and by no means a limitation:

a. Defendant Westen is the founder and president of Defendant Park Cities;

b. Defendant Westen has had the authority to issue and sign checks on Defendant Park Cities' accounts.

c. Defendant Westen had made decisions relating to significant aspects of Defendant Park Cities' day-to-day business and, in fact, is and has been

Case 3:16-cv-03500-D Document 34 Filed 12/05/17 Page 4 of 13 PageID 213

the only officer of Defendant Park Cities since it began operations;

d. Defendant Westen has made decisions affecting the terms and conditions of Plaintiffs' employment, including how much to pay them, what employment agreement terms they should be offered, how many work hours per week they are offered, and adopting and enforcing workplace policies;

e. Defendant Westen made the decision whether or not to pay overtime compensation to Plaintiffs when they worked in excess of 40 hours in a work week; and

f. Defendant Westen made the decision in late November 2016 or early December 2016 to begin paying overtime compensation to Defendant Park Cities' hourly employees when they worked in excess of 40 hours in a work week.

14. At all times material to this action, Plaintiffs were domestic service employees and, as such, are covered under the FLSA's mandatory overtime provisions.

15. Plaintiffs performed domestic service employment in households at all times during their employment by Defendants.

16. In 1974, Congress amended the FLSA to extend the FLSA's protections to all domestic service employees, including those employed by employers too small to be covered under the Act's enterprise coverage provisions. *See* Pub. L. No. 93-259, § 7, 88 Stat. 55, 62 (1974).

17. The U.S. Department of Labor's FLSA regulations define "domestic service employees" to include, but is not limited to, services performed by employees such as

Case 3:16-cv-03500-D Document 34 Filed 12/05/17 Page 5 of 13 PageID 214

"nurses, … caretakers, … home health aides, [and] personal care aides." *See* 29 C.F.R. § 552.3. Section 2(a) of the FLSA expressly recognizes that "the employment of persons in domestic service in households affects commerce." 29 U.S.C. § 202(a).

18. At all times material to this action during their employment with Defendants, Plaintiffs handled goods such as detergents, vacuum cleaners, medication, and medical supplies that had moved in or were produced for interstate commerce.

19. At all times material to this action during their employment with Defendants, the services that Plaintiffs performed freed up members of Defendants' clients' family members to themselves engage in activities in interstate commerce.

20. In addition, at all times material to this action during their employment with Defendants, Plaintiffs used fax machines and/or text messaging/SMS communications through interstate telecommunications voice and data carriers to facilitate their communications with Defendants.

## V. FACTUAL BACKGROUND

21. According to its website, www.parkcitieshealthcare.com (subsequently modified by Defendants after Plaintiffs filed this action), Defendant Park Cities considers itself "the leading provider of Concierge Health services, via: private duty staff, nursing case-management, physician home visits and referrals for the geriatric population throughout Dallas and the surrounding area."

22. Defendant Park Cities performs these services in "Dallas and the surrounding area" by, among other things, employing hourly-paid home health employees, like it did with Plaintiffs, who provided medically related services and care to Defendants' patient-clients in their private homes, apartments, and elsewhere.

23. Defendant Westen is the president of Defendant Park Cities. She has ultimate decision-making authority for establishing the terms and conditions of employment for Defendant Park Cities' employees. This includes, but is not limited to, setting work schedules, setting rates of pay, awarding pay raises and bonuses, making the decision whether or not to pay employees overtime compensation when an employee works in excess of 40 hours per week, and adopting workplace policies or rules that affected Plaintiffs' and other employees' employment.

24. Plaintiff Charlotte Carmack is a certified nursing aide who began working for Defendants as an hourly-paid home health employee in 2011. At no point during her employment with Defendants was she ever directly employed by Defendants' patient-client or the patient-client's family or household. Defendants terminated her employment in January 2017 after she filed this action in late December 2016.

25. Plaintiff Teresa Miller is a certified nursing aide who began working for Defendants as an hourly-paid home health employee in 2013. At no point during her employment with Defendants was she ever directly employed by Defendants' patient-client or the patient-client's family or household. Her employment with Defendants ended in November 2016.

26. Plaintiff Jovan Aniagu is a medical aide who began working for Defendants as an hourly-paid home health employee in 2011. She was one of Defendants' first employees. At no point during her employment with Defendants was she ever directly employed by Defendants' patient-client or the patient-client's family or household. Her employment with Defendants ended in February 2017.

27. Plaintiff Carmack, Miller, and Aniagu's duties while employed with

Case 3:16-cv-03500-D Document 34 Filed 12/05/17 Page 7 of 13 PageID 216

Defendants included medically related services, such as taking vitals, recording fluid in/out, and administering shots or finger sticks for testing blood.

