IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLOTTE CARMACK, | § | |
| individually and on behalf of others | § | |
| similarly situated, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | Civil Action No. 3:16-CV-3500-D |
| | § | |
| PARK CITIES HEALTHCARE, LLC, | § | |
| et al., | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

Charlotte Carmack, Teresa Miller, and Jovan Aniagu, plaintiffs and judgment

creditors in this lawsuit (collectively, "plaintiffs"), apply pursuant to Fed. R. Civ. P. 69(a)[1]

for a writ of execution and move for seizure of non-exempt assets held by defendant-

judgment debtor Sharon Westen ("Westen"). At issue are a residence, located in Texas, and

two horses, located in New Hampshire. Without suggesting that plaintiffs can never obtain

any form of post-judgment relief from Westen, the court denies the application and motion

(collectively, "the motion," unless the context otherwise requires) for the reasons that

---

[1] Plaintiffs rely in part on Rule 64(a) as well. But Rule 64(a) provides for prejudgment remedies; Rule 69(a) is the proper rule for *post*-judgment remedies. *See In re 2920 ER, L.L.C.*, 607 Fed. Appx. 349, 354 (5th Cir. 2015) (per curiam) ("The Federal Rules of Civil Procedure set up a dichotomy. Rules 64 and 65 provide for *pre* judgment remedies, and Rule 69 provides for *post* judgment remedies.") (emphasis in original); *3 Kids, Inc. v. Am. Jewel, LLC*, 2019 WL 462781, at *2 (N.D. Tex. Jan. 15, 2019) (Ramirez, J.) ("Rule 64 does not govern the enforcement of judgments after they have been obtained."), *rec. adopted*, 2019 WL 460325 (N.D. Tex. Feb. 6, 2019) (Scholer, J.).

follow.[2]

I

The court will briefly recount the background facts and procedural history and defer a more detailed discussion of the evidence to its analysis of the issues presented.

In August 2018 plaintiffs obtained a judgment against defendants for the principal sum of $32,323.34, liquidated damages in the sum of $32,323.34, post-judgment interest at the rate of $2.44% per annum, and attorney's fees and costs, to be awarded separately. In October 2018 the court awarded attorney's fees in the sum of $103,429.25 and costs, and ordered that they be paid within 30 days.

As of December 16, 2019 the judgment had not been satisfied, and the court granted plaintiffs' motion for turnover relief. The motion concerned rent owed to Westen by tenants living at her Irving, Texas residential property (the "Property"). The order ("Turnover Order") required that Westen turn over "(1) current rent from the property within 14 days of the date of this order; and (2) future rent of property, up to the amount of plaintiffs' judgment plus accrued interest." Dec. 16, 2019 Turnover Order at 1.

As of September 8, 2021, however, the judgment still had not been paid. The

---

[2]Although this memorandum opinion and order focuses on Westen, plaintiffs also seek relief from Park Cities Healthcare, LLC ("Park Cities"), which is also a defendant and judgment debtor. The property that plaintiffs seek, however, is only in Westen's possession or control, and plaintiffs advance no arguments or evidence that shows that Park Cities possesses or controls the property. Because Texas law provides that "[t]he court may order the judgment debtor to turn over nonexempt property that is in the debtor's possession or is subject to the debtor's control," Tex. Civ. Prac. & Rem. Code Ann. § 31.002(a) (West 2016), the court denies the motion to the extent plaintiffs seek relief from Park Cities.

Turnover Order failed to compel Westen to satisfy the judgment because the tenants at the Property do not pay rent directly to Westen but instead pay the mortgage and property taxes on the Property in exchange for a right of possession.  Plaintiffs now apply for a writ of execution and move to seize nonexempt assets to satisfy the judgment.  At issue are the Property, located in Texas, and two horses, located in New Hampshire.  The court is hearing the motion on the papers.  *See* Rule 43(c) ("Evidence on a Motion. When a motion relies on facts outside the record, the court may hear the matter on affidavits or may hear it wholly or partly on oral testimony or on depositions.").