28. Plaintiff Carmack, Miller, and Aniagu's duties while employed with Defendants also included assisting the Defendants' patient-clients with activities of daily living such as dressing, grooming, feeding, bathing, toileting, and transferring from bed, and instrumental activities of daily living that enabled the patient-client to live at home such as meal preparation, light housework, assistance with the physical taking of medications, and arranging medical care. With regard to the duties described in this paragraph, these duties generally exceeded 20 percent of their total hours worked per week.

29. Plaintiffs' weekly work times varied from week-to-week while employed with Defendants. Prior to December 2016, Defendants generally scheduled Plaintiffs to work roughly 60 hours per week in most workweeks.

30. When Plaintiffs worked in excess of 40 hours per workweek, Defendants did not compensate Plaintiffs by paying them an overtime premium of at least one and one-half times their regular rate of pay for all hours worked in a week over 40. Instead, Defendants only paid them "straight" time for hours worked over 40 in a workweek.[1] This includes for workweeks both before January 1, 2015, as well as one or more workweeks after January 1, 2015.[2]

---

[1] For example, for the pay period from September 27, 2016 to October 10, 2016, Plaintiff Carmack's pay statement reflects that she worked a total of 144.00 hours, earned $12.00 per hour, and received gross pay of $1,728.00. Defendants paid her no overtime premium for hours worked over 40 in a workweek.

[2] In either late November 2016 or December 2017, Defendants began paying hourly employee "time and one-half" for all hours worked over 40 in a workweek except, before doing so, Defendants required employees to substantially reduce their hourly rates of pay so that, when they did work over 40 hours in a week under Defendants' new pay scheme and received "time-and-a-half," they effectively would receive the same amount of gross pay as before when they did not receive an overtime premium. Employees like

Case 3:16-cv-03500-D Document 34 Filed 12/05/17 Page 8 of 13 PageID 217

31. As a result, Plaintiffs were not paid all overtime compensation to which they were entitled under the FLSA for hours worked over 40 in a workweek.

32. Defendants' actions in violation of the FLSA's overtime requirements were "willful." Defendant Westen admitted to at least one employee that Defendant Park Cities is required to pay "time and a half" after 40 hours in a workweek but stated that she cannot afford to pay overtime. On another occasion, Defendant Westen notified an employee that Defendant Park Cities is not required to pay employees overtime compensation because they are "contract labor."

33. After Plaintiffs brought this action, Defendants retaliated against Plaintiffs Carmack and Aniagu and continue to retaliate against them. Defendants asserted, and Defendant Park Cities maintains, a state court action against Carmack and Aniagu, alleging violations of the nondisclosure and noncompetition provisions of their employment agreement.

34. Only there is no factual or legal basis for Defendant Park Cities' state court claims against Plaintiffs Carmack or Aniagu. Neither Carmack, nor Aniagu, has solicited any client to leave Defendant Park Cities, nor has either used or disclosed Defendant Park Cities' confidential information.

35. In fact, on Friday, October 20, 2017, Defendant Westen testified under oath during her deposition that—when Defendant Park Cities filed its state court lawsuit—she had no information that either Carmack or Aniagu had violated their employment agreements with Defendant Park Cities.

36. Not only is Defendant Westen the founder and president of Defendant Park

---

Plaintiff Carmack and Plaintiff Aniagu who declined to accept a lower hourly rate were restricted to working only 36 hours per workweek.

Case 3:16-cv-03500-D Document 34 Filed 12/05/17 Page 9 of 13 PageID 218

Cities, she also is its only officer and member of management. And, therefore, Defendant Westin is the only agent or representative of Defendant Park Cities to provide information to Defendant Park Cities' counsel in connection with the state court lawsuit.

## VII. CAUSE OF ACTION: FAILURE TO PAY WAGES IN ACCORDANCE WITH THE FAIR LABOR STANDARDS ACT

37. Plaintiffs incorporate the preceding paragraphs as if stated fully herein.

38. Defendants have violated Section 7 of the FLSA, 29 U.S.C. § 207, and § 215(a)(2), by employing employees covered by the FLSA for workweeks longer than 40 hours without compensating such employees for their work in excess of 40 hours per week at a rate no less than one-and-one-half times the regular rate for which they were/are employed.

39. No exemption to the FLSA's mandatory overtime provisions apply to Plaintiffs' employment. The so-called "companionship services" exemption, 29 U.S.C. § 213(a)(15) does not apply to Plaintiffs. This is so for three (3) main reasons.

40. Effective January 1, 2015, regulations went into effect prohibiting third-party employers from applying the "companionship services" exemption to domestic service employees. *See* 29 C.F.R. § 552.109(a) ("Third party employers of employees engaged in companionship services … may not avail themselves of the minimum wage and overtime exemption provided by section 13(a)(15) of the Act").