## II

Rule 69(a) provides that "[t]he procedure on execution, in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held." For a judgment for money, a writ of execution is the appropriate vehicle to seize the nonexempt personal or real property of the judgment debtor (here, Westen) that is subject to execution. *See* Tex. Civ. Prac. & Rem. Code Ann. § 31.002(a) (West 2016); Tex. R. Civ. P. 621, 630.

## III

The court considers, first, whether plaintiffs have proved by a preponderance of the evidence that they are entitled to relief as to the Property on the basis that it is nonexempt, i.e., that it is subject to execution.

- 3 -

A

Westen maintains that the Property is exempt from execution because it is her homestead, and that plaintiffs have failed to show that her move to, and new residence in, New Hampshire have changed the homestead status of the Property. Plaintiffs respond that the Property is nonexempt because Westen has abandoned it as her homestead. They rely on evidence of Westen's move to New Hampshire, her rental of the Property, and her social media posts.

B

Westen has the initial burden of establishing the homestead status of the Property. *See In re Perry*, 345 F.3d 303, 311 (5th Cir. 2003) (first citing *Burk Royalty Co. v. Riley*, 475 S.W.2d 566, 568 (Tex. 1972); and then citing *Lifemark Corp. v. Merritt*, 655 S.W.2d 310 (Tex. App. 1983, writ ref'd n.r.e.)). This burden is a "short hurdle." *Id.* A homestead designation is considered *prima facie* evidence of homestead status. *In re Comu*, 542 B.R. 371, 385 n.76 (Bankr. N.D. Tex. 2015); *Wade v. First Nat'l Bank*, 263 S.W. 654, 656 (Tex. Civ. App. 1924, writ dism'd w.o.j.). The claimant of the exemption may also present evidence of both (i) overt acts of homestead usage and (ii) an intent to assert the land as a homestead to establish homestead status. *In re Bradley*, 960 F.2d 502, 507 (5th Cir.1992). "Possession and use of land by one who owns it and who resides upon it makes it the homestead in law and in fact." *Id.* (citation omitted). "[W]hen the claimant actually resides at the property, a court generally does not need to investigate the second prong of 'intention to claim as a homestead' because actually residing on the property is 'the most satisfactory

- 4 -

and convincing evidence of intention.'"  *Comu*, 542 B.R. at 385 (citing *PaineWebber Inc. v. Murray*, 260 B.R. 815, 822-23 (E.D. Tex. 2001)).  If the homestead claimant does not currently reside at the property, however, evidence of prior residence at the home is sufficient.  *See id.*

Westen has satisfied her burden of establishing the Property as her homestead.[3]  She has introduced proof from the websites of the Dallas County Tax Office and the Dallas Central Appraisal District showing that she has claimed a homestead designation on the Property.[4]  She has also adduced evidence that she asserted the designation in 2003 and continued to do so until at least 2020.  Westen has also presented evidence that she is the owner of the Property and that she occupied the Property before July 2018.  The court finds by a preponderance of evidence that Westen has met her initial burden.  *See Settle v. Compass Bank by Tex. State Bank*, 2011 WL 13248861, at *3 (S.D. Tex. Aug. 29, 2011) ("Such evidence of occupancy and a designation as homestead property easily vaults the Settles over the short hurdle that the Fifth Circuit has established as the initial burden of the homestead claimant.") (citing *Perry*, 345 F.3d at 311).

---

[3]Plaintiffs do not dispute that the Property was Westen's homestead at some point. They focus on establishing that Westen has abandoned the Property as her homestead.

[4]These records show the homestead owner as "Quick Sharon Diane," but it is undisputed that this is the same person as Westen.