41. Defendants are third-party employers of employees engaged in companionship-type services.

42. Even if Defendants were not a third-party employer, the "companionship services" exemption does not apply where the employee performs medically related services. *See* 29 C.F.R. § 552.6(d).

Case 3:16-cv-03500-D Document 34 Filed 12/05/17 Page 10 of 13 PageID 219

43. Further, both for the period before and after January, 1, 2015, the "companionship services" exemption does not apply where the amount of time spent per week on the provision of care (e.g., assisting the person with activities of daily living such as dressing, grooming, feeding, bathing, toileting, and transferring), and instrumental activities of daily living, which are tasks that enable a person to live independently at home (such as meal preparation, driving, light housework, managing finances, assistance with the physical taking of medications, and arranging medical care) exceeds 20 percent. *See* 29 C.F.R. § 552.6(b).

44. Defendants have acted willfully in failing to pay Plaintiffs in accordance with the FLSA.

**VIII. CAUSE OF ACTION:**
**RETALIATION IN VIOLATION OF THE FAIR LABOR STANDARDS ACT**
**(on behalf of Plaintiff Carmack and Plaintiff Aniagu only)**

45. Plaintiffs incorporate the preceding paragraphs as if stated fully herein.

46. Plaintiffs Carmack and Aniagu engaged in protected activity when they filed this action seeking to recover overtime pay under the FLSA from Defendants.

47. Defendants violated the provisions of 29 U.S.C. § 215(a)(3) by terminating Plaintiff Carmack's employment, filing and maintaining the state court action against Carmack and Aniagu, and otherwise discriminating against them because they instituted or caused to be instituted a proceeding under or related to the FLSA, or have testified or are about to testify in any such proceeding. Plaintiff Carmack has suffered damages as a result of Defendants' violations of 29 U.S.C. § 215(a)(3), including without limitation, lost or diminished wages and attorney fees. Plaintiff Aniagu has suffered damages as a result of Defendants' violations of 29 U.S.C. § 215(a)(3), including without limitation,

attorney fees.

48. Defendants knowingly, willfully, wantonly, and/or with reckless disregard carried out their retaliation against Plaintiffs Carmack and Aniagu in violation of 29 U.S.C. § 215(a)(3).

## VIII. JURY DEMAND

49. Plaintiffs hereby request a trial by jury on all issues appropriate for determination by a jury under the FLSA.

## IX. RELIEF SOUGHT

50. WHEREFORE, cause having been shown, Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

a. For an Order, pursuant to Section 16(b) of the FLSA, finding Defendants liable for unpaid overtime wages due to Plaintiffs Carmack, Miller and Aniagu, and for liquidated damages equal in amount to the unpaid compensation found due to Plaintiffs; and

b. For an Order, pursuant to Section 16(b) of the FLSA, finding Defendants liable to Plaintiffs Carmack and Aniagu for lost wages, attorney fees and expenses incurred defending against the state court action, and other harms and losses due to Defendants' retaliation; and

c. For an Order awarding Plaintiffs Carmack and Aniagu liquidated damages equal in amount to the damages found due to Defendants' retaliation and/or, in the alternative, punitive damages as a result of Defendants' retaliation, as well as any other remedies that may be appropriate to effectuate the purposes of the Act; and

d. For an Order, pursuant to Section 15(a)(3) of the FLSA, enjoining Defendants from taking any action to enforce or secure any of the benefits Defendants obtain or may obtain against Plaintiffs Carmack and/or Aniagu, if any, from the state court action.

e. For an Order awarding Plaintiffs Carmack, Miller, and Aniagu the costs of this action; and

f. For an Order awarding Plaintiffs Carmack, Miller, and Aniagu reasonable attorneys' fees; and

g. For an Order awarding Plaintiffs Carmack, Miller and Aniagu pre-judgment and post-judgment interest, as allowable, at the highest rates allowable by law; and

h. For an Order granting such other and further relief as may be necessary and appropriate.

Respectfully submitted,

Barry S. Hersh
State Bar No. 24001114

*Board Certified in Labor and Employment Law*
*Texas Board of Legal Specialization*

Hersh Law Firm, PC
3626 N. Hall St., Suite 800
Dallas, TX 75219-5133
Tel. (214) 303-1022
Fax (214) 550-8170
barry@hersh-law.com

ATTORNEY FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document is being served on all counsel of record via the District Court's ECF system. Certified on this 27th day of November, 2017.

Michael Donohue
Friedman & Feiger, LLP
5301 Spring Valley Rd., Ste. 200
Dallas, TX 75254
(972) 776-5313 (Fax)
mdonohue@fflawoffice.com

ATTORNEY FOR DEFENDANTS

/s/ Barry S. Hersh