C

Because Westen has established the Property as her homestead, the burden has shifted

to plaintiffs to prove that Westen has abandoned the Property as her homestead. *See Bradley*,

960 F.2d at 507 (citing *Sullivan v. Barnett*, 471 S.W.2d 39, 43 (Tex. 1971)).  In Texas,

"homesteads are favorites of the law," and courts are directed to apply homestead protections

liberally. *Id.*[5]  Termination of a homestead can only occur through death, abandonment, or

alienation. *Perry*, 345 F.3d at 310.  "Abandonment requires cessation or discontinuance of

the use of the property coupled with intent to abandon permanently the homestead." *Id*. at

310 n.8.  Proof of abandonment is a high bar—it generally requires evidence "undeniably

clear and beyond almost the shadow, at least all reasonable ground of dispute, that there has

_____

[5]As this court has explained:

> Texas laws protecting the homestead are expansive and deeply
> rooted.  Homestead rights have long been zealously guarded,
> and they trace back to Texas' days as a republic, prior to
> admission into the Union.  They are not only based upon a
> tender regard for the welfare of the citizen, but have for their
> object the stability and welfare of the state.  The homestead
> exemption was founded on principles of soundest policy.... Its
> design was not only to protect citizens and their families from
> destitution, but also cherish and support in bosoms of
> individuals, those feelings of sublime independence which are
> so essential to maintenance of free institutions. . . .  The
> universal rule of construction is that the Texas homestead law is
> to be liberally construed to accomplish its objectives.
> Homestead protections will not be lightly disturbed.

*In re Davis*, 188 B.R. 544, 549 (N.D. Tex. 1995) (Fitzwater, J.) (first ellipsis in original)
(second ellipsis added) (citations and internal quotation marks omitted), *aff'd*, 170 F.3d 475
(5th Cir. 1999) (en banc).

been a total abandonment with an intention not to return and claim the exemption." *Drake Interiors, L.L.C. v. Thomas*, 433 S.W.3d 841, 848 (Tex. App. 2014, pet. denied) (quoting *Gouhenant v. Cockrell*, 20 Tex. 96, 98 (1857)); *see also Gulf Production Co. v. Continental Oil Co.*, 132 S.W.2d 553, 557 (Tex. 1939).

Abandonment is a question of fact. *See Gilmore v. Dennison*, 115 S.W.2d 902, 902 (1938) (homestead question is fact issue). To establish abandonment, courts consider a variety of factors. *See Robinson v. McGuire*, 203 S.W. 415, 417 (Tex. Civ. App. 1918, no writ) (considering defendant's move to new state with new home); *Kendall Builders, Inc. v. Chesson*, 149 S.W.3d 796, 809-10 (Tex. App. 2004, pet. denied) (considering where defendant voted, registered his car, had a driver license, employment, and a joint bank account); *Hinton v. Uvalde Paving Co.*, 77 S.W.2d 733, 735-36 (Tex. Civ. App. 1934, writ ref'd) (considering that original homestead was rented, defendant resided in second home, and whether there was evidence showing an intent to return to original homestead). These factors must establish that there has "been a discontinuance of use of the old home coupled with an intention not to return and use it as a homestead." *Comu*, 542 B.R. at 386.

Courts do not consider any of these factors to be dispositive. A move to another home, even out of state, is alone insufficient to show intent to abandon the homestead. *See Robinson*, 203 S.W. at 417 ("We are unable to perceive why the crossing of a governmental boundary line, whether it be county, state, or national, and the acquisition of a home there, should be given conclusive effect in determining the question of abandonment of a homestead right."). Temporarily renting of the property is also alone insufficient. *See* Tex.

- 7 -

Const. art. XVI, § 51 ("[A]ny temporary renting of the homestead shall not change the character of the same.").[6]

In their effort to show Westen's intention to abandon the Property as her homestead, plaintiffs rely the following evidence.[7]  Westen has moved to, and currently resides in, New Hampshire.  Westen has changed her vehicle registration and mailing address for her mortgage bills to a New Hampshire address.  Westen began leasing the Property to renters on December 15, 2018.  At the expiration of the original lease, the renters refused to enter a new lease.  Westen and the renters entered an agreement, however, where the renters would remain on the Property and pay Westen's mortgage payments and property taxes. Finally, Westen has made comments on social media that plaintiffs maintain are probative of an intent

--------

[6]The Fifth Circuit has established a test to determine whether a lease is permanent or temporary. *See Perry*, 345 F.3d at 319.  The test is applied in two steps.  First, the court asks "whether, and if so, over what portions of property, [the claimant] released possession and control."  *In re Pearson*, 570 B.R. 237, 243 (Bankr. N.D. Tex. 2017) (alteration in original) (quoting *Perry*, 345 F.3d at 319).  Second, the court determines whether "the owner intends to never resume control over the property at any point in the future."  *Id.*  Plaintiffs' theory is not that the lease is a permanent one, but that the rental of the Property, together with the other evidence, show an intent to abandon.  The court therefore does not apply this test.

[7]In one of plaintiffs' replies, they point to the *lack* of evidence that Westen has provided.  They assert that Westen has failed to prove that she notified the Dallas County Central Appraisal District that she had temporarily moved away from her homestead.  But because plaintiffs bear the burden of proving abandonment, the court places little significance on Westen's lack of evidence.  *See Union Square Fed. Credit Union v. Clay*, 2009 WL 1099434, at *8 (Tex. App. Apr. 23, 2009, no pet.) (mem. op.) ("[Claimant] did not have to put on evidence of any kind that he intended to return to the property; rather, Appellants had to prove that he discontinued use of [homestead] with the intent to permanently do so.").

- 8 -

to abandon.[8]  These include comments such as "my husband, bless him, bought this farm so I could finally have my horses at home."  ECF No. 129 at 2.  She has also stated that she "le[ft] . . . Dallas for [her] next great adventure."  ECF No. 129-2 at 2.  And that she "live[s] in New Hampshire where [she doesn't] have bible thumpers trying to control her life."  *Id.*[9]

Plaintiffs contend that, considered together, these facts show an intent to abandon the Property as her homestead.[10]  In support, they point to *Kendall Builders* and *Hinton*, where courts found evidence sufficient to show abandonment.  These cases do bear similarities to the facts at issue in this case.  In *Kendall Builders*, for example, the claimant moved to Austin to work and reside while his family remained in California.  *Kendall Builders*, 149

---

[8]The court declines to consider the conclusions in the affidavit of Larry Gingold ("Gingold").  Based on his reading of the social media posts, Gingold opines that Westen "intended to permanently abandon her homestead interest," ECF No. 129-1 at 2, ¶ 4, and her move "is a permanent move," *id.* at ¶ 3.  This opinion is not admissible expert testimony under Fed. R. Evid. 702 or lay opinion testimony under Fed. R. Evid. 701.

[9]There is no evidence that Westen has voted in New Hampshire.  In one of Westen's responses, she says that "Plaintiffs' allege that Westen registered to vote in New Hampshire."  ECF No. 124 at 8.  Plaintiffs point to this statement in their reply as an admission that Westen voted in New Hampshire.  But because Westen stated that plaintiffs *allege* that she registered to vote, the court does not agree that this is an admission of that fact.

[10]Plaintiffs also appear to suggest that Westen enjoys homestead protection on her home in New Hampshire by statute under New Hampshire law.  Plaintiffs argue that this defeats Westen's exemption; plaintiffs cite cases where courts have held that "no one can have two residence homesteads at the same time."  *Robinson*, 203 S.W. at 417.  Westen responds that her husband's actions cannot involuntarily divest her of her homestead interest.
As the *Robinson* court makes clear, however, it is that one does not acquire a second homestead passively, by operation of law, but intentionally.  *See id.* ("[I]f it be shown that the newly acquired home was acquired or used with the *intention of making it a homestead* . . . the former homestead right will be lost, because no one can have two residence homesteads at the same time.") (emphasis added).  Accordingly, the inquiry into whether the facts show an intent to abandon is still necessary.

S.W.3d at 800-01, 809.  The claimant and his wife both registered to vote in Austin, obtained Texas driver licenses, moved and registered their car in Texas, and opened a joint bank account in Austin.  *Id.* at 809.  The court held that this evidence was sufficient to support a finding of abandonment of the California property as their homestead.  *Id.*

Similarly, in *Hinton* a couple moved from their first home to a second home nearby. *Hinton,* 77 S.W.2d at 735.  They then rented the first home and took out a loan secured by a mortgage on that home.  *Id.*  They did not return to reside at the first home in the intervening years.  *Id.*  The court held that the trial court did not err by finding that the second home, not the first, was the couple's homestead because the couple evidenced an intent to abandon the first home as their homestead.  *Id.* at 736.

Unlike in *Kendall Builders* and *Hinton*, in the instant case there is no evidence of a change of licenses, registering to vote, or opening a joint bank account in New Hampshire. Nor is there evidence that Westen took out another mortgage on the Property after moving to New Hampshire.  *See Union Square Fed. Credit Union v. Clay*, 2009 WL 1099434, at *8 (Tex. App. Apr. 23, 2009, no pet.) (mem. op.) (highlighting evidence of taking out mortgage on homestead as significant in finding intent to abandon); *Hinton*, 77 S.W.2d at 736 (stating that if parties did not intend to abandon their former home as a homestead, "the continuity of this intention" was broken by their mortgage of the property to secure a loan, "for it will not be assumed that they would be parties to the void, illegal, and futile act of mortgaging their home-stead").  These are important facts tending to show a permanent intent to abandon, and they are not present here.

The court finds that the evidence plaintiffs have presented fails to satisfy their burden because it does not necessarily show a *permanent* intent to abandon the Property and never return.  For example, the change of address for the purposes of mortgage payments and registering a vehicle in New Hampshire is consistent with a temporary move, not conclusive evidence of an intent never to return to Texas (and, in particular, the Property).  Similarly, Westen's social media comments, such as her desire for another adventure outside of Dallas, may not suggest an intent *never* to return.  And although the Property is being rented under an arrangement where the tenant pays the mortgage and property taxes (giving the appearance of a permanent lease), plaintiffs have not introduced sufficient evidence for the court to find that the lease is one that Westen can never terminate and then resume use of the Property.  In fact, Westen's decision not to sell the Property and her continued asserting of the homestead exemption since leaving Dallas, while indicative of an intent to shield herself from creditors, are also probative of an intent to return to using the Property someday. Plaintiffs' failure in these circumstances to prove abandonment does not stem so much from a failure to establish Westen's desire to leave Dallas as from a failure to prove  "beyond almost the shadow, at least all reasonable ground of dispute" her intent to make the New Hampshire home her homestead and *never* return to using the Property.

Two cases—*Robinson* and *Clay*—are more similar to the instant case and involve facts that are consistent with an intent to temporarily, rather than permanently, abandon the homestead.  In *Robinson* the claimant moved to Missouri.  *Robinson*, 203 S.W. at 417.  But the court found that the claimant had only gone to Missouri for treatment for a disease.  *Id.*

- 11 -

And the remaining evidence, which showed that the defendant had lived for some time in Missouri, did not necessarily suggest a permanent move. *Id.* The court suggested, however, that if there was evidence that the claimant was made a citizen of Missouri or changed his domicile for good—facts consistent with a permanent move—"the verdict would have been in [the plaintiff's] favor." *Id.*

Likewise, in *Clay* the evidence showed that the claimants had moved to a second property and had let their homestead tax exemption lapse. *Clay*, 2009 WL 1099434, at *8. The evidence also showed that the claimants did not rent or sell the property. *Id.* at *9. And they stated credibly that they did not intend to assert the new residence as a homestead. *Id.* The court found that the evidence did not establish abandonment. *Id.*

The court acknowledges that the abandonment question is a close one. Westen's conduct certainly bears a patina of chicanery. But the standard of proof that plaintiffs must satisfy is quite high—"beyond almost the shadow"—precisely because it gives force to the strong Texas policy in favor of protecting homesteads. *See In re Mitchell*, 132 B.R. 553, 557 (Bankr. W.D. Tex. 1991) ("A liberal construction must be given to effectuate the purpose of the Constitution to protect the homestead rights of families."); *see supra* note 5 (discussing Texas policy favoring homestead protections). And plaintiffs' evidence in essence establishes only a move to New Hampshire; changes of residence, vehicle registration, and mortgage bill address; and social media posts tending to show a desire to leave Dallas. But this evidence is not sufficient for plaintiffs to prove under the high standard that Westen

- 12 -

intended to *permanently* abandon the Property and never return to use it as her homestead.[11]

IV

The court considers, second, whether plaintiffs have proved by a preponderance of the evidence that they are entitled to relief as to the two horses because they are nonexempt, i.e., that they are subject to execution.

A

Plaintiffs first contend that New Hampshire law applies because New Hampshire has a dominant interest in determining whether the property is exempt. They maintain that New Hampshire law does not exempt the horses as personal property because they are not being used as farm animals. Westen responds that New Hampshire law does not control because Texas has the dominant interest. Alternatively, Westen contends that this court lacks the power to issue a writ of execution for property located in New Hampshire.

B

The court will begin by addressing Westen's alternative argument that the court lacks the authority to issue a writ of execution for horses located in New Hampshire because Texas law does not permit a court to issue a writ of execution extraterritorially. If the court in fact lacks such authority, it does not matter whether under New Hampshire law the horses qualify as exempt personal property.

---

[11]Because the court concludes that plaintiffs have failed to meet their burden, it need not reach Westen's contention that she cannot abandon her homestead without her spouse's consent and that plaintiffs have failed to show that she abandoned the homestead with his consent.

Rule 69(a) permits this court to issue a writ of execution only insofar as permitted by federal or Texas law. *See GM Gold & Diamonds LP v. Fabrege Co.*, 489 F.Supp.2d 725, 726 (S.D. Tex. 2007) ("[T]he court [sitting in Texas] must analyze federal and state laws to determine whether it can exercise jurisdiction over personal property situated in New York."). Texas statutes and rules do not address extraterritoriality. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 31.002(a), 34.001-.076 (West 2016); Tex. R. Civ. P. 621, 630. Tex. R. Civ. P. 622, however, states that the writ is to be addressed to "any sheriff or any constable within the State of Texas," suggesting a territorial reach. But the statutes and rules are not conclusive. And the court has not found, nor have plaintiffs cited, any cases that discuss the territorial reach of a writ of execution in Texas. But the case law suggests that Texas courts are constrained by territorial limits when taking such remedial measures. *See Licea v. Curacao Drydock Co.*, 952 F.3d 207, 215 (5th Cir. 2015) ("Texas allows attachment or garnishment only of a debt whose situs is within the jurisdiction of the court.").

*GM Gold & Diamonds* is instructive in addressing this question. There the Southern District of Texas analyzed whether it could exercise jurisdiction under Texas law via a writ of attachment over personal property located in New York. *GM Gold & Diamonds*, 489 F.Supp.2d at 726. The court began by noting that an attachment proceeding is essentially an action *in rem* because it results in constructive control of the property itself. *Id.* at 727. It observed that *in rem* jurisdiction traditionally extends only to property within the state's borders. *Id.* The court noted next that every court to address the issue had found that the writ could not reach beyond the limits of the state. *Id.* at 727 n.1 (collecting cases). Looking

- 14 -

specifically to Texas, the court noted that Texas courts had only alluded to the extraterritoriality issue in the context of writs of attachment, but not addressed it head on. *Id.* at 728. For the Texas courts that had addressed the issue, it noted that these courts had suggested that Texas attachment statutes would not apply extraterritorially. *Id.* (first citing *Garland v. Shepherd*, 445 S.W.2d 602, 606 (Tex. Civ. App. 1969, no writ); and then citing *Bruyere v. Liberty Nat'l Bank of Waco*, 262 S.W. 844, 846 (Tex. Civ. App. 1924, no writ)). In fact, a Texas appellate court had stated:

> The clerk would have no authority to issue such writ [of attachment] to any officer outside of the state, nor would any officer outside of the state have authority to execute such writ, even if directed to him. Generally speaking, statutes of a state have no extraterritorial force, and a writ, the creature of them, can rise no higher.

*Id.* (alteration in original) (quoting *Bruyere*, 262 S.W. at 846).

Although *GM Gold & Diamonds* addresses writs of *attachment*, the court finds the case to be instructive as applied to writs of *execution*. The opinion relies on a background principle that *in rem* actions do not extend beyond state borders. *Id.* at 727. And attachment proceedings are essentially *in rem* actions because they result in control of the property. *Id.* This logic applies as well to writs of execution. Much like writs of attachment, writs of execution "result in actual or constructive control over the res itself, rather than simply adjudicating personal rights to the subject property," meaning they are also essentially *in rem* actions (which, again, do not generally apply beyond a state's borders). *Id.*

*GM Gold & Diamonds* points out that courts outside Texas have refused to issue

- 15 -

attachment writs for property located outside the state in which they sit.  *Id.* at 727; *see, e.g.,* *Cutting Edge Techs., Inc. v. Nosyuiaido*, 2012 WL 1327969, at *3 (D. Md. Apr. 17, 2012) (applying *GM Gold & Diamonds*'s logic to writs of execution); *Palestine Monetary Auth. v. Strachman*, 837 N.Y.S.2d 828, 838 (Sup. Ct. 2007) ("[T]here is no statutory authority under New York law to require ... a financial intermediary, to transfer property from outside [New York's] jurisdiction") (alterations in original) (citation omitted), *rev'd*, 873 N.Y.S.2d 281 (2009); 33 C.J.S. *Executions* § 78 ("Unless authorized by statute, execution may not ordinarily go beyond the territorial jurisdiction of the particular court which rendered the judgment.").[12]  The court is persuaded by the reasoning of *GM Gold & Diamonds* that Texas would not authorize the issuance of a writ of execution for property located outside the state.

As in *GM Gold & Diamonds*, it appears the plaintiffs have failed in any of their briefs to respond to Westen's argument that the court lacks jurisdiction to issue a writ of execution for the horses.  This absence is "[p]erhaps telling[]."  *GM Gold & Diamonds*, 489 F.Supp.2d at 728 ("Perhaps tellingly, plaintiff never addressed these substantive issues of Texas law in its argument that this court has jurisdiction over the merchandise in New York.").

Accordingly, because the court lacks authority to issue a writ of execution for horses located in New Hampshire, it denies the motion to the extent it seeks such relief.

_____

[12]*GM Gold & Diamonds*'s analysis of Texas law also extends beyond writs of attachment, looking generally to Texas law on writs.  *See GM Gold & Diamonds*, 489 F.Supp.2d at 728 (citing *Garland*, 445 S.W.2d at 606 (writ of injunction)).

*   *   *

Accordingly, for the reasons explained, the court denies plaintiffs' February 25, 2021 application for writ of execution and motion for seizure of non-exempt assets.

**SO ORDERED**.

September 10, 2021.


_____
SIDNEY A. FITZWATER
SENIOR JUDGE

- 17 